**JOHN L. BURRIS, Esq., SBN 69888**
**ADANTE D. POINTER, Esq. SBN 236229**
**MELISSA C. NOLD, ESQ. SBN 301378**
**PATRICK M. BUELNA, Esq. SBN 317043**
**LAW OFFICES OF JOHN L. BURRIS**
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone:      (510) 839-5200
Facsimile:       (510) 839-3882
John.Burris@johnburrislaw.com
Adante.Pointer@johnburrislaw.com
Melissa.Nold@johnburrislaw.com
Patrick.Buelna@johnburrislaw.com


Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROY NELSON III, successor-in-Interest to Decedent ROY NELSON; ORNELL STEVENS, individually,<br><br>                    Plaintiffs,<br>v.<br><br>CITY OF HAYWARD, a municipal corporation; and DOES 1-50, inclusive, individually and in their official capacity as police officers for the City of Hayward<br><br>                    Defendants. | Case No.: 3:16-cv-7222-SK<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY AJUDICATION AGAINST DEFENDANTS**<br><br>Date:   February 25, 2019<br>Time:   9:30 A.M.<br>Ctrm:   Courtroom C—15th Floor<br>            San Francisco Courthouse<br><br>**U.S. MAGISTRATE JUDGE**<br><br>**HONORABLE SALLIE KIM** |

**PLAINTIFF'S NOTICE OF MOTION FOR PARTIAL SUMMARY ADJUCATIONS
AGAINST DEFENDANTS**

    **PLEASE TAKE NOTICE** that on February 25, 2019 at 9:30 A.M., or as soon as this matter may be heard by U.S. District Court Magistrate Judge Sallie Kim, in the United State District Court, Northern District, San Francisco Courthouse, 450 Golden Gate Avenue, Courtroom C, 15th Floor, San Francisco, California, Plaintiffs Roy Nelson III and Orenell Stevens will move for an order of partial adjudication for Plaintiffs' Wrongful Death Negligence, Excessive Force and Title II ADA Claim pursuant to Federal Rules of Civil Procedure 56.

# TABLE OF CONTENTS

I.      INTRODUCTION                                                                    1

II.     FACTUAL HISTORY                                                            2

        A.  Defendant Officers' WRAP Device Training

        B.  Defendant Shannon's Body Worn Camera

        C.  Defendant Hall's Body Worn Camera

        D.  Defendant McCrea's Body Worn Camera

        E.  Defendant Padavana's Body Worn Camera

III.    LEGAL ANALYSIS                                                               9

        A.  THE COURT SHOULD GRANT SUMMARY JUDGMENT ON PLAINTIFFS'     12
            EXCESSIVE FORCE CAUSE OF ACTION BECAUSE A REASONABLY MUST
            FIND THAT DEFENDANT OFFICERS USED EXCESSIVE FORCE AGAINST
            DECEDENT ROY NELSON II

                1. Legal Analysis for Excessive Force Claims
                2. Qualified Immunity Is Not Appropriate

        B.  THE COURT SHOULD GRANT SUMMARY JUDGMENT                 19
            ON WRONGFUL DEATH BECAUSE A REASONABLE
            JURY MUST FIND THAT DEFENDANT OFFICERS MADE
            AN OVERWHELMING NUMBER OF NEGLIGENT
            DECISIONS AND USED UNREASONABLE FORCE
            AGAINST DECEDENT ROY NELSON II

        C.  THE COURT SHOULD GRANT SUMMARY JUDGMENT                 21
            ON PLAINTIFF'S TITLE II ADA CLAIM BECAUSE A
            REASONABLE JURY MUST FIND THAT DEFENDANT
            OFFIERS FAILED TO PROVIDE MR. NELSON
            REASONABLE ACCOMMODATIONS FOR HIS
            DISABILITY OF SCHIZOPHRENIA AND
            SCHIZOPHRENIA

IV.     CONCLUSION                                                                   25

TABLE OF AUTHORITIES

*Anderson v. Liberty Lobby, Inc.*,

    447 U.S. 242, 248 (1986)………………………….………………….9

*Celotex Corp. v. Catrett*,

    477 U.S. 317, 323 (1986)……………………………...………11

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*,

    210 F.3d 1099, 1102 (9th Cir. 2000)…………………………11

*Keenan v. Allan*,

    91 F.3d 1275, 1279 (9th Cir. 1996) …………………………11

*Nelson v. City of Davis*,

    571 F.3d 924, 928-929 (9th Cir. 2009) …………………………11

*Sankovich v. Life Ins. Co. of N. Am.*,

    638 F.2d 136, 140 (9th Cir. 1981)…………………………12

*O.S.C. Corp. v. Apple Computer, Inc.*,

    792 F.2d 1464, 1466-1467 (9th Cir. 1986) …………………...12

*Barnes v. Arden Mayfair, Inc.*,

    759 F.2d 676, 681 (9th Cir. 1985) …………………………...12

*Graham v. Connor*,

    490 U.S. 386, 397 (1989) …………………………………12-13

*Tennessee v. Garner*,

    471 U.S. 1, 8 (1985) …………………………………12

*Glenn v. Washington Cnty.*,

    673 F.3d 864, 871 (9th Cir. 2011) …………………………...13

*Espinosa v. City & Cnty. of S.F.,*

    598 F.3d 528, 532 (9th Cir. 2010)…………………………………13

*Santos v. Gates,*

    287 F.3d at 853…………………………………………………13

*Deorle v. Rutherford,*

    272 F.3d 1272, 1282-83 (2001) …………………………………...13

*Bryan v. MacPherson,*

    *630 F.3d 805, 826 (9th Cir. 2010)* …………………………………..13

 *Franklin v. Foxworth,*

    31 F.3d 873, 876 (9th Cir. 1994) …………………………………13

*Miller v. Clark Cnty.,*

    340 F.3d 959, 964 (9th Cir. 2003) …………………………………13

*Munoz v. Olin,*

    24 Cal.3d 629, 634 (1979)…………………………………………19

*Drummond v. City of Anaheim,*

    343 F.3d 1052 (9th Cir. 2003) …………………………………15-17

*Pearson v. Callahan,*

    555 U.S. 223, 231 (2009) …………………………………………18

*Morales v. Fry,*

    2017 WL 4582732 (9th Cir. 2017) …………………………….…18

*Hayes v. County of San Diego,*

    57 Cal.4 th (2013) …………………………………………………19

*Quiroz v. Seventh Ave. Center,*

v

140 Cal.App.4th 1256, 1264 (2006) ……………………………19

*Grudt v. City of Los Angeles,*

2 Cal.3d 575, 587 (1970) ……………………………………19

*Brown v. Ransweiler,*

171 Cal.App.4th 516, 526, fn.10 (2009) ………………………19

*Young Han v City of Folsom,*

695 Fed.Appx. 197, 198 (9th Cir. 2017) ………………………20

*Sheehan v. CCSF,*

743 F.3d 1211, 1232 (9th Cir. 2014) …………………………21-23

*Waller ex rel. Estate of Hunt v. Danville,*

556 F.3d 171, 174 (4th Cir. 2009) ……………………………21-23

*Gohier v. Enright,*

186 F.3d 1216, 1220–21 (10th Cir. 1999) ……………………21-23

*Vinson v. Thomas,*

288 F.3d 1145, 1154 (9th Cir.2002) …………………………22

*Zukle v. Regents of Univ. of Cal.,*

166 F.3d 1041, 1047 (9th Cir.1999) …………………………22

*EEOC v. UPS Supply Chain Solutions,*

620 F.3d 1103, 1110 (9th Cir.2010) …………………………22

O'Guinn v. Lovelock Corr. Ctr.,

502 F.3d 1056, 1060 (9th Cir.2007) …………………………24

*Ferguson v. City of Phoenix,*

157 F.3d 668, 674 (9th Cir. 1998) ……………………………24

*Duvall v. County of Kitsap*,

    250 F.3d 1124 (9th Cir. 2001) …………………………………..24


RULES & STATUTES

    Federal Rule of Civil Procedure 56……………………………...11

    C.F.R. § 35.130(b)(7) …………………………………………19

    Cal. Gov. Code § 820………………………………..………...19

    Cal. Gov. Code § 815.2………………………...………...19

# I.      INTRODUCTION

Three years ago, Defendant Officers received a call for a 5150 mental health detention for Roy Nelson, II from his ex-wife. On arrival, Defendant Officers learned that Mr. Nelson had been recently released from the psychiatric hospital for issues in relation to his mental health disability and was currently suffering paranoia and hallucinations due to his schizophrenia.

In the hours that followed, Mr. Nelson cooperated with officers voluntarily getting into the patrol car in order to be transported back to the psychiatric hospital for further treatment. The officers did not even handcuff Mr. Nelson, who was compliant and non-aggressive, when they put him in the car. However, ambulances were delayed and Mr. Nelson became restless, began hallucinating, kicked the patrol car doors and complained for officers to let him out. Defendant Officers transported Mr. Nelson to a parking lot and decided to place Mr. Nelson in a WRAP device to keep him from kicking inside the police car.

In video footage that is heart wrenching to watch Defendant Officers' body worn camera captured the following: Defendant officers directed a scared but compliant Mr. Nelson to the ground; Mr. Nelson laid down on the ground; Defendant Officers Hall and Shannon climbed onto Mr. Nelson's back; Mr. Nelson complained he could not breathe; Defendants handcuffed and continued to compress Mr. Nelson with their knees in his back; then ignored his grunts and muffled gasps; Mr. Nelson turned briefly on his side and bent his knee in order to breathe; Defendant Offices rolled him back onto his stomach and pressed their knees into his back again; after Defendants finished putting on the ankle strap, Defendant Officers noticed Mr. Nelson became unconscious, was not breathing and was motionless; Defendant Shannon called for an ambulance because Mr. Nelson was unconscious but made a deliberate decision to not roll Mr. Nelson onto his side or sit him up in a recovery position (as trained); instead, Defendant Shannon instructed Defendants to continue put on the leg straps even though Mr. Nelson's ankles and hands were already bound: Defendants continued

1

to fiddle with the legs straps with Mr. Nelson face down on the ground and Defendant Officers continuing to apply pressure to Mr. Nelson's back; finally, Defendant Officers finished putting the leg strap and flipped Mr. Nelson over, but he was dead.

Plaintiffs move for summary adjudication on their Excessive Force, Wrongful Death – Negligence and Title II ADA claims against Defendants.

## II.    FACTUAL HISTORY

On December 19, 2015, at approximately 1:30 A.M., Ms. Patsy Nelson Taft called 9-1-1 to summon medical care to her house at 29291 Ironwood Court, Hayward, CA for Decedent Roy Nelson II who was experiencing a mental health crisis due to his schizophrenia. Mr. Nelson had recently been released from John George Psychiatric Facility. Deposition of Defendant Michelle Hall "Hall Depo" attached as **Exhibit 1**, pages 38-39. Earlier in the day, Mr. Nelson had taken a taxi to Ms. Taft's house, his ex-wife, and she allowed Mr. Nelson to stay overnight on the couch. Hall Depo, 38-39.  Ms. Taft awoke when Mr. Nelson began shouting that someone had kidnapped his son, Roy Nelson III, and saying that there were people on the roof. Hall Depo, 23; 38-39. Ms. Taft recognized that Mr. Nelson II was suffered from his disability of paranoid schizophrenia and called 9-1-1. Hall Depo, 22.

Officers were dispatched to a family disturbance and a request for a mental health detainment (5150). Hall Depo, 16. Hayward Police Officer Lloyd McKee was the first to arrive and spoke with Ms. Patsy Taft who told him that Mr. Nelson was suffering hallucinations and paranoia as a result of his schizophrenia. Deposition of Defendant Lloyd McKee "McKee Depo" attached as **Exhibit 2**, 23. Ofc. McKee's understanding was that he was there to provide assistance for Mr. Nelson's mental health disorder. McKee Depo, 23. Eventually, Ofc. McKee spoke to Mr. Nelson and asked him to come outside. McKee Depo, 26. Mr. Nelson was compliant and came outside. McKee Depo, 27.

Officer Hall and Officer Shannon approached the house, and Ofc. McKee passed custody of Mr. Nelson to them. McKee Depo, 27. Ofc. McKee continued to speak to Ms. Taft who informed him that she was remarried now but allowed Mr. Nelson to come and stay, now and then – however, his mental illness was keeping everybody awake and she wanted him to get treatment. McKee Depo, 27.

When Ofc. Hall first saw Mr. Nelson she estimated his size to be 6'4" and 300 lbs. Hall Depo, 20. Ofc. Hall was on her fifth month of the probationary period of field training as a new officer for Hayward police at the time of the incident. Hall Depo, 13-14. Her field training officer was with her – Officer Shannon. Hall Depo, 14. Ofc. Hall had responded to approximately five 5150 calls for service prior to this incident. Hall Depo, 21.

Ofc. Hall performed a 5150 evaluation on Mr. Nelson. Hall Depo, 22. Ofc. McKee informed her that Mr. Nelson needed to see a doctor for his schizophrenia and Ms. Taft corroborated insisting he needed to return to John George Psychiatric Facility. Hall Depo, 22. Ofc. Hall spoke with Mr. Nelson and ultimately concluded that Mr. Nelson was gravely disabled and a danger to himself pursuant to Cal. Welf. & Inst. Code Section 5150. Hall Depo, 25.

Mr. Nelson voluntarily walked himself over to Ofc. Hall's patrol car and tried to open the door to get in but it was locked. Hall Depo, 29. Ofc. Hall patted Mr. Nelson down for weapons and did not find any then unlocked the back door for Mr. Nelson to get into the patrol car. Hall Depo, 31-32. Ofc. Hall decided not to handcuff Mr. Nelson because he was non-aggressive and compliant. Hall Depo, 32. The Officers requested an ambulance to transfer Mr. Nelson to the psychiatric facility. Hall Depo, 22. Ms. Taft continued to tell Ofc. Hall that Mr. Nelson had left his medications and clean clothes in the taxi earlier in the day as collateral . Hall Depo, 39. After Mr. Nelson was waiting in the car for some time, he began asking to get out. Hall Depo, 39.

Hayward Police Officers McKee, Shannon, Kawada and Hall waited for approximately thirty minutes for an ambulance to come to the house on Ironwood Court with Mr. Nelson in the backseat of the patrol car. Hall Depo, 41-43. While in the backseat of the car, Mr. Nelson, in a soft voice, begged the officers not to kill him. Hall Depo, 41-42. Ofc. Hall perceived that Mr. Nelson was still hallucinating and calling out for "Petey" – a nickname for his biological son (Plaintiff Roy Nelson, III) who was not present. Hall Depo, 42.

After repeated ambulance delays due to the ambulance being diverted to other calls, Officers decided to transport Mr. Nelson to the parking lot of Chabot University. Hall Depo, 44. Mr. Nelson had begun to kick at the patrol doors and window (which had steel bars) from inside the backseat and asking the officers to let him out. Hall Depo, 45-46; McKee Depo, 51-52. In response, Ofc. McKee arced his taser in a threat of force to warn Mr. Nelson, who was actively hallucinating and calling out for his son that he believed was kidnapped. Hall Depo, 42; McKee Depo, 51-52. Ofc. Shannon had suggested to put him in a WRAP and transport Mr. Nelson themselves to John George Psychiatric Facility rather than wait for an ambulance. Hall Depo, 43. Officers also wanted to remove Mr. Nelson from the front of the home because they believed it was causing him to become more agitated and wanted more space to call additional officers in order to place him in the WRAP device. Hall Depo, 44-45.

Officers drove Mr. Nelson to the Chabot University parking lot in Hayward, CA. Hall Depo, 47. Ofc. McCrea and Ofc. Padavana joined Officers McKee, Hall and Shannon at the Chabot parking lot, because Ofc. McCrea was the on-duty supervisor he had to personally bring the WRAP device to the scene. Deposition of Defendant McCrea "McCrea Depo" attached as **Exhibit 3**, 28-30. Per Hayward Police Department Policy, only a supervisor is permitted to possess a WRAP device and must be present during the application. McCrea Depo, 28-30.

Once the officers arrived at the Chabot parking lot, they learned there was still an extended wait for an ambulance. Hall Depo, 54. Mr. Nelson began to kick at the patrol doors again and Sgt. McCrea ordered for the WRAP device to be applied. Body Worn Camera Footage of Defendant McCrea "McCrea BWC" attached as **Exhibit 4**, at 00:00-4:05. After the incident, Ofc. Hall did not personally notice any damage to the backseat of the patrol car although she read in a police report Mr. Nelson may have scuffed the backseat. Hall Depo, 56.

Officers discussed and Acting-Sergeant Defendant McCrea formulated a plan to have Mr. Nelson place his hands behind his back, scoot his back up against the patrol door, then open the door to handcuff him and have him lay onto the WRAP device to be applied. McCrea Depo, 76. Officers specifically chose one side of the patrol car because it opened up to the parking lot which had space whereas the other side opened up to a hillside in dirt where it would be difficult to apply the WRAP device. McCrea Depo, 76. Officers Padavana, Hall, McCrea and Shannon gathered onto one side of the car prepared to execute the plan when, inexplicably and without telling his colleagues, Ofc. McKee walked to the other side of the car and opened the door to let Mr. Nelson out. McCrea Depo, 76.

In response, Mr. Nelson exited the vehicle compliantly and the rest of the officers rushed around the patrol car barking orders and rookie Ofc. Hall arced her taser and threatened to tase Mr. Nelson. Body Worn Camera Footage from Defendant Michelle Hall "Hall BWC" attached as **Exhibit 5**, at 08:35-08:50. Supervisory Officer McCrea recalled Mr. Nelson being non-aggressive, compliant and was not startled when Mr. Nelson exited the car. McCrea Depo, 81-82; Hall BWC 08:35-08:50. Officers ordered Mr. Nelson around the car and onto his knees then completely on the ground. Hall BWC 08:50-09:15. Mr. Nelson continued to be compliant and said, "Okay, I'll get on the ground" as

he followed officers' orders. Body Worn Camera Footage from Defendant Nathanael Shannon "Shannon BWC" attached as **Exhibit 6**, at 08:20-08:50.

A. <u>**Defendant Officers' WRAP Device Training**</u>

The WRAP device consists of four pieces: (1) the handcuffs; (2) the ankle strap; (3) the leg strap; (4) the chest strap. See WRAP Device Manual attached as **Exhibit 7**. Hayward Police Deparment Officers are trained that placing a person on their stomach, applying pressure to their back, and a person's obesity can contribute to their inability to breathe and result in death (referred to as "positional asphyxia). McKee Depo, 49-51; Ofc. Brandon Wilson Person Most Knowledgeable Regarding Hayward Police Department's Training on the WRAP Device "WRAP PMK Depo" attached as **Exhibit 8**, 16-19; 41-42; WRAP Device Manual. HPD Officers are trained that while using the WRAP device, obese persons left on their stomach may experience difficulty breathing. WRAP PMK, 40-41.

Officers are trained to monitor a person's breath. WRAP PMK, 16-19. If a person expresses respiratory distress officers are trained to roll a person on their side or sit them up to relieve allow them to breathe. WRAP PMK, 16-19.   In fact, the WRAP Restraint is not for de-escalation but intended for persons who are "being uncontrollable and violent." WRAP PMK, 42-43. Furthermore, Defendant Officers were trained that if a person experiences a medical emergency, the officers should stop applying the WRAP and address the medical emergency. McCrea Depo 69-70.

Defendants application of the full body restraint (WRAP Device) was captured on video and three of the Defendants' Body Worn Cameras (BWC) documented the following pivotal moments[1]:

---

[1] Plaintiffs notate the following timestamps so that the jury and the Court can reliably determine the amount of time different actions were taken. For example: when Mr. Nelson was placed on the

### B.  Defendant Shannon's Body Worn Camera

On **Defendant Shannon**'s Body Camera – **at 8:50-9:00**, Mr. Nelson was forced to his stomach and Defendant Hall climbed on Mr. Nelson's back pressing her knee into his back and pressing his head into the concrete (see also Still Photo of Shannon BWC at 08:56 attached as **Exhibit 9); at 9:08**, Nelson said, "I can't breathe"; **at 9:26,** Defendant Shannon finished handcuffing Mr. Nelson and said, "There we go"; at **11:45-12:05**, Defendant Hall informed Defendant Shannon that Mr. Nelson was unconscious and not reacting so Defendant Nelson upgraded the ambulance response to an emergency response at (see also Dispatch Audio 1:18:54-1:19:00 attached as **Exhibit 10**); **at 12:15-12:30,** Defendant Hall informed Defendant Shannon that Mr. Nelson was not breathing and searched for a pulse but the sweatshirt was in the way while officers continued to apply WRAP device; **at 12:40-12:50,** Defendant Shannon instructed officers to continue applying the leg portion of the WRAP device with Mr. Nelson facedown and relayed through an officer (Lt. Jakub call sign "L3") to dispatch that the reason for an emergency response from the ambulance was that Mr. Nelson was "unconscious" (see also Dispatch Audio 1:19:25-1:19:45; Computer Automated Dispatch attached as **Exhibit 11**); **at 13:05-13:15,** Defendant Shannon informed other officers that he could not tell if Mr. Nelson was breathing, one officer recommended rolling Mr. Nelson over, but instead another officer insisted on finishing to apply the leg strap; **at 13:23,** Defendants flipped Mr. Nelson to his back but he was dead; **at 14:40-14:50,** Defendant Hall explained that the sweatshirt got tight on his neck so he "knocked out".

### C.  Defendant Hall's Body Worn Camera

---

ground on his stomach; what actions officers at the legs took; what actions officers at the head took at that same time; how long Mr. Nelson was left on his stomach with officers compressing his back, etc.

7

On **Defendant Hall's** Body Camera – **at 9:09**, Mr. Nelson was forced to his stomach**; at 9:19**, Defendant Hall's pushed Mr. Nelson's head into the concrete and Defendant's knee was pressed over Mr. Nelson's spine and neck; **at 9:26,** Nelson said, "I can't breathe"; **at 9:43**, Defendant Shannon finished handcuffing Mr. Nelson and said, "There we go"; **at 9:49,** Defendant Shannon's knee continued to be pressed across Mr. Nelson's spine and upper back; **at 9:50-10:10**, Mr. Nelson rolled to his side then Defendant rolled him back to his stomach and Defendant Shannon placed his knee across Mr. Nelson's upper back again; **10:15-10:25,** Mr. Nelson made muffled whimpers and "Okay" can be heard as he struggled for breath with Defendant Shannon's knee across his back; **at 11:20-11:30,** Mr. Nelson continued to make muffled whimpers and appeared to be slowly suffocating; **at 11:48-11:52,** Defendant Hall continued to tug on Mr. Nelson's hood and Defendant Shannon continued to compress Mr. Nelson's upper back with his knee; **12:05-12:30**, Defendant Hall informed Defendant Shannon that Mr. Nelson was unconscious and not reacting, Defendant Shannon continued to compress Mr. Nelson's back but finally lifted his knee when he upgraded the ambulance response to an emergency response (see also Dispatch Audio 1:18:54-1:19:00); **at 12:15-12:30,** Defendant Hall informed Defendant Shannon that Mr. Nelson was not breathing and searched for a pulse but the sweatshirt was in the way while officers continued to apply WRAP device; **at 12:30-12:55,** Defendant Hall informed officers that Mr. Nelson was no longer breathing but Defendants continued to apply WRAP restraint and apply pressure; **at 12:55-13:15,** Defendant Shannon instructed officers to continue applying the leg portion of the WRAP device with Mr. Nelson facedown and relayed through an officer (Lt. Jakub call sign "L3") to dispatch that the reason for an emergency response from the ambulance was that Mr. Nelson was "unconscious" (see also Dispatch Audio 1:19:25-1:19:45; See Computer Automated Dispatch); **at 13:30-13:40,** Defendant Hall explained that the sweatshirt was tight on his neck and that he was kicking the patrol

car doors; **at 13:42-13:50,** Defendants flipped Mr. Nelson to his back, blood and spit ooze from his mouth and he is dead.

### D. __Defendant McCrea's Body Worn Camera__

On McCrea's Body Camera, **at 01:50-3:30,** Mr. Nelson asked Defendant McCrea to open the door and Defendant McCrea instructed Mr. Nelson to not kick at the door; **at 3:30-4:30,** Defendant McCrea threatened to take Mr. Nelson out of the car and put him in the full body restraint (WRAP device) if he kicked the car again, which he did so Defendant McCrea decided to put him in the WRAP; **at 4:30-10:15;** Defendant McCrea formulated a plan to put Mr. Nelson in the WRAP device, Defendant McKee let Mr. Nelson out, Defendant Hall arced her taser, Defendant Nelson was directed to his stomach; **at 10:16,** Mr. Nelson was forced to his stomach; **at 10:17-10:32,** Defendant John Padavana crossed and sat on Mr. Nelson's legs (referred to as a "figure 8") then Defendant McCrea instructed him to move; **at 10:33,** Nelson said, "I can't breathe"; **at 10:39,** Defendant Shannon's knee is placed across Mr. Nelson's upper back; **at 10:51,** Defendant Shannon finished handcuffing Mr. Nelson and can be heard saying, "There we go,"; **at 10:58,** Defendant Shannon has his weight lean over Mr. Nelson's back with one knee across Mr. Nelson's upper back and the other knee on Mr. Nelson's lower back with Mr. Nelson visibly handcuffed (See Still Photo of McCrea BWC Frame 10:58 attached as **Exhibit 12**); **at 11:00-11:15,** Mr. Nelson rolled to his side briefly and bent his leg then Defendants rolled him back to his stomach; **at 12:15-12:25,** Mr. Nelson was instructed to straighten his leg and he straightened it; **at 12:45-13:15,** Defendants realized they put the ankle strap backwards; **at 13:15-13:40,** the ankle strap was secured, Defendant McCrea instructed officers to roll Mr. Nelson over, but another officer interjected to finish putting on the leg wrap; **at 13:26,** Defendant Officers still had their knees on Mr. Nelson even compressing his back even though Mr. Nelson is handcuffed and hobbled at the ankles (See Still Photo of McCrea BWC Frame 13:26

attached as **Exhibit 13**); **at 13:30-13:55,** Defendants were notified that Mr. Nelson was no longer

breathing and unconscious, two Defendant Officers still have their fists pressed into Mr. Nelson back

while Defendants continued to apply the leg wrap (See Still Photo of McCrea BWC Frame 13:53

attached as **Exhibit 14**); **at 14:00-14:25,** Defendant Shannon explained the ambulance emergency

response was because Mr. Nelson was unconscious but kept his fist compressing Mr. Nelson's back;

**at 14:25-14:40,** Defendant Shannon has his knee on Mr. Nelson's back again; **at 14:50,** Mr. Nelson

was flipped over.

 **E.** <u>**Defendant Padavana's Body Worn Camera**</u>

  On **Defendant Padavana's** Body Camera – **at 2:35,** Mr. Nelson was forced to the ground on

his stomach (see Defendant Padavana's Body Worn Camera "Padavana BWC" attached as **Exhibit**

**17**); **at 6:20,** Defendant Shannon instructed officers to continue applying the leg portion of the

WRAP device with Mr. Nelson facedown and relayed through an officer (Lt. Jakub call sign "L3") to

dispatch that the reason for an emergency response from the ambulance was that Mr. Nelson was

"unconscious" (see also Dispatch Audio 1:19:25-1:19:45); **at 6:56,** Defendant Shannon's knee was

placed across Mr. Nelson's back again. (See Still Photo of Padavana BWC Frame 6:56 attached as

**Exhibit 15**); **at 7:07,** Defendants flipped over Mr. Nelson's lifeless body.


  When paramedics arrived Mr. Nelson was pulseless, had no heartbeat and was not breathing.

See Medical Records attached as **Exhibit 16**.

  Plaintiff Orenell Stevens, Decedent Nelson's mother, first learned that Defendant officers had

killed her son when she spotted the hospital staff at St. Rose carrying him out in a body bag. Ms.

Stevens spoke with her son, Decedent Roy Nelson II, almost daily, and no longer can enjoy those

calls or his company any longer. Plaintiff Roy Nelson, III, Decedent Roy Nelson's son, actually

attends Chabot University where he must pass by the parking lot where Defendant Officers killed his dad when he attends class. Mr. Nelson, a young man, was robbed of the company, guidance and relationship with his father permanently.

/

### III.   <u>LEGAL ANALYSIS</u>

Rule 56 states summary judgment is proper when the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. §56(c).  Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to return a verdict for the nonmoving party. *Id*. at pp. 248-249.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Celotex,* 477 U.S. at 323 (citing Fed.R.Civ.P., Rule 56(e)). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

"[A]t this stage of the litigation, the judge does not weigh disputed evidence with respect to a disputed material fact. Nor does the judge make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions. These determinations are within the province of the factfinder at trial." *Nelson v. City of Davis*, 571 F.3d 924, 928-929 (9th Cir. 2009). Moreover, the court is required to draw all inferences in a light most favorable to the non-moving party. *Id.* The court should not grant summary judgment where there are undisputed facts which reasonably lend themselves to different inferences. *Sankovich v. Life Ins. Co. of N. Am.,* 638 F.2d 136, 140 (9th Cir. 1981). The court must evaluate the evidence and reasonable inferences to determine whether there is sufficient probative evidence to permit "a finding in favor of the opposing party based on more than mere speculation, conjecture, or fantasy." *O.S.C. Corp. v. Apple Computer, Inc.,* 792 F.2d 1464, 1466-1467 (9th Cir. 1986), quoting *Barnes v. Arden Mayfair, Inc.,* 759 F.2d 676, 681 (9th Cir. 1985).

A. **THE COURT SHOULD GRANT SUMMARY JUDGMENT ON PLAINTIFFS' EXCESSIVE FORCE CAUSE OF ACTION BECAUSE A REASONABLY MUST FIND THAT DEFENDANT OFFICERS USED EXCESSIVE FORCE AGAINST DECEDENT ROY NELSON II**

Plaintiff contends a reasonably jury must find, based on the undisputed facts and *reasonable* inferences drawn in Defendants' favor, that the officers' extended use of their body weight and compression of Mr. Nelson after he expressed and showed symptoms of respiratory distress was objectively excessive and unreasonable. Or, in other words, no reasonable juror could find that the officers' extended use of their body weight on Mr. Nelson while he complained he could not breathe, fell unconscious, was handcuffed and his ankles were bound was objectively reasonable.

1. **The Legal Standard for Excessive Force Claims**

In evaluating a Fourth Amendment claim of excessive force, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor,* 490 U.S. 386, 397 (1989).  This inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner,* 471 U.S. 1, 8 (1985)). The Ninth Circuit applies a three-step process to determine reasonableness in use-of-force cases. *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011).

First, the court must "assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" *Id.*  (quoting *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 532 (9th Cir. 2010)). Even when an officer may have been justified in using some force, "the amount [of force] actually used may be excessive." *Id.* (quoting *Santos v. Gates*, 287 F.3d at 853).

Second, the court must evaluate the government's interest in the use of force under the totality of the circumstances. *Glenn, supra*, 673 F.3d at 871 (citing *Graham*, 490 U.S. at 396). In G*raham*, the Supreme Court noted that courts should consider such factors as (1) whether the suspect posed an immediate threat to the safety of the officer or others; (2) the severity of the crime at issue; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. In addition to the *Graham* factors, the Ninth Circuit considers the availability of less intrusive alternatives to the force employed, whether proper warnings were given, and whether it should have been apparent to officers that the person they used force against was emotionally disturbed, as additional factors in its analysis.  *See, e.g. Deorle v. Rutherford,* 272 F.3d 1272, 1282-83 (2001). The Ninth Circuit "examines the totality of the circumstances and considers 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham.*'"  *Bryan v.*

*MacPherson,* 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth,* 31 F.3d 873, 876 (9th Cir. 1994)).

Finally, the court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Glenn*, 673 F.3d at 871 (quoting *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).  In applying this test, the court must keep in mind the perspective of a reasonable officer on the scene and recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.  The Supreme Court has cautioned against use of the "20/20 vision of hindsight" in evaluating the circumstances facing the officer at the time of the shooting. *Id.* at 396. However, the Ninth Circuit has also cautioned that "the prohibition against evaluating officers' actions 'with 20/20 vision of hindsight' cuts both ways" and that in evaluating those circumstances facing an officer, they cannot rely on evidence that the officers were not then aware. *Glenn*, 673 F.3d at 873, fn. 8.

Here, the Defendant Officers' intrusion is to use force in order to place Mr. Nelson in the WRAP device which is essentially a four-piece full body restraint device with handcuffs, ankle strap, leg straps and chest strap/vest. Defendant Officers' need for that intrusion is purportedly to prevent damage to a police vehicle despite the fact that Defendants were trained that the WRAP device is not for de-escalation but intended for persons who are "being uncontrollable and violent." WRAP PMK, 42-43. Here, the undisputed extent of Mr. Nelson's violence, as Defendant McCrea's body camera, showed that Mr. Nelson apparently kicked inside the police car but the force he used appeared extremely small and there was no damage to the car except alleged scuffing to the backseat. See McCrea Body Camera at 02:00-04:20; Hall Depo, 56. In sum, the intrusion of a placing someone in a

full body restraint is severe when compared to the minimal threat of someone scuffing the backseat of a patrol car.

Furthermore, Mr. Nelson was not an immediate threat to the safety of officers or others, was not attempting to evade officers and the severity of the crime was property damage - a minimal, if not petty excuse to put someone in a WRAP device. Finally, this was not a tense situation, it was a slow-moving situation with an unarmed man that officers knew was suffering from paranoid schizophrenia and hallucinating as a result. Even when officers were placing Mr. Nelson in the WRAP device the extent of any resistance amounted to him bending his leg and turning on his side after complaining that he could not breathe because Defendant officers were using their knees and full body weight to compress Mr. Nelson into the ground, restricting his ability to breathe. Officers were trained that placing a person on their stomach, particularly an obese person, can result in the person having difficulty breathing. The officers should expect the person to react in accordance with their instinctive desire for air, such as turning to one's side to catch their breath.

Therefore, the nature and quality of the intrusion on the individual's freedom is severe given that the officers are dangerously impacting Mr. Nelson's breathing and the countervailing governmental interests at stake is property damage to the police car while assisting in Mr. Nelson's transportation back to the psychiatric hospital. Without considering whether or not it was appropriate to place Mr. Nelson in a WRAP Device in order to protect their car, it is overwhelmingly apparent based on the undisputed facts that a reasonable jury must find that the type of force used on Mr. Nelson in the deployment of the WRAP Device was unreasonable and excessive under the circumstances.

In *Drummond,* officers were called to respond to Mr. Drummond running in the freeway, who was suffering from hallucinations as a result of his bipolar disorder and schizophrenia. *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003).  His neighbor requested the officers for assistance,

because he was afraid Mr. Drummond might hurt himself. *Id.* Similarly, Anaheim Police Officers who recognized Mr. Drummond, including a rookie and her field training officer, responded to detain him for a 5150. *Id.* The three officers put Mr. Drummond on the ground and handcuffed him. *Id.* Similarly, two officers placed knees on his back and neck although he offered no serious resistance. *Id.* Mr. Drummond informed officers he could not breathe but the officers continued to apply compression force and an ankle strap. *Id* at 1054-1055. One minute after the ankle restraint was applied the officers realized Mr. Drummond had lost consciousness, flipped him over and applied CPR. *Id.* Minutes later, paramedics arrived and revived Mr. Drummond but he remained in a permanent vegetative state. *Id.* Defendant Officers were granted summary judgment against Plaintiff's claims, which were overturned by the 9th Circuit.

The 9th Circuit applied the *Graham* factors in the following analysis:

> "Here, some force was surely justified in restraining Drummond so that he could not injure either himself or the arresting officers. **However, after he was handcuffed and lying on the ground, the force that the officers then applied was clearly constitutionally excessive when compared to the minimal amount that was warranted.** Drummond was a mentally disturbed individual not wanted for any crime, who was being taken into custody to prevent injury to himself. Directly causing him grievous injury does not serve that objective in any respect. Once on the ground, prone and handcuffed, Drummond did not resist the arresting officers. Nevertheless, two officers, at least one of whom was substantially larger than he was, pressed their weight against his torso and neck, crushing him against the ground. They did not remove this pressure despite Drummond's pleas for air, which should have alerted the officers to his serious respiratory distress." *Id* at 1059 [emphasis added].

The 9th Circuit concluded:
> "The officers—indeed, any reasonable person—should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable. In this case, it is even more striking that the officers had been specifically warned of the extreme danger of this sort of force." *Id.*

Although the 9th Circuit did not consider whether or not summary judgment was appropriate in favor of Plaintiff's claim, the Court did note, as quoted above, "after [Drummond] was handcuffed and lying on the ground, the force that the officers then applied was clearly constitutionally excessive when compared to the minimal amount that was warranted." Similarly here, once Mr. Nelson was handcuffed, which occurred in approximately 45 seconds, the force used to continue compressing Mr. Nelson back for the next approximately 4 minutes was clearly constitutionally excessive.

Similar to Drummond, Mr. Nelson complained early on that he could not breathe, then showed symptoms respiratory distress including grunts and muffled whimpers before falling unconscious. Nevertheless, the officers continued to compress Mr. Nelson's back and applying the full body restraint even after he was bound at the hands and ankles. Defendant Shannon kept his knees leveraged on Mr. Nelson's mid-back and particularly over his spine which officers are trained to avoid. PMK Depo, 45-46.

Indeed, the force used against Mr. Nelson was significantly more unreasonable than *Drummond*. Mr. Nelson was quickly handcuffed but Defendants continued to compress Mr. Nelson back with their knees. At times, Defendant Shannon's had both knees leveraged on Mr. Nelson's back, while Defendant Hall had a knee and a hand pulling on Mr. Nelson's sweatshirt choking him which she acknowledge may have knocked him out.

Furthermore, in *Drummond*, once the officers had Mr. Drummond handcuffed and hobbled at the ankles they noticed he appeared unconscious, flipped him over and began to apply CPR. Here, after Mr. Nelson is handcuffed and hobbled at the ankles, Defendant Hall reported to other officers that Mr. Nelson was unconscious and not breathing. In response, Defendant Shannon called for an ambulance to respond "Code 3" which means to respond immediately because of a medical emergency. Nevertheless Defendant Shannon commanded the other officers to finish putting on the

17

leg strap, and clarified for dispatch the reason he was calling for an emergency medical response was that Mr. Nelson was "unconscious." For another approximately 50 seconds Defendants continued to apply the leg strap and Defendant Shannon applied his fist to Mr. Nelson's back then his knees despite knowing that Mr. Nelson was unconscious and possibly not breathing in violation of his Hayward Police Department policies – which instructs Defendant officers to put a person suffering a medical emergency while the WRAP device is being applied to turn them on their side or sit them up. PMK Depo, 27-30.

Essentially, the Defendant Officers continued to use force against a person that was handcuffed, hobbled at his ankles, not breathing and unconscious instead of turning him on his side or sitting him up in order to address his medical emergency. No reasonable juror could find, based on these undisputed facts, that Defendants use of force was reasonable. Therefore the Court should grant Plaintiffs summary adjudication on his Excessive Force claim.

## 2. Qualified Immunity Is Not Appropriate

Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *See Pearson v. Callahan,* 555 U.S. 223, 231 (2009).  To determine whether a government official is entitled to qualified immunity, this court must conduct a two-part analysis. Government officials are denied qualified immunity only if: (1) the facts that a plaintiff has alleged or proved show a violation of a constitutional right; and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct.  *See id.* at 232. The court continues to focus on the policy intentions driving the doctrine of qualified immunity which "balance[s] two important, competing interests: the need to hold public officials accountable for irresponsible actions, and the need to shield them from liability when they make reasonable

mistakes." *Morales v. Fry*, --- F.3d ----, 2017 WL 4582732, at \*4 (9th Cir. 2017).  Thus, the body of law seeks to shield only officers when the undisputed record shows that defendant officers made 'reasonable mistakes', as opposed to 'irresponsible actions' such as those described in the present action. *Id.* Here, the undisputed records showed not only were Defendants not making reasonable mistakes under *Drummond*, but in fact used deliberately unreasonable force in violation of the constitution. Therefore qualified immunity is not appropriate here.

### B.  THE COURT SHOULD GRANT SUMMARY JUDGMENT ON WRONGFUL DEATH BECAUSE A REASONABLE JURY MUST FIND THAT DEFENDANT OFFICERS MADE AN OVERWHELMING NUMBER OF NEGLIGENT DECISIONS AND USED UNREASONABLE FORCE AGAINST DECEDENT ROY NELSON II

Plaintiffs asserted direct liability against the Defendant Officers and against Defendant City under a theory of respondeat superior for wrongful death. Under California law, public employees "are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions, subject to the same defenses available to private persons." *Hayes v. County of San Diego*, 57 Cal.4 th 622 (2013); *see also* Cal. Gov. Code § 820. In addition, "public entities are generally liable for injuries caused by the negligence of their employees acting within the scope of their employment." Id.; *see also* Cal. Gov. Code § 815.2. "The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages" suffered by the heirs. *Quiroz v. Seventh Ave. Center,* 140 Cal.App.4th 1256, 1264 (2006).

The California Supreme Court has long held that an officer's lack of due care can give rise to negligence liability. *Munoz v. Olin,* 24 Cal.3d 629, 634 (1979) (citing *Grudt v. City of Los Angeles,* 2 Cal.3d 575, 587 (1970)). In this context, to prove the tort, a plaintiff must show that the officer violated his "duty to use reasonable force under the totality of the circumstances." *See Brown v. Ransweiler,* 171 Cal.App.4th 516, 526, fn.10 (2009).

Here, for the same reasons stated above in Plaintiff's Excessive Force claim, a reasonable jury must find that Defendants failed to use reasonable force under the totality of the circumstances. In fact, under the negligence claim, it is abundantly more certain that a reasonable jury must find for Plaintiffs on their negligence claim because the jury may factor in the Defendant's poor tactics leading up to Mr. Nelson's death in the consideration of the officers' use of force.

The California Supreme Court recently reaffirmed long-standing precedent that when an officer's pre-shooting conduct did not cause the plaintiff any injury independent of the injury resulting from the shooting, negligence "liability can arise if the tactical conduct and decisions leading up to the use of deadly force *show*, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Hayes,* 57 Cal.4th at 632. "In short, California recognizes that peace officers have a duty to act reasonably when using force, and reasonableness is determined in light of the totality of the circumstances, including consideration of tactical and preshooting actions." *Young Han v City of Folsom*, 695 Fed.Appx. 197, 198 (9th Cir. 2017).

Defendant officers' tactics in the detention of Mr. Nelson for a mental health hold should be a factor of reasonableness in considering the deadly force Defendants ultimately used in killing Mr. Nelson. Here, rookie police officer Defendant Hall negligently decided to place Mr. Nelson, who is over 300 pounds and suffering from hallucinations and paranoia as a result of his schizophrenia, in her patrol car without handcuffs. If Defendant Hall had handcuffed and put Mr. Nelson in his seatbelt, Mr. Nelson would never have been able to kick the car doors, the WRAP device would not have been deployed and Mr. Nelson would be alive today.

Then, after acting-sergeant McCrea and Defendant Shannon formulated a plan to have Mr. Nelson back up against the car door, handcuff then place him in the WRAP device more fluidly, Defendant McKee ignored the plan and opened the door from the opposing side escalating Defendant

Hall's behavior who quickly arced her taser at Mr. Nelson. Defendant Hall and McKee both arced their tasers at Mr. Nelson increasing the anxiety despite knowledge that Mr. Nelson was suffering from hallucinations and paranoia.

Furthermore, the Defendant Officers ultimately did use deadly force and were trained that compression of a person's back could result in respiratory distress and death. McCrea Depo, 88-90. Defendant Officers were trained that if a person experiences a medical emergency, the officers should stop applying the WRAP and address the medical emergency. McCrea Depo 69-70. Here, Defendants were supposed to be monitoring Mr. Nelson's breathing and rolling him into a recovery position on his side if he expressed respiratory distress, but when Mr. Nelson expressed respiratory distress and rolled onto his side to breathe, Defendant claimed it was resisting, rolled him onto his stomach and climbed back on top of him.  Even when Defendants knew that Mr. Nelson was not breathing, unconscious and motionless, instead of placing him in a recovery position on his side they continued to apply pressure to his back and apply the WRAP device in direct violation of their department's training and policies.

All of these negligent decisions are undisputed facts that require a reasonable jury to find for Plaintiffs' Negligence Claim even with all reasonable inferences drawn in favor of Defendants.

### C. THE COURT SHOULD GRANT SUMMARY JUDGMENT ON PLAINTIFF'S TITLE II ADA CLAIM BECAUSE A REASONABLE JURY MUST FIND THAT DEFENDANT OFFIERS FAILED TO PROVIDE MR. NELSON REASONABLE ACCOMMODATIONS FOR HIS DISABILITY OF SCHIZOPHRENIA AND SCHIZOPHRENIA

In order to prove the third prong of the Title II ADA test, Plaintiffs must show that the officers committed one of the two actions:

(1) **failure to provide reasonable accommodation**, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably

accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees; and/or

(2) **a wrongful arrest**, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity. [emphasis added.] *See Sheehan v. CCSF*, 743 F.3d 1211, 1232 (9th Cir. 2014) (overturned on other grounds); *Waller ex rel. Estate of Hunt v. Danville*, 556 F.3d 171, 174 (4th Cir. 2009); *Gohier v. Enright*, 186 F.3d 1216, 1220–21 (10th Cir. 1999). Here, Plaintiffs contend that officers failed to provide a reasonable accommodation to Mr. Nelson for his disability of obesity and schizophrenia.

In order to prove that a public entity failed to provide a reasonable accommodation under 28 C.F.R. § 35.130(b)(7), Plaintiff must produce evidence of the existence of a reasonable accommodation. *See Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir.2002).

A public entity may defeat a reasonable accommodation claim by showing "that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); *see Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1047 (9th Cir.1999).However, "the reasonableness of an accommodation is ordinarily a question of fact" for the jury. *Sheehan*, 743 F.3d at 1233; *see also EEOC v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1110 (9th Cir.2010).

Case law that involves Title II ADA Claims against police officers for failure to provide reasonable accommodations to mentally ill persons during a detention and/or arrest is relatively sparse but quickly evolving. In *Gohier*, the 10th Circuit granted summary judgment on the Plaintiff's ADA claim because Gohier failed to argue at summary judgment and on appeal "that Title II required Colorado Springs to better train its police officers to recognize reported disturbances that are likely to involve persons with mental disabilities, and to investigate and arrest such persons in a manner reasonably accommodating their disability." *Gohier*, 186 F.3d at 1222. Here, Plaintiff contends that

Defendant City of Hayward has failed to trained its police officers to arrest people, such as Mr.

Nelson, with a recognized mental disability (paranoid schizophrenia) and physical disability (obesity)

to reasonably accommodate them.

It is undisputed that the Defendant Officers recognized that Mr. Nelson suffered from

schizophrenia and obesity. However, Defendant Officers did not provide reasonable accommodations

to Mr. Nelson in order to accommodate his disabilities. Defendant Officers could have provided the

following reasonable accommodations: (1) remained patient with Mr. Nelson while he was back of

the police car and reassured him that he would be safe instead of continuously threatening to put him

in a restraint device; (2) Defendant Officers could have simply handcuffed Mr. Nelson and had him

sit down while they waited for the ambulance; (3) Defendant Officers could have handcuffed Mr.

Nelson then periodically rolled Mr. Nelson on his side in order to allow him to breathe and not left

him for extended periods of time on his stomach; (4) Defendant Officers could have sat Mr. Nelson

up after he was handcuffed and applied the ankle straps; (5) Defendant Officers could have

handcuffed Mr. Nelson then put him back in the patrol car and strapped on his seatbelt; (6) Defendant

Officers could have rolled down the windows, since there were metal bars and transported Mr.

Nelson to the hospital themselves. These six reasonable accommodations were easy and safe to

provide by the five Defendant Officers.

There are two recent cases that define the contours of the "reasonableness" of an accommodation.

*See Sheehan v. CCSF*, 743 F.3d 1211 (9th Cir. 2014) (finding a jury could find it was unreasonable

for officers to re-enter a schizophrenic woman's room who had charged at them with a knife without

waiting for back up, respecting her comfort zone, engaged in non-threatening communications and

used the passage of time to defuse the situation rather than precipitating a deadly confrontation;

*compare to, Waller ex rel. Estate of Hunt v. Danville*, 556 F.3d 171, 174 (4th Cir. 2009) (finding

23

officers exhausted reasonable accommodations when a suspect barricaded himself in a house with his girlfriend, threatened to kill the officers, the officers negotiated for two hours, one officer returned to department to confer with superior, performed criminal background check, before the suspect charged at officers with a scythe and they shot him).

None of the high-risk factors and time constraints found in *Sheehan* and *Waller* existed so officers had even more reason and opportunity to engage in non-threatening communications, use the passage of time, and formulate a plan to accommodate Mr. Nelson's disabilities without endangering Mr. Nelson or themselves. Furthermore, there was no urgency to forego providing Mr. Nelson reasonable accommodations because, by and large, Mr. Nelson showed no aggression, was cooperative and was already in-custody. Mr. Nelson had committed no crimes and was not a threat to anyone. Here officers did not attempt any reasonable accommodations. Defendant Officers did not consider providing any of the six reasonable accommodations even though Mr. Nelson was in-custody, in a patrol car and not a threat to anyone. Defendant officers were merely preoccupied with speculative damage to the backseat of Defendant Hall's patrol car which suffered some questionable scuff marks that cannot be proved to have been caused by Mr. Nelson.

In order to prove the fourth prong of a Title II ADA Claim, Plaintiff must show that the Defendants intentionally discriminated against Ms. Moore by reason of her disability." O'Guinn v. Lovelock Corr. Ctr., 502 F.3d 1056, 1060 (9th Cir.2007).

Intentional discrimination on the part of the defendant is analyzed under a deliberate indifference standard. *See Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998); *Duvall v. County of Kitsap*, 250 F.3d 1124 (9th Cir. 2001). To show deliberate indifference the plaintiff must prove that there was a reasonable accommodation available and the officer's decision not to provide the reasonable accommodation involved an element of deliberateness. *Duval, supra,* at 1139.

Here, the Defendant Officers knew that Mr. Nelson was hallucinating and suffering symptoms from his disability of schizophrenic paranoia. See Medical Records. Furthermore, Defendants admit that Mr. Nelson suffered from the disability of obesity. Hall Depo, 119-120. Defendants had already brought Mr. Nelson into custody since Mr. Nelson voluntarily entered the patrol car in order to be transported back to the psychiatric unit. Defendant Officers arced tasers at Mr. Nelson and threatened him with the WRAP device despite the fact Mr. Nelson was scared and begged for officers not to kill him. Instead of simply reassuring Mr. Nelson and providing him a reasonable accommodation while waiting for the ambulance as they are trained Defendants to punitive measures of placing Mr. Nelson in a full-body restraint even though they knew Mr. Nelson's mental disability prevented him from understanding the purpose of their punishment and threats. Defendant compress Mr. Nelson into the ground for over 4 minutes while he complained he could not breathe and did nothing to address his respiratory distress. Defendants were trained that obese persons left on their stomach are more likely to experience respiratory distress but Defendants made no accommodations to account for Mr. Nelson's disability. Even when they were aware of his medical emergency, Defendant continued to apply a full body restraint until he died.

## IV.   CONCLUSION

For the reasons stated above, this Court should grant Plaintiffs' motion for partial adjudication on his Excessive Force, Negligence – Wrongful Death and Title II ADA Claims and summon a jury only to determine Plaintiffs' remaining causes of action and damages.

Dated:  December 31, 2018                    **The Law Offices of John L. Burris**


                                                    /s/ Patrick M. Buelna

                                             Patrick M. Buelna
                                             Attorney for Plaintiff