# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

ROY NELSON III, Successor-
in-Interest to Decedent ROY
NELSON; ORENELL STEVENS,
individually,

        Plaintiffs,

                         CASE NO.:
    vs.                   3:16-cv-7222

CITY OF HAYWARD, a municipal
corporation; MICHELLE HALL, in her
individual and official capacity
as Police Officer for the CITY OF
HAYWARD; NATHANAEL SHANNON, in his
individual and official capacity
as Police Officer for the CITY OF
HAYWARD; MATTHEW MCCREA, in his
individual and official capacity
as Police Sergeant for the CITY OF
HAYWARD; JOHN PADAVANA, in his
individual and official capacity
as Police Officer for the CITY OF
HAYWARD and DOES 1-50, inclusive,
individually and in their official
capacity as police officers for
the City of Hayward,               CERTIFIED COPY

        Defendants.
_____/

DEPOSITION OF OFFICER MICHELLE HALL
MONDAY, DECEMBER 4, 2017

(CONFIDENTIAL Page 14, Line 24
to Page 17, Line 1
ARE BOUND UNDER SEPARATE COVER)

REPORTED BY:  KELLY L. MCKISSACK, CSR #13430

1

1    shadow phase.  And at the time I was on my fourth week

2    of phase four of training.

3         Q.   Okay.  And during phase four were you acting

4    as a solo unit or were you riding with your training

5    officer?

6         A.   I was riding with my training officer.

7         Q.   Okay.  And who was your field training officer

8    on that date?

9         A.   Officer Shannon.

10        Q.   And just to make sure, that would be the

11   Officer Shannon who is also a part of this litigation;

12   is that correct?

13        A.   Yes.

14        Q.   And is it your understanding that you were

15   supposed to be familiar with Hayward Police Department

16   policies?

17        A.   Yes.

18        Q.   Is it your understanding that you're supposed

19   to comply with Hayward Police Department policies while

20   on duty?

21        A.   Yes.

22        Q.   Okay.  This I think we would deem the

23   confidential portion.

24   * This begins a confidential portion of the deposition.*

25

14

1    * This ends the confidential portion of the deposition.*

2    BY MS. NOLD:   Q.   So I want to talk about the date of

3    the incident.   Once again that will be December 19,

4    2015.   And I believe earlier you indicating that you

5    were riding with Officer Shannon on that day; is that

6    correct?

7          A.   Yes.

8          Q.   And I'm assuming it was the only two of you in

9    the car, correct?

10         A.   Yes.

11         Q.   Do you recall when you started your shift that

12   day?

13         A.   I began my shift at 1800 hours, which is

14   6:00 p.m. Friday.

15         Q.   And were these -- what type of shifts were

16   they, eight-hour, ten-hour, twelve hours?

17         A.   We're assigned 12-and-a-half-hour shifts.

18         Q.   And on that date do you recall being

19   dispatched to the Ironwood address where you ultimately

20   met up with Mr. Roy Nelson?

21         A.   Yes.

22         Q.   Do you recall what type of call you were

23   responding to?

24         A.   I believe the initial call was dispatched as a

25   5150 or some sort of family disturbance.

                                                              17

1      Q.   And do you recall if you were the first

2  responding officer?

3      A.   I initially wasn't dispatched because I was on

4  my lunch.  And so another officer was dispatched first.

5      Q.   And do you know who that officer was?

6      A.   Officer Kawada and Officer McKee.

7      Q.   And at some point were you assigned to also go

8  attend to that call?

9      A.   Yes, because I understood that the call was in

10 my assigned area of patrol.  So I left the station to go

11 to the call.

12     Q.   And so when you left to go to the call you

13 were with Officer Shannon at that time?

14     A.   Yes.

15     Q.   And I'm sorry.  For clarity, is he Officer or

16 Sergeant Shannon?

17     A.   Officer.

18     Q.   Okay.  And when you arrived at the -- when you

19 arrived at the home and met with Mr. Nelson, do you

20 recall how much time had elapsed from the time of the

21 call until the time you arrived?

22     A.   I would estimate it was about 10 to

23 15 minutes.

24     Q.   And when you first arrived do you recall

25 seeing Mr. Roy Nelson?

                                                        18

1          MR. ROLLAN:  Objection.  Vague as to time.  Is

2     it right when she got there or soon thereafter or --

3     BY MS. NOLD:  Q.  But you can still answer if you

4     understand.

5          A.   I'm sorry.  I just -- repeat.  Repeat.

6          MR. ROLLAN:  You want her to repeat the

7     question?

8          MS. NOLD:  Could you read the question back,

9     please.

10         (Whereupon, the question was read by the

11         court reporter.)

12         THE WITNESS:  Yes.

13    BY MS. NOLD:  Q.  And where was Mr. Nelson located when

14    you first saw him?

15         A.   He was exiting the residence.

16         Q.   And was he exiting the front door or, like,

17    the gated area?  Do you recall?

18         A.   I recall the entrance to be on the side of the

19    house.  I don't recall any entrance directly on the

20    front.

21         Q.   And when you first saw Mr. Nelson did you

22    recognize him from any prior contacts?

23         A.   No.

24         Q.   So, to your knowledge, you had never seen

25    Mr. Nelson before?

19

1        A.    No.

2        Q.    And when you first saw Mr. Nelson can you

3   describe his physical stature?

4        A.    He was approximately 6'4, over 300 pounds.

5        Q.    Prior to arriving at the residence, did you

6   receive any information about Mr. Nelson?  Any prior

7   contacts from Hayward, anything that would be, I guess,

8   considered, like, an officer safety statement?  Anything

9   like that?

10        A.    Not prior to me arriving there.

11        Q.    It sounds like at some point you did receive

12   some information about Mr. Nelson?

13        A.    Yes.  During my interaction with Mr. Nelson, I

14   received information from Officer McKee.

15        Q.    What did Officer McKee tell you about

16   Mr. Nelson?

17        A.    Officer McKee told me that Mr. Nelson -- I

18   believe he was either on probation or parole or both.

19   And that he had several contacts with Mr. Nelson in the

20   past.  He remembered Mr. Nelson from selling drugs and

21   that he threw another officer off of a second story

22   building.

23        Q.    Okay.  And at the time when Officer McKee

24   provided you that information about Mr. Nelson had you

25   already made contact with Mr. Nelson?

                                                          20

1     A.    Yes.

2     Q.    And at the time Officer McKee provided you the

3  information about Mr. Nelson's, I'll say his past,

4  did -- where was Mr. Nelson located?

5     A.    In the back --

6     Q.    Go ahead.

7     A.    In the backseat of my patrol car.

8     Q.    Okay.  Prior to the date of the incident, had

9  you ever responded to a call for a 5150 before?

10    A.    Yes.

11    Q.    Approximately how many times?

12    A.    I can't recall.

13    Q.    Okay.  More than five times?

14    A.    I was on field training at the time.  So I'd

15 only be on for about 18 weeks.

16    Q.    Okay.

17    A.    My estimate would be at least five times.

18    Q.    Okay.  What is your understanding of what a

19 5150 detention is?

20    A.    5150 detention would be evaluating someone for

21 a 5150 hold, which means that the person is -- can be a

22 combination of inebriation, use of narcotics or

23 restricted drugs or a mental illness, and they are a

24 danger to themselves, others or are greatly -- and/or

25 greatly disabled.

                                                            21

1    Q.   And prior to the incident with Mr. Nelson have

2    you ever -- had you ever done -- performed an evaluation

3    for a 5150 before?

4    A.   Yes.

5    Q.   And did you perform the evaluation for the

6    5150 for Mr. Nelson?

7    A.   Initially when I arrived, Officer McKee let me

8    know that Mr. Nelson needed to go see the doctor for

9    what I understood was the schizophrenic tendencies.  So

10   I initially used the knowledge from the call and what

11   Officer McKee was telling me to request the Code 2

12   ambulance for a 5150.  And my intention was to gather

13   more information from the original reporting party.

14   Q.   Okay.  And did you ultimately end up speaking

15   to the reporting party?

16   A.   Yes.

17   Q.   And I'll represent that the reporting party is

18   Mrs. Patsy Nelson Taft.  Is that your understanding?

19   A.   Yes.

20   Q.   And did you end up speaking to Patsy before

21   you contacted Mr. Nelson or after?

22   A.   Patsy was present while I was talking to

23   Mr. Nelson.  And she was telling me that he had

24   schizophrenic tendencies and he needed to go back to

25   John George.

22

DEPOSITION OF OFFICER MICHELLE HALL

```
 1        Q.   Okay.  Was it your understanding from Patsy
 2   that Mr. Nelson had previously been at John George
 3   Hospital?
 4        A.   From my understanding of what she was saying,
 5   yes.
 6        Q.   Okay.  And what do you -- what else do you
 7   recall Ms. Nelson telling you about Mr. Nelson's mental
 8   health condition?
 9        A.   I remember she said Mr. Nelson does not live
10   there.  And that he had just been released from John
11   George.  She did not know why he had been released as
12   he -- because of his behavior was not acting in a manner
13   that he had been treated.  She said that she ended up
14   letting him stay there and letting him get cleaned up
15   because his -- he was disheveled when he arrived at her
16   house.
17             She said he was sleeping on the couch in the
18   middle of the night and started yelling, saying that
19   their 23-year-old son had been kidnapped and that there
20   were people on the roof.  Which, according to Patsy,
21   neither of those things were true.
22        Q.   Okay.  So at that point did you -- I
23   understand you're not a doctor.  Did you have a reason
24   to believe that Mr. Nelson was having some sort of
25   active mental health episode?
```

23

1          A.    Can you rephrase.

2          Q.    Sure.   When Ms. Nelson told you that

3    Roy Nelson was -- thought that their son had been

4    kidnapped and that there was people on the roof, did you

5    have reason to believe that -- that Mr. Nelson was

6    having hallucinations or was imagining those things

7    happening?

8              MR. ROLLAN:    Objection.   Calls for speculation

9    and vague as to time.   Is it when she was -- is the

10   question was he hallucinating at the time that she --

11   that Officer Hall encountered Mr. Nelson or prior to --

12   prior to that?

13   BY MS. NOLD:   Q.   In talking to Ms. Nelson, did you have

14   reason to believe that he was having some sort of active

15   hallucinations or had recently been having some active

16   hallucinations?

17         A.    I -- from my understanding it was recent

18   hallucinations.

19         Q.    Okay.   And at some point you spoke with Mr. --

20   did you speak to Mr. Nelson directly?

21         A.    Yes.

22         Q.    Okay.   And what did -- what did Mr. Nelson say

23   to you?   What was the conversation with Mr. Nelson?

24         A.    My initial contact with him, with Mr. Nelson,

25   was when he was walking out of the house and he was

                                                              24

1    looking around as if he was looking for people or -- I

2    don't know what he was looking for.  But he was looking

3    around and he seemed disoriented, not focused on what I

4    was saying.  He did tell me his name.  And he was able

5    to understand when I told him to take his hands out of

6    his pockets.

7             And then I walked him over to my patrol car.

8    And once he was in the backseat of my patrol car I asked

9    him if he wanted to hurt himself.  And what I

10   remembered, he said yes.  I asked him if he wanted to

11   hurt other people.  He said yes.  And then he said no.

12   So from his behavior and what he had responded I

13   didn't -- I wasn't sure if he understood what I was

14   saying.  So I repeated the question, did you want -- do

15   you want to hurt yourself and he said no.

16        Q.   Okay.  And at that point did you consider

17   Mr. Nelson to be either a danger to himself, a danger to

18   other or gravely disabled within the confines of the

19   5150?

20        A.   Yes.

21        Q.   And which of those things?  The gravely

22   disabled, danger to himself or danger to other, which or

23   how many of those things did you think he fit the

24   category of?

25        A.   Danger to himself and gravely disabled.

                                                            25

1      Q.   Okay.  And at some point you had completed the

2  5150 form, correct?

3      A.   Yes.

4      Q.   Okay.  And where were you when you completed

5  that form?

6      A.   I was primarily in the front seat of my patrol

7  car.

8      Q.   And while you were completing that form were

9  you having any conversations with Mr. Nelson?

10      A.   Yes.  When I was asking him the questions I

11  was filling out the form.

12      Q.   Okay.  And when you were doing that was

13  Mr. Nelson located in the car with you?

14      A.   Yes.

15      Q.   In the backseat of the car?

16      A.   Yes.

17      Q.   And at the time when you first contacted

18  Mr. Nelson and determined that he was -- strike the

19  question.

20          When you first contacted Mr. Nelson, at some

21  point you made the determination that he was going to be

22  placed on a 5150 hold, correct?

23      A.   Yes.

24      Q.   Okay.  What were the next steps in your mind?

25  What was going to happen after he was placed on the 5150

26

1    hold?

2         A.    Well, I called for the Code 2 ambulance within

3    probably two to three minutes of arriving.  So I was

4    expecting them to arrive typically no more than 10 to

5    20 minutes from when I initially called it.  From there

6    the paramedics would transport Mr. Nelson to John George

7    Psychiatric Hospital.

8         Q.    Okay.  And would you typically fill out the

9    5150 form, provide it to the ambulance, and then they

10   would make the transport?

11        A.    Yes.

12        Q.    And is that determined by policy, or is

13   there -- is there any wiggle room in that?  For example,

14   would you have been permitted to drive Mr. Nelson to the

15   hospital yourself?  Or do you require -- is the policy

16   required that he be taken by ambulance?

17        A.    I'm unaware of any policy.  I believe that's

18   our procedure.  I was never aware of any of us

19   personally taking a person to John George.

20        Q.    So during the time that you've been working

21   for the City of Hayward you've never personally

22   transported somebody to John George for a 5150 hold,

23   correct?

24        A.    During -- from up until that time I would say

25   I have not taken anyone to John George.  After that, I'm

27

1    not sure.

2        Q.   Okay.  So you're saying today you don't recall

3    whether you've ever taken somebody to John George

4    personally for a mental health hold or transporting --

5    strike that.

6            Up to today's date you don't recall whether

7    you've ever transported somebody to John George for a

8    5150 hold?

9        A.   Like I said, I can't recall after the incident

10   if I have or not.

11       Q.   Is there any particular reason why you

12   wouldn't be able to recall the information from the last

13   two years of your employment?

14       A.   I recall another situation where the

15   paramedics were having an extended wait.  And I recall a

16   supervisor suggesting a unit transport.  I believe it

17   was another unit.  I don't recall personally

18   transporting that person, but I was at the call.

19       Q.   To your knowledge, is there anything that

20   would prohibit you from transporting a person on a 5150

21   hold to the hospital as opposed to having them go in an

22   ambulance?

23       A.   I'm sorry.  Repeat that.

24       Q.   Sure.  Is there anything, as far as you know

25   policy-wise or procedure-wise, that would prevent it --

                                                           28

1   would prevent you as an officer from transporting

2   somebody to John George for a 5150 hold as opposed to

3   having an ambulance come and transport them?

4       A.   Policy-wise I don't know of anything.

5       Q.   And how did Mr. Nelson end up in the back of

6   your patrol car?

7       A.   When I was initially talking to him and I had

8   asked him to come with me over to my patrol car.  And

9   when he walked up to the car he actually pulled the

10  handle on the rear passenger door, but it was locked.

11      Q.   Okay.  Would you have been considered the lead

12  officer on that call at that point?

13      A.   Well, based on me being assigned to that area

14  and being on scene, yes.  I was primary.

15      Q.   Okay.  And when you asked Mr. Nelson to walk

16  to your car did he go with you voluntarily?

17      A.   Yes.

18      Q.   And at that point was Mr. Nelson being led,

19  for example, with a hand on his arm or anything like

20  that, or was he walking under his own direction?

21      A.   I don't recall touching him.  I -- I told him

22  let's go over to my car.  And from what I remember he

23  walked over on his own willing.

24      Q.   Did Mr. Nelson verbally object to being walked

25  to your car?

29

1        A.    No.

2        Q.    And did Mr. Nelson verbally object to -- to

3   the intention of -- strike that.

4              Did you tell Mr. Nelson that you intended to

5   take him or have him taken to the hospital for a mental

6   health evaluation?

7        A.    Repeat that.

8        Q.    Could you please repeat the question.

9              (Whereupon, the question was read by the

10             court reporter.)

11             THE WITNESS:  Yes.

12  BY MS. NOLD:  Q.  And this is -- just go back a little

13  bit regarding the 5150.  Can you explain the distinction

14  between a 5150 detention and a 5150 custodial arrest?

15       A.    We use the term 5150 hold.  So I'm not sure if

16  that's what you're referring to when you say custodial

17  arrest.

18       Q.    Okay.  So is it fair to say that you can't

19  explain the difference between a 5150 detention and a

20  5150 custodial arrest?

21       A.    No.  So a 5150 detention, I don't even use

22  those terms.  But I would say a 5150 evaluation and

23  persons being evaluated for a hold, they're placed on a

24  hold.  Then they are in our care and custody.  Only time

25  there would be an arrest along with the 5150 is if

                                                          30

1    you're charging them with a criminal case as well.

2       Q.   And in Mr. Nelson's case, was Mr. Nelson

3    suspected of any sort of crime or infraction at the time

4    when you came in contact with him?

5       A.   No.

6       Q.   And you indicated that Mr. Nelson walked up to

7    the car and attempted to open the door; is that correct?

8       A.   Yes.

9       Q.   And in response to Mr. Nelson trying to open

10   the door did you unlock the door?

11      A.   Not at that time.

12      Q.   Okay.  What happened next after he tried to

13   open the door?

14      A.   I asked Mr. Nelson to put his hands on the

15   car.  And I advised him that I just wanted to check him.

16   And I wanted to make sure he didn't have any weapons

17   prior to going in my patrol car.

18      Q.   Okay.  And after that did you pat search

19   Mr. Nelson to check to see if he had any weapons?

20      A.   Yes.

21      Q.   And did Mr. Nelson have any weapons or any

22   sort of illegal paraphernalia or anything like that on

23   his person?

24      A.   I didn't search him for paraphernalia, but he

25   didn't have any weapons.

31

1      Q.   Okay.  And then what happened next?

2      A.   I unlocked my patrol car, opened the door and

3  had Mr. -- I asked Mr. Nelson to take a seat.

4      Q.   And what were you having Mr. Nelson sit down

5  for?

6      A.   I was placing him in my car until the

7  paramedics arrived.

8      Q.   And did you handcuff Mr. Nelson?

9      A.   No.

10      Q.   And why didn't you handcuff Mr. Nelson?

11      A.   Based on his demeanor, even though he was

12  disoriented, he wasn't aggressive towards me or anyone

13  else.  And I didn't have any reason to believe that he

14  would be violent to anyone.

15      Q.   And what's your understanding of when you're

16  supposed to handcuff somebody in order to be in

17  compliance with your Hayward Police Department's

18  handcuffing policy?

19      A.   There's no requirement that I have to

20  handcuff.  In this instance there's no requirement.

21  It's based on whatever the officers feel for the

22  situation.

23      Q.   Okay.  So it was your understanding that for

24  a -- for example, Mr. Nelson, a 300-something pound,

25  mentally ill, hallucinating person you weren't required

                                                        32

1    to handcuff him, correct?

2        A.    Correct.

3        Q.    And are there certain categories of people or

4    situations that require a person to be handcuffed?

5            MR. ROLLAN:   Objection.   Vague.

6    BY MS. NOLD:   Q.   You still need to answer even if he

7    says it's vague, unless you just don't understand the

8    question.

9        A.    Can I ask you to rephrase it.

10       Q.    Sure.   You said that under the circumstances

11   that Mr. Nelson -- there was no requirement to handcuff

12   him.   Under what circumstances would you be required to

13   handcuff somebody?

14       A.    Again, I don't think there is any requirement.

15   But had he been aggressive or had he hurt Patsy or

16   anyone else in the house, then at that point I would

17   have handcuffed him.   But based on his demeanor and that

18   he is mentally ill, I didn't want to put the handcuffs

19   on him and elevate or escalate the situation more than

20   necessary.

21       Q.    So you felt like handcuffing Mr. Nelson at the

22   time, would it be fair to say you felt like it might

23   agitate him or make him -- worsen his mental condition?

24       A.    Yes.

25       Q.    And just so I'm clear, as far as you know, is

                                                          33

1    there any sort of distinct policy related to handcuffing

2    or not handcuffing people on 5150 holds?

3         A.    We do have a handcuffing policy.

4         Q.    Is there anything in the policy that dictates,

5    gives you direction on handcuffing or not handcuffing

6    people on a mental health holds specifically?

7         A.    I can't recall specifically.

8         Q.    Okay.  Is that one of the policies that you

9    reviewed prior to your deposition?

10        A.    Yes.

11        Q.    So you had Mr. Nelson in the backseat of the

12   car.  At that point was Mr. Nelson fully in the backseat

13   or was he -- did he have his feet on the ground sitting

14   on the seat?  Can you explain how he was located in the

15   car?

16        A.    He was -- his full body was inside the car.

17   And I think his foot might have been near the doorway.

18   So I told him to put his feet inside the car.

19        Q.    And at that point was the door still open?

20        A.    The door was open up until he put his feet in

21   the car, and then I closed it.

22        Q.    And at that point is that when you got into

23   the car and began working on your paperwork?

24        A.    Yes.  I obtained the form from my trunk, and I

25   went back around.  And from what I remember I was in the

                                                          34

 1    car with him.  And then I also went to speak with Patsy.

 2         Q.   And at that point was Mr. Nelson free to go?

 3         A.   No.

 4         Q.   At that point was Mr. Nelson being detained?

 5         A.   He was on a 5150 hold.  He wasn't -- I

 6    wouldn't use the word detained for a 5150 hold.

 7         Q.   Okay.  So Mr. Nelson was not free to go, but

 8    you didn't consider him to be in a detention; is that

 9    correct?

10              MR. ROLLAN:  If you can answer that question.

11              THE WITNESS:  He's not free to go.  He's on a

12    5150 hold.  If you consider that a detention, then yes.

13    He was detained.

14    BY MS. NOLD:  Q.  And are you familiar with any specific

15    City of Hayward Police Department policies related to

16    contact with mentally ill persons?

17         A.   I don't know of a specific policy.  I know

18    that our policies include information about mentally

19    ill.

20         Q.   Okay.  Did you, either in the academy or

21    working for the City of Hayward, ever receive any

22    training on interacting with persons with mental health

23    problems?

24         A.   Yes.

25         Q.   And if you can explain what you recall as far

                                                             35

```
 1   as the guidelines of, I guess, best practices in dealing

 2   with people with mental health problems.  Do you recall?

 3       A.   Well, primarily officer safety and safety of

 4   the subject comes first.  So irregardless if they're

 5   mentally ill or not, if they have a weapon or --

 6       Q.   Coaching isn't working on that one, Mr. @Nor.

 7            Have you ever been -- received any training

 8   with the City of Hayward or in your police academy

 9   training where you were advised that people with mental

10   health problems may have -- take a longer time to be

11   able to comply with orders?

12       A.   I'm sorry.  I don't know what the comment was

13   about.  So if you can clarify.

14            MS. NOLD:  Oh, it wasn't directed at you.

15   Just as far as your attorney's not allowed while you're

16   in the middle of a question to --

17            MR. ROLLAN:  Oh, I'm not coaching.  I was

18   going --

19            MS. NOLD:  Well, you actually wrote something,

20   went like this and then you went like this (indicating.)

21            MR. ROLLAN:  No, I didn't.

22            MS. NOLD:  Okay.  That's fine.  Okay.

23            MR. ROLLAN:  If it appeared that way, I wasn't

24   doing that.

25            MS. NOLD:  Okay.
```

```
 1          MR. ROLLAN:  I was going back to the previous
 2   page.
 3          MS. NOLD:  Okay.  I'll take your
 4   representations as an officer of the court that that's
 5   not what you were doing.
 6      Q.   Did you want to -- did you want to -- did you
 7   feel like that answer was complete or were you still --
 8   did you still have anything to add to that?
 9      A.   No.  Your comment kind of interrupted what I
10   was thinking.  So I'm going to have to ask you to
11   repeat.
12          MS. NOLD:  Okay.  I'll have her read back the
13   question.  Okay.  If you can read back the question.
14          (Whereupon, the question was read by the
15          court reporter.)
16          THE WITNESS:  Yes.
17   BY MS. NOLD:  Q.  And to your knowledge does the City of
18   Hayward have a policy related to the Americans with
19   Disabilities Act?
20      A.   I don't recall.
21      Q.   Are you familiar with the Americans with
22   Disabilities Act?
23      A.   I've heard of it.
24      Q.   Do you -- but, to your knowledge, have you
25   ever received any training related to your requirements
```

                                                        37

1    for compliance with the Americans with Disabilities Act

2    while acting in the capacity of a police officer?

3        A.   I don't recall it ever being addressed to us,

4    any reference to the ADA.

5        Q.   Okay.  So Mr. Nelson is in the backseat of

6    your patrol car.  You said you closed the -- closed the

7    door.  What happened next?

8        A.   As I was interviewing him, I did roll the

9    window down at least two to three inches just so he had

10   air circulating in the backseat.  And after I had spoke

11   with Mr. Nelson he kept repeating he didn't want the

12   ambulance, and he didn't want help.

13            And I proceeded to get -- Officer Kawada was

14   speaking with Patsy and getting information from her.

15   So in her presence he advised me what Patsy told him.

16   And then I asked her a couple questions for

17   clarification.

18       Q.   And do you recall what that conversation was

19   with Patsy, that additional information?

20       A.   It was, again, about the -- his son --

21   Mr. Nelson's son being kidnapped, kept hearing noises.

22   Patsy had also mentioned Mr. Nelson had come -- come to

23   her house from John George and -- in a taxi, and he left

24   all his clean clothing and medications in the taxi.  And

25   told the taxicab driver to keep it as collateral.

38

1    So that part was something else I felt she had

2    witnessed as him being gravely disabled.  Not able to

3    care for himself where he's leaving his medications and

4    means of clothing in a car.

5    Q.    Okay.  So when you talked to Ms. Nelson you

6    had additional information to help in your evaluation

7    for the 5150; is that accurate?

8    A.    Yes.

9    Q.    You indicated that you had rolled the windows

10   down for Mr. Nelson.  Did Mr. Nelson make any request

11   for you to roll the windows down, or was he making any

12   complaints that prompted you to do that?

13   A.    Not at that time.  I -- I just typically do

14   that if I have someone in the backseat of my car.  That

15   way there's -- there's always air circulating.  But I

16   did notice that he was sweating profusely as he kept

17   saying he didn't want to go or he didn't want the

18   ambulance.

19   Q.    Okay.  And when you're saying he was sweating

20   profusely, did -- did you notice that prior to

21   Mr. Nelson getting in the car or subsequently?

22   A.    Shortly after he got in the car and I had

23   asked him why he was sweating so much.

24   Q.    What did he say, to your recollection?

25   A.    I don't remember him answering at all

39

1    actually.  Any time he would answer it was either really

2    vague or it would be irrelevant to what I asked him.

3        Q.   Okay.  Fair to say that Mr. Nelson seemed to

4    be having a hard time answering questions in a way that

5    you would consider to be adequate?

6        A.   Yes.  But he was still able to repeat that he

7    didn't want the ambulance and he wanted -- he asked for

8    the door to be opened.  He wanted to be out.

9        Q.   Okay.  And did you ask Mr. Nelson about --

10   about his medications during that conversation?

11       A.   Yes.

12       Q.   And what do you recall him saying about his

13   medications?

14       A.   He said that he took them the previous day.

15       Q.   And then at some point you -- sounds like you

16   had -- earlier you represented that you had had a

17   conversation with Officer McKee where he provided you

18   some additional information about Mr. Nelson.  Where in

19   the sequence did that occur?

20       A.    I believe it was at some point on Ironwood

21   after Mr. Nelson was already in the car.  And I believe

22   it was after I had already completed the evaluation

23   form.

24       Q.   Okay.  And that's when, at that point,

25   Officer McKee provided you information about his

                                                        40

1     personal knowledge about Mr. Nelson, correct?

2         A.   Yes.  It was either at Ironwood or directly

3     after we had moved him over to Chabot.

4         Q.   Okay.  And Officer McKee had at that point let

5     you know that Mr. Nelson had -- he had previous

6     knowledge of Mr. Nelson having some sort of narcotic

7     sales history and being on probation or parole and

8     having previously thrown a police officer off of a

9     balcony; is that correct?

10        A.   Yes.

11        Q.   And at that point Mr. Nelson was in the

12     backseat of your car and restrained, correct?

13        A.   Yes.

14        Q.   But you don't recall whether that occurred on

15     Ironwood or once you guys had gone over to Chabot; is

16     that correct?

17        A.   I don't recall, but I believe it was at

18     Ironwood.

19        Q.   And how long were you guys located at Ironwood

20     with Mr. Nelson in the backseat of the car prior to the

21     decision to take Mr. Nelson to Chabot?

22        A.   It was about 30 minutes.

23        Q.   And during that course of time did Mr. Nelson

24     make some sort of a reference or a request to you not to

25     kill him or something to that effect?

41

DEPOSITION OF OFFICER MICHELLE HALL

1      A.   Yes.

2      Q.   And how did you respond to Mr. Nelson's making

3  those comments?

4      A.   From what I remember he said, "Don't kill me."

5  He said it in a very soft voice.  I said something like,

6  "What's going on?  Why did you say don't kill me?"  And

7  then I think he said something like, "I don't know.  I

8  was just playing."  Or something along those lines.

9      Q.   And when you were in the -- when Mr. Nelson's

10  in the car with you, did he make any further comments

11  that caused you to believe he was hallucinating?  For

12  example, making references to things or people that

13  weren't there?

14      A.   He kept yelling at one point in the car.  He

15  was -- kept saying, "Petey.  Petey."  And he was yelling

16  out.  He made a reference -- he would say something

17  about his uncle.  And then when I would ask for

18  clarification, he wouldn't clarify anything.

19      Q.   And at the time when you were in the car with

20  Mr. Nelson was it just you and Mr. Nelson or was

21  Officer -- was Officer Shannon in the car as well?

22      A.    He was not in the car.  He was standing

23  outside.

24      Q.   Okay.  And is it fair to say that at that

25  point you guys were just waiting for the ambulance to

                                                          42

1    arrive?

2        A.    Yes.

3        Q.    Were there ever any suggestions from any of

4    the officers on the scene that one of the present

5    officers just go ahead and drive Mr. Nelson to John

6    George as opposed to waiting for the ambulance to

7    arrive?

8        A.    I don't remember at all at Ironwood.   I

9    remember later on towards the -- the end when we were

10   going to put in the wrap.

11       Q.    So at some point when you guys were over at

12   Chabot you recall there being a conversation about one

13   of the officers providing the transport for Mr. Nelson?

14       A.    Yes.   I remember Officer Shannon saying let's

15   get him in the wrap and take him to John George as a

16   suggestion.

17       Q.    And as far as you know was that the plan at

18   that point?   Or was that just still in the -- in the

19   area of possibilities, just things you guys were

20   discussing?

21       A.    It was in the area of possibility based on

22   Mr. Nelson's behavior.

23       Q.    But at that point there was no decision to --

24   for one of you guys to transport him, correct?

25       A.    Correct.

43

1    Q.   And when you guys were back sitting in front

2    of Ironwood what was your understanding of what the

3    delay was for the ambulance arrival?

4    A.   When I asked our dispatch, I just recall on a

5    couple occasions that the ambulance had been diverted.

6    And I think once was for a shooting or a stabbing in

7    Oakland.

8    Q.   Okay.  And at some point there was a decision

9    made to drive away from the Ironwood address and go to

10   an alternate location, correct?

11   A.   Yes.

12   Q.   And how did that decision come about?  Was

13   there a conversation?  Did you make the decision?  How

14   did that come about?

15   A.   There was a conversation.  Officer Shannon and

16   Officer McKee, I don't remember who.  One of the two

17   officers suggested moving him for a variety of reasons.

18   Q.   And if you can recall, what were the reasons

19   that prompted you guys to want to move Mr. Nelson from

20   in front of his ex-wife's house?

21   A.   One reason being that it seemed like he was

22   more agitated when he was yelling and looking in the

23   direction of the house.  So we didn't know if he was

24   agitated being there.  We also wanted to get him out of

25   the street if we were going to have to put him in a

44

1    wrap.  Get him out of a residential neighborhood and get

2    him in an area where there's better lighting and more

3    accessible for paramedics to come.

4        Q.   And can you explain Ironwood.  Is that -- what

5    type of a street is that?  Is that a cul-de-sac?  Is

6    that a through street?

7        A.   Ironwood's a court.  So where Patsy's house

8    was located it was at the dead end of the street.  Kind

9    of a T.  It was a court, but it was shaped in a T, not a

10   circular court.

11       Q.   Okay.  And that area you consider to be a

12   poorly lit area?

13       A.   There was minimal street lighting, but it

14   wasn't as good of lighting as it was at Chabot.

15       Q.   And ultimately who made the decision to -- to

16   transport Mr. Nelson to Chabot?

17       A.   From my recollection it was Officer Shannon.

18       Q.   Is it fair to say at that point

19   Officer Shannon was considered to be your supervisory

20   officer?

21       A.   Yes.  On field training he monitors my

22   decisions.

23       Q.   Were there any other factors that played into

24   the decision to move Mr. Nelson besides the lighting and

25   him, you believe, being more agitated and that being

45

1   more accessible to the paramedics at Chabot?

2        A.   Well, because Mr. Nelson's behavior was

3   increasingly agitated and he was kicking my patrol doors

4   and windows, his behavior was to the point where we were

5   discussing the use of the wrap or other means of

6   control.  And because of that we would need more space

7   because additional officers would be needed to put the

8   wrap on.  So an empty parking lot was a better option.

9        Q.   Was there any discussion while he was still on

10  Ironwood of getting him handcuffed?

11       A.   I think it was mentioned, but based on his

12  size and his behavior, we would need more officers to do

13  it.  And just it wasn't a possibility with just the

14  three of us.

15       Q.   Was there any attempt to get -- to ask

16  Mr. Nelson to comply with being handcuffed while he was

17  still located in the patrol car?

18       A.   We told him several times to stop kicking the

19  door, stop trying to kick the window.  And he would say

20  okay.  And a few seconds later he'd go right back into

21  kicking.  So for our own safety it wasn't -- it wasn't

22  possible to handcuff him there.

23       Q.   Have you ever handcuffed somebody through the

24  window while they were still located inside of a patrol

25  car?

46

1        A.    There wouldn't be a way.  There's bars in the

2   way of the -- between the window and the --

3        Q.    So during your time with the Hayward Police

4   Department you've never seen somebody handcuffed while

5   they were in the car with the window rolled down through

6   the bars?

7        A.    No.

8        Q.    And you drove Mr. Nelson away after you guys

9   left?

10       A.    Yes.

11       Q.    Mr. Nelson placed in a seatbelt?

12       A.    I don't recall.

13       Q.    Did you seatbelt Mr. Nelson?

14       A.    To my recollection, we didn't.  It wasn't safe

15   for us to open the door.  So I don't believe he was --

16   had a seatbelt on.

17       Q.    So when you decided to transport Mr. Nelson in

18   a moving vehicle he was not restrained in handcuffs nor

19   was he seatbelted; is that correct?

20       A.    From my recollection, he was not seatbelted.

21       Q.    Is it your understanding that you are

22   permitted to transport people in your -- in the backseat

23   of your patrol car who are not wearing seatbelts or in

24   handcuffs?

25       A.    Repeat that.

47

1    were just standing there waiting.  So there wasn't a

2    need for a camera.

3         Q.   Okay.  And is it your understanding that --

4    that you're not supposed to be operating your -- your

5    cameras when there's not something actively occurring?

6         A.   From my understanding at the time, I believe

7    our policy didn't indicate that.

8         Q.   Do you have a different understanding now?

9         A.   Our policy has changed since then.

10        Q.   Okay.  Do you recall when the policy changed?

11        A.   It's changed several times.  It's been at

12   least a few months.

13        Q.   Okay.  And your best estimate, how long was

14   your -- the camera off?

15        A.   I'd say it was probably only off for a couple

16   minutes.

17        Q.   And at the time you got Mr. Nelson to the

18   Chabot parking lot did you have any idea or

19   understanding of what the ETA on the ambulance was at

20   that point?

21        A.   I don't remember the exact time.  But I do

22   remember that they still had an extended wait.  And at

23   some point our dispatch even asked if paramedics were on

24   scene yet.

25        Q.   So from the time that you -- so you arrived at

                                                           54

1    the Chabot parking lot.  There's some period of time

2    where the camera was off.  What prompted you to turn the

3    camera back on?

4         A.   I turned the camera back on while I was still

5    at Ironwood.  And that was when Mr. Nelson started

6    kicking in my car.  So I activated it.

7         Q.   Okay.  What was Mr. Nelson kicking?

8         A.   He was kicking the door.  He was kicking the

9    window.  And he was trying to kick the rear window where

10   there was no bars or protective layer between the

11   subject and the window.

12        Q.   And after this incident when Mr. Nelson had

13   already passed, did you notice any damage to the inside

14   interior of your vehicle that you attribute to

15   Mr. Nelson's kicking?

16        A.   Say that again.

17        Q.   Did you -- after the incident did you find any

18   damage to the interior of your car that you attributed

19   to Mr. Nelson's kicking?

20        A.   I don't recall if I personally checked after.

21        Q.   To your knowledge, did anyone ever check your

22   patrol vehicle for damage that was attributed to

23   Mr. Nelson's kicking?

24        A.   According to the police report, yes.

25        Q.   Okay.  And what is your understanding of the

55

1  type of damage that Mr. Nelson caused by kicking the

2  backseat of the car -- or excuse me, the back of the

3  car?

4      A.   My recollection, I don't think there was any

5  significant damage.

6      Q.   When you say there was no significant damage,

7  was there some sort of minimal damage?  Was there some

8  sort of documented damage?

9      A.   I think Detective Mosby might have mentioned

10 scuffs or something along that line.  But no mention of

11 dents or anything.

12     Q.   Okay.  And was it your understanding that

13 there was no scuffs in the backseat of your patrol car

14 prior to Mr. Nelson getting into it?

15     A.   I don't check my patrol car for scuffs.  I

16 check it to make sure there's no weapons or contraband

17 in the backseat.

18     Q.   So you personally don't have any knowledge of

19 any damage that Mr. Nelson caused to the backseat of

20 your patrol car?

21     A.   Correct.

22     Q.   And while you were parked at Chabot were you

23 having -- were you physically still located in the car

24 with Mr. Nelson or did you get out?

25     A.   I got out.

                                                        56

1    A.   I recall just more of an informative training

2    of just to create awareness around it and what it really

3    is.

4    Q.   Okay.  And but you indicated that you had --

5    or sorry.  Strike that.

6         During that exited delirium -- was that

7    specific -- was that training specific to excited

8    delirium, or was that just a topic that was covered with

9    other things?  Or did you have, like, a class that was

10   training for excited delirium?

11   A.   I know -- I believe it occurred on a CPT day,

12   which is a training day that we have monthly.  I don't

13   think the entire day was about excited delirium.  But I

14   believe it was a topic that was covered during that day.

15   Q.   Okay.  After the incident or after -- I don't

16   want to say after the incident.  After Mr. Nelson became

17   unresponsive, at some point in the time after he became

18   unresponsive, you mentioned that his sweatshirt had

19   gotten tight and something to the effect of Mr. Nelson

20   had knocked out.  Do you recall saying that?

21   A.   Yes.

22   Q.   Can you explain what you meant by that?

23   A.   I think when I was trying to check for his

24   pulse Mr. Nelson was obese.  And a lot of the -- the fat

25   was, like, the sweatshirt was bunched up in his fat on

                                                        119

DEPOSITION OF OFFICER MICHELLE HALL

1    his neck.

2         Q.   And at the time you thought that might have

3    contributed to Mr. Nelson being unconscious?

4         A.   Well, I thought it was a possibility because

5    of the positioning.

6         Q.   Okay.  And at the time when you were

7    interacting with Mr. Nelson -- well, prior to him --

8    prior to him becoming unconscious, did you -- did you

9    notice his sweatshirt becoming, I guess, I don't know

10   how you would explain it, sort of wrapped up in --

11   wrapped up in his neck folds or neck meat area?

12        A.   I didn't notice it until I was trying to check

13   for his pulse.

14        Q.   Okay.  To your knowledge, during the incident,

15   prior to Mr. Nelson becoming unresponsive, is there

16   anybody else who would have been positioned in a vantage

17   point to be able to see Mr. Nelson's neck and his

18   sweatshirt area?

19        A.   Well, I don't think any of the officers that

20   were down at his legs would be able to at that -- while

21   they're applying the wrap.  I can't speak for

22   Officer Shannon.  I don't know what his view was.

23        Q.   Okay.  But to your knowledge he sort of was

24   facing the opposite of you, facing sort of away from

25   Mr. Nelson's head, neck area?

                                                          120

DEPOSITION OF OFFICER MICHELLE HALL

1   STATE OF CALIFORNIA          )

2                                )  ss.

3   COUNTY OF ALAMEDA            )

4

5            I hereby certify that the witness, OFFICER
    MICHELLE HALL, in the foregoing deposition appeared
6   before me, Kelly McKissack, a Certified Shorthand
    Reporter and a disinterested person.
7
             Said witness was then and there at the time
8   and place previously stated by me placed under oath to
    tell the truth, the whole truth and nothing but the
9   truth in the testimony given on the date of the within
    deposition; that the deposition is a true record of the
10  witness' testimony as reported by me.

11           The testimony of the witness and all questions
    and remarks requested by Counsel was reported under my
12  direction and control, caused to be transcribed into
    typewritten form by means of Computer-Aided
13  Transcription.

14           I am a Certified Shorthand Reporter licensed
    by the State of California, and I further certify that I
15  am not interested in the outcome of the said action, nor
    connected with, nor related to any of the parties in
16  said action, nor to their respective counsel.  I am not
    of counsel or attorney for either or any of the parties
17  to the case named in the within caption.

18           IN WITNESS WHEREOF, I have hereunto affixed my
    signature this 18th day of December, 2017.
19

20

21  __/Kelly McKissack_____

22  Kelly McKissack
    Certified Shorthand Reporter
23  California License No. 13430

24                    --o0o--

25

147