# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA
--oOo--

ROY NELSON III, Successor-
in-Interest to Decedent ROY
NELSON; ORENELL STEVENS,
individually,

         Plaintiffs,

                      CASE NO.:
     vs.               3:16-cv-7222

CITY OF HAYWARD, a municipal
corporation; MICHELLE HALL, in her
individual and official capacity
as Police Officer for the CITY OF
HAYWARD; NATHANAEL SHANNON, in his
individual and official capacity
as Police Officer for the CITY OF
HAYWARD; MATTHEW MCCREA, in his
individual and official capacity
as Police Sergeant for the CITY OF
HAYWARD; JOHN PADAVANA, in his
individual and official capacity
as Police Officer for the CITY OF
HAYWARD and DOES 1-50, inclusive,
individually and in their official
capacity as police officers for
the City of Hayward,          CERTIFIED COPY

         Defendants.
_____/


DEPOSITION OF OFFICER LLOYD McKEE


FRIDAY, APRIL 6, 2018


REPORTED BY: KELLY L. MCKISSACK, CSR #13430

1

DEPOSITION OF OFFICER LLOYD McKEE

1                      I N D E X

2

3    EXAMINATION BY:                           PAGE

4    MS. NOLD                                   6

5    MR. ROLLAN                                 59

6                      --o0o--

7

8    Appearance Page                            3

9    Exhibit Page                               4

10   Location                                   5

11   Reporter's Certificate                     64

12   Deponent Signature Page                    65

13   Deponent Signature Waiver                  66

14   Witness Letter                             67

15   Changes and/or Corrections                 68

16   Attorney's Notes                           69

17                      --o0o--

18

19

20

21

22

23

24

25

                                                    2

1                    A P P E A R A N C E S

2

3   For the Plaintiff:

4        LAW OFFICES OF JOHN L. BURRIS
         Airport Corporate Centre
5        7677 Oakport Street, Suite 1120
         Oakland, California 94621
6        510-839-5200

7        BY:  MELISSA NOLD, ATTORNEY AT LAW

8

9   For the Defendants:

10       CITY OF HAYWARD
         City Attorney's Office
11       777 B Street
         Hayward, California 94541
12       510-583-4460

13       BY:  RAYMOND R. ROLLAN, DEPUTY CITY ATTORNEY

14

15                       --o0o--

16

17

18

19

20

21

22

23

24

25

                                                        3

1                           EXHIBITS

2

3   EXHIBIT              DESCRIPTION                PAGE

4

5               (No Exhibits Were Marked.)

6

7                        --o0o--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          Pursuant to Notice of Taking Deposition, and

2     on Friday, April 6, 2018, commencing at the hour of

3     2:28 p.m., thereof, at 7677 Oakport Street, Suite 1120,

4     Oakland, California 94621, before me, KELLY MCKISSACK,

5     CSR No. 13430, a Certified Shorthand Reporter and

6     Deposition Officer of the State of California, there

7     personally appeared:

8

9               OFFICER LLOYD MCKEE,

10

11    called as a witness by the Plaintiffs, who having been

12    duly sworn by me, to tell the truth, the whole truth and

13    nothing but the truth, testified as hereinafter set

14    forth:

15

16                    --o0o--

17

18

19

20

21

22

23

24

25

5

1                    OFFICER LLOYD MCKEE,

2      having been first duly sworn, testified as follows:

3              THE WITNESS:  (TO OATH) Yes.

4                  EXAMINATION

5  BY MS. NOLD:  Q.  Good afternoon.  My name is Melissa

6  Nold.  I'm an attorney for the family of Roy Nelson.

7          Could you please say and spell your first and

8  last name, please.

9      A.  Lloyd McKee, L-L-O-Y-D, M-C-K-E-E.

10     Q.  And today we're going to be talking about the

11  incident that occurred on December 19 of 2016 when

12  Mr. Roy Nelson passed away.  Is that your understanding

13  of why you're here today?

14     A.  Yes.

15     Q.  And is it your understanding that you've been

16  named as one of the defendants related to the death of

17  Mr. Roy Nelson?

18     A.  Yes.

19     Q.  Okay.  And what documents did you review to

20  prepare for your deposition today?

21     A.  A transcript of my statement to the detectives

22  in the investigation.  And then review of body cam

23  footage.

24     Q.  And is that all?

25     A.  And my attorney.

6

1      Q.   Okay.  And that's -- we'll talk about some

2   rules in a few minutes.  We don't want you to discuss

3   anything that came as a result of conversations with

4   your attorney.  I just mean like standalone documents

5   that you can identify or camera footage.

6           With the -- and I'll go back in a minute and

7   I'll go over some rules.  I just want to go through this

8   first.  Did you only read your own transcript from the

9   interview?

10      A.   That's it.

11      Q.   And did you watch any body camera footage

12   other than your own that you're aware of?

13      A.   There was some body camera footage that I saw

14   that wasn't mine.

15      Q.   Okay.  Do you have an understanding of whose

16   camera footage it was?

17      A.   I don't recall whose it was.

18      Q.   Okay.  And, obviously, it's facing forward.

19   You can't see the person.  Sometimes people know for

20   whatever reason.  That's fine that you don't.

21           Have you been deposed before previously?

22      A.   Yes.

23      Q.   Okay.  About how many times?

24      A.   Once.  And it was for a traffic collision

25   between two parties.

7

1    Q.    Okay.  Well, I'll go over some rules and

2  hopefully make this a little bit easier and get you out

3  of here as soon as possible.

4         It's important that we make sure that all of

5  our responses are verbal.  No nodding of the head,

6  shaking, anything that the court reporter would need to

7  either be watching you do or trying to have to

8  interpret.  So no uh-huhs and huh-uhs.  We try to be

9  clear and use words.

10        Also, we want to make sure that we're getting

11 the best testimony possible of what's available within

12 the scope of your memory.  We would ask for your best

13 remembrance of any question.  And if you don't recall,

14 it's fine to say I don't know.  We don't want you to

15 speculate.  We don't want you to guess.  But we are

16 entitled to whatever portion of memory you do have.

17        So, for example, if you knew that it was

18 night, but you didn't know what time.  We'd be entitled

19 to know that you know that it was night or it was dark

20 or something like that even though you might not know

21 that it was 8:45.  Do you understand?

22    A.    Right.

23    Q.    Also, the testimony that you provide today is

24 being provided under oath.  You were sworn in by the

25 court reporter.  Even though there's not a judge present

8

1    here, we will be -- during the deposition your attorney

2    most likely will be putting forth some objections that

3    are being preserved for the record.  In case we get to

4    the point of having trial in this case, at some point

5    there will be a judge who will actually rule on the

6    objections that are being made today.

7          So try to be patient as we go through the

8    process.  I'll ask you questions.  Your attorney after I

9    ask the question may jump in and say objection.  But

10   unless he tells you otherwise, you still need to answer

11   the question.  It will be pretty clear usually if you're

12   being directed not to answer the question.

13         There will also be a transcript prepared of

14   the testimony that's provided today.  You'll get an

15   opportunity to review that transcript for accuracy.  And

16   please make any corrections that you find necessary,

17   whether that be location, spelling, anything that you

18   find that was not what you recall to be your testimony

19   was inaccurate.

20         But be mindful that any substantive changes

21   can be used to affect judgment of your credibility.  For

22   example, if this was a car accident case and you

23   testified that a light was green.  And then later on you

24   changed it to red.  That's a pretty significant,

25   substantive change, depending on what type of case it

9

1   was.  So that could be used to affect your memory and

2   credibility regarding your testimony.

3          You can take a break at any time you need.

4   Just let us know.  We just ask that you don't take any

5   breaks while there's a question pending.  Let's see.

6          Is there anything that would potentially

7   affect your ability to provide your best testimony

8   today?  You've been up for three days?  Are there any

9   medications or anything like that that might affect your

10  memory or ability to be deposed today?

11      A.   No.

12      Q.   Do you have any questions before we proceed?

13      A.   No.

14      Q.   Okay.  If you do have any questions or

15  anything is unclear as we're going forward, please let

16  me know.  If any of the questions are unclear, you're

17  not a hundred percent sure what I'm driving at, please

18  let me know.  We don't want people answering questions

19  under the impression that I mean one thing and then

20  later on you're kind of stuck with an answer to a

21  question that it wasn't something exactly what you

22  understood.  Do you see where I'm going?

23      A.   Yes.

24      Q.   Who is your current employer?

25      A.   City of Hayward.

                                                        10

1    Q.   How long have you been working for the City of

2    Hayward?

3    A.   Thirty years.

4    Q.   And during that 30 years have you been a sworn

5    officer that entire time?

6    A.   Yes.  And, actually, 30 years will be up

7    July 5th.  So it's not quite 30 years, but really close.

8    Q.   We'll let you round up at this point.  That's

9    a long time.

10        Prior to working for City of Hayward, did you

11   work in any other sworn law enforcement capacity?

12   A.   No.

13   Q.   What's your current job title right now?

14   A.   Police officer.

15   Q.   And I'm assuming that although it was a while

16   back that you went to a POST-certified police academy?

17   A.   Yes.

18   Q.   Wasn't sure when POST started.  I got

19   certified, like, almost 15, 19 years ago.

20        Where did you go to the academy?

21   A.   Started July 5th.  Actually, the academy

22   started two weeks later.  So --

23   Q.   Oh, I'm sorry.  I meant where, as far as what

24   police academy?

25   A.   Santa Rosa.

11

1        Q.   Okay.  At the junior college?

2        A.   Yes.

3        Q.   And are you currently working in the capacity

4    of a training officer?  And by training I don't mean as

5    a field training officer.  But I mean, do you train any

6    specific subjects?

7        A.   No.

8        Q.   And have you ever acted in the capacity of a

9    field training officer?

10       A.   I was.

11       Q.   Okay.  Are you currently a field training

12   officer?

13       A.   No, I'm not.

14       Q.   How long were you a field training officer

15   for?

16       A.   Three years.

17       Q.   At the time of this incident were you a field

18   training officer?

19       A.   No.

20       Q.   Have you ever acted in the capacity of field

21   training officer for any of the other defendants?

22       A.   No.

23       Q.   And do you have any certifications in any sort

24   of advanced officer courses?  Anything that's not

25   required as part of your continuing education?

                                                              12

1        A.    In 1999 I went to narcotics investigation

2   school.  And I went to a crime scene technician school

3   in '96 for two weeks.

4        Q.    And those are the only courses that you can

5   think of?

6        A.    Yeah.  I mean, there's been other schools that

7   I've been to.  I was a field training officer.  That

8   required a school.  I was a vehicle or pursuit driving

9   instructor.  I went to school for that.

10       Q.    And is it your understanding that you are

11  required to be familiar with Hayward Police Department

12  policies while on duty?

13       A.    Yes.

14       Q.    And is it your understanding you're supposed

15  to comply with all Hayward Police Department policies

16  while on duty?

17       A.    Yes.

18       Q.    Of course, any policies that apply while off

19  duty that are unknown to us.

20             And are you familiar with the City of

21  Hayward's WRAP device policy?

22       A.    I am.

23       Q.    And can you explain to me what a WRAP device

24  is?  Or I don't know if that's the proper terminology.

25       A.    It's a way to safely control somebody and

                                                          13

1    basically -- basically take away their ability to fight.

2        Q.    Okay.  And do you recall being trained by the

3    City of Hayward how to apply the WRAP device?

4        A.    Yes.

5        Q.    Do you recall when you had -- when you had

6    that training or what it looked like?

7             MR. ROLLAN:  Objection.  Vague as to time and

8    number of times.

9    BY MS. NOLD:  Q.  You can still answer.

10       A.    Yeah.  I don't know how many times I've been

11   to the training, but it's I think bi-annually.

12       Q.    Okay.  So you think there's a WRAP training --

13       A.    Correct.

14       Q.    -- a course bi-annually?

15       A.    Yes.  It's -- it's a -- it's -- our people

16   trained us and I believe it's bi-annually.

17       Q.    Okay.  So it's inter-department, department

18   personnel providing the training?

19       A.    Yes.

20       Q.    Is this -- is the training a hands-on

21   training, or is it like a classroom learning training?

22       A.    No.  It's a hands-on training.

23       Q.    And during the what you believe are the

24   bi-annual training is there any sort of certification

25   that's provided with the training?

                                                    14

1        A.    I don't believe so.

2        Q.    Okay.  Like, for example, CPR or something you

3   have to be recertified every certain period of time.

4   You're not aware of any certification for the WRAP like

5   that?

6        A.    Correct.

7        Q.    Okay.  When was the last time that you had

8   WRAP training that you recall?

9        A.    Probably 2015 or 2016.

10       Q.    And you said that the training is a practical

11   application training?

12       A.    Yes.

13       Q.    So are you actually putting the WRAP restraint

14   on living people?

15       A.    Other officers.

16       Q.    Other officers.

17             And during the WRAP training, is the training,

18   to your understanding, is it to learn how to apply the

19   various components of the WRAP device?

20       A.    Yes.

21       Q.    Okay.  And during the training are the people

22   that you're trying to put the WRAP device on, are

23   they -- are they remaining stationary or are they, for

24   example, acting out scenarios?

25       A.    Yeah.  It's just -- they're not acting out

                                                              15

1    scenarios.  It's just kind of a round robin where you

2    get three officers or two officers and you put another

3    officer into a WRAP.

4         Q.   Okay.  But, for example, while you're doing

5    the WRAP training, the hands-on training, there's not a

6    person who's, like, for example, actively resisting or

7    doing anything to obstruct your ability to put on the

8    WRAP, correct?

9         A.   Correct.

10         Q.   Okay.  Just gives us a better idea.  Everyone

11    does very different training.  So trying to figure out

12    what the capacity of the training was.

13              Do you recall if there was any sort of written

14    or practical test that was done prior to you being

15    completed -- the WRAP training being completed?

16         A.   I don't recall any written test.

17         Q.   Okay.  Are you familiar with the City of

18    Hayward's Mental Illness Commitment Policy?

19         A.   Yes.

20         Q.   And is it your understanding that the Mental

21    Illness Commitment Policy is related to performing

22    detentions under Welfare and Institution Code 5150?

23         A.   Yes.

24         Q.   Okay.  Can you explain to me what your

25    understand of what a mental illness commitment is from

16

1    the capacity of a police officer?

2         A.   It's -- it's identifying and providing

3    assistance and help for people who have a mental illness

4    or a -- takes them out of their own -- their own mind.

5    And it could be anything from being under the influence

6    and/or being somebody that has documented mental

7    illness.  It's being unable to care for themselves and

8    make decisions for themselves.

9         Q.   Would it be fair to say that your

10   understanding of what a mental health commitment is, is

11   when a person is a danger to themselves, a danger to

12   others or gravely disabled to the point that they're

13   being involuntarily taken for a mental health

14   evaluation?

15        A.   Yes.

16        Q.   Sorry to put you on the spot for trying to

17   explain what that is.

18        A.   I mean, it's -- yeah.

19        Q.   Do you recall being trained by the City of

20   Hayward on how to conduct a mental illness commitment

21   Under Section 5150?

22        A.   Yes.

23        Q.   And what type of training did you receive?

24   Was it classroom training?  Was it practical training,

25   if you recall?

                                                          17

1    A.    It was classroom and it was practical.    It was

2    small groups, which has instructors from outside of the

3    police department as well as officers giving the

4    training.

5    Q.    Okay.  And is the mental illness commitment

6    training something that you do on a routine basis

7    annually?

8    A.    Yes.

9    Q.    Okay.  And is there any sort of certification

10   or test required to be considered to be able to do a

11   5150 hold?

12   A.    There's no formal certification.

13   Q.    Okay.  Is it your understanding that a Hayward

14   police officer would need to have completed those

15   trainings prior to conducting a 5150?

16   A.    Yes.

17   Q.    During the course that is geared at mental

18   illness commitments, do you recall covering any sort of

19   topic areas that had to do with how to interact with

20   people with mental illnesses, how to speak to people

21   with mental illnesses, things like that?

22   A.    Yes.

23   Q.    Do you recall offhand any of the, I guess,

24   guidelines or suggestions on how to interact with people

25   with mental health problems, even in just a general way?

18

1    A.   I mean, depending on their illness or their

2  mindset, you always try to talk at a base level, not --

3  not argumentative.  Not pointed towards them, but

4  pointed towards their affliction, whatever that might

5  be.

6    Q.   During the training do you recall having been

7  provided information about different types of mental

8  health conditions, for example, schizophrenia, bipolar

9  disorder, things like that?

10    A.   Yes.

11    Q.   Do you recall getting training wherein you

12  were notified that some members of the population that

13  are mentally ill may see or hear things that are not

14  real, but that they are realtime experiencing?

15    A.   Yes.

16    Q.   And is it your understanding that those

17  consideration are things that you're supposed to take in

18  as you're evaluating a person for a mental health

19  commitment?

20    A.   Absolutely.

21    Q.   So, for example, you understand if a person

22  has schizophrenia, that person may be, say, hearing

23  voices or seeing things that aren't there while they're

24  interacting with you?

25    A.   Yes.

19

1      Q.   And you further understand that sometimes

2   people that have schizophrenia may or may not even

3   recognize you to be a police officer, even a human

4   being, for example?

5      A.   Correct.

6      Q.   And you take all these things into

7   consideration while you're interacting with a mentally

8   ill person, correct?

9      A.   Yes.

10      Q.   Okay.  Have you ever been sued in your

11   capacity as a police officer?

12      A.   I have not.

13      Q.   Now, I want to talk a little bit specifically

14   about the incident.  So when I refer to the incident, I

15   mean to indicate December 19, 2015, the late night,

16   early morning time when Mr. Nelson passed away.

17      A.   Yes.

18      Q.   So if I refer to the incident, I mean to

19   indicate that incident.  If I mean a different date,

20   I'll try to be specific.  If it's ever unclear what date

21   I'm talking about, please let me know so I can clarify.

22           On the night of the contact with Mr. Nelson,

23   do you recall if you were riding alone or with another

24   officer?

25      A.   I was by myself.

1      Q.    And do you guys typically have solo night

2    units?

3      A.    Yes.

4      Q.    Do you recall what shift you were working?

5      A.    Midnight shift from 6:00 p.m. to 6:30 a.m.

6      Q.    Do you know if you were the first responding

7    officer to the -- to the Nelson home that night?

8      A.    Yes.

9      Q.    And were you dispatched to that call for

10   service?

11     A.    I was.

12     Q.    Do you recall what the -- what the dispatcher

13   told you?  What was your understanding of the type of

14   call for service?

15     A.    An unwanted guest at a private residence.

16     Q.    Okay.  Is it fair to say that when you were

17   dispatched and responded to the -- initially responded

18   to the home that you weren't aware that there was a

19   potential 5150 involved?

20     A.    I -- I don't recall that.  I -- I believe that

21   I was sent for an unwanted guest.

22     Q.    Okay.  When you were en route to what I'll

23   represent is the property on Ironwood Court, when you

24   were en route to Ironwood, did you contact dispatch or

25   use any other resources to try to get any background on

                                                          21

 1   the property you were going to or the individuals that

 2   you were contacting?

 3        A.   No.

 4        Q.   And while you were en route to the Ironwood

 5   address were you aware that other officers were being

 6   dispatched as well?

 7        A.   Yes.

 8        Q.   At that point who did you know were also an

 9   their way?

10        A.   It was Officer Shannon as the field training

11   officer of Officer Hall.

12        Q.   Okay.  Were those the only persons arriving

13   initially?

14        A.   Yes.

15        Q.   And prior to arriving to the house, did you

16   have any personal knowledge of Roy Nelson?

17        A.   Yes.

18        Q.   And had you had previous police contacts with

19   Roy Nelson?

20        A.   Yes.

21        Q.   When you initially arrived at the house, do

22   you recall who you first spoke to?

23        A.   It would be his ex-wife.

24        Q.   Okay.  I'll represent her name is Patsy Nelson

25   Taft or refer to her as Mrs. Nelson so we'll know who

                                                          22

1    we're talking about.

2          So when you first arrived at the house you

3    talked to Patsy Nelson Taft, Mr. Nelson's ex-wife,

4    correct?

5          A.   Yes.

6          Q.   Do you recall what Patsy told you about

7    Mr. Nelson or the situation?

8          A.   That he was paranoid and believing that

9    somebody was -- I'm trying to recall what specific.  She

10   wanted him out of the home because of his, I guess,

11   schizophrenia or another issue.  But she advised that

12   every now and then she allows him to have a place to

13   sleep.  And she couldn't deal with him on this evening.

14         Q.   And was it your understanding that Ms. Nelson

15   was contacting the police because she was reporting some

16   sort of criminal activity?  Or was it your understanding

17   that she contacted the police to get assistance for his

18   mental health disorder?

19         A.   The second.

20         Q.   And when you spoke to Ms. Nelson it was your

21   understanding that she was relaying that he had some

22   sort of mental -- diagnosed mental health problem,

23   correct?

24         A.   Correct.

25         Q.   Do you recall Ms. Nelson making references to

                                                          23

 1    Mr. Nelson having recently been released from John

 2    George Psychiatric facility?

 3         A.   Yes.

 4         Q.   Okay.  Had you ever participated in a 5150

 5    hold on Mr. Nelson in the past before this incident?

 6         A.   No.

 7         Q.   What was the nature of your previous contacts

 8    with Mr. Nelson?  Do you have any recollection of them

 9    specifically or just --

10         A.   I -- honestly, I hadn't dealt with Mr. Nelson

11    in probably 20 years.  But in the '90s he was well

12    known.

13         Q.   And when you say "well known," could you be

14    more illustrative of what you mean by that?  Strike

15    that.

16              When you say "well known," do you mean well

17    known to the police department?

18         A.   Well known, yes.

19         Q.   Okay.  He was somebody that you knew by name

20    at that point?

21         A.   Yes.

22         Q.   Okay.  At what point during this incident did

23    you realize that the well-known Mr. Nelson from many

24    years ago was the same gentleman that was --

25         A.   As soon as I saw him coming down the stairs.

                                                           24

1      Q.    Okay.  So you immediately recognized

2   Mr. Nelson esthetically?

3      A.    Yes.

4      Q.    Can you describe Mr. Nelson's physical

5   stature, physical description?

6      A.    Probably 6'2, 6'1, 300 pounds.  Stocky.

7      Q.    And was that Mr. Nelson's sort of general

8   description from many years ago as well?

9      A.    He was -- he was out of shape now.  He was a

10  stocky, strong person 20 years earlier.

11     Q.    Okay.  Obviously, at this point he was larger

12  and older?

13     A.    Um-hmm.

14     Q.    Okay.  And when you said when you first saw

15  Mr. Nelson he was coming downstairs.  You mean

16  downstairs from inside of Mrs. Nelson's house?

17     A.    Yeah.  He was upstairs and I was talking to

18  Ms. Nelson, Mrs. Nelson when he started coming down the

19  stairs.

20     Q.    Okay.  And at that point did you have direct

21  communications with Mr. Nelson?

22     A.    Yeah, briefly.  I asked him to step outside.

23     Q.    Did he do so?

24     A.    So I could talk to him.  Yes, he walked out.

25     Q.    And was Mr. Nelson at that point compliant

25

1    with your direction to come outside?

2        A.   Yes.

3        Q.   Did you have -- when Mr. Nelson came outside

4    did you have any discussion with him about his mental

5    health?

6        A.   No.  Officer Hall and Officer Shannon were

7    walking up, and I just let him walk to them.

8        Q.   Okay.

9        A.   And I talked to Mrs. --

10       Q.   Ms. Nelson?

11       A.   Um-hmm.

12       Q.   Is it fair to say after Mr. Nelson came

13   outside, is it fair to say that you transferred custody

14   of him and control of him to the other officers?

15       A.   Yes.

16       Q.   And you said those officers were Hall and

17   Shannon?

18       A.   Correct.

19       Q.   Was there anyone else there at that point?

20       A.   No.

21       Q.   And at that point when you allowed Mr. Nelson

22   to come outside, at that point had he been handcuffed?

23       A.   No.

24       Q.   Was it your understanding that the other

25   officers would be the ones to handcuff him because you

26

1    were letting him go past you?

2         A.   Well, they were -- and they were just past me.

3    There's a walkway out of the front door.  And halfway

4    there it jogs to the right and then to the street.  And

5    they stopped him and started talking to him right there.

6         Q.   Okay.  So at that point is it fair to say that

7    you sort of -- you ceased your policing related to

8    Mr. Nelson at that moment?

9         A.   I talked to Mrs. Nelson for a short time.  And

10   she expressed her frustration that his -- she allows him

11   to come over every now and then just to have a place to

12   sleep.  She's married to somebody else at this point.

13   And she just didn't want the issue of his mental illness

14   keeping everybody awake.

15        Q.   Right.  And so you continued to speak with

16   Ms. Nelson.  And it sounds like she was sort of

17   discussing some of the history or background of the

18   interaction with Mr. Nelson.  And Mr. Nelson went on to

19   interact with Officers Hall and Shannon?

20        A.   Correct.

21        Q.   When Mr. Nelson made his way to Officers Hall

22   and Shannon, do you recall seeing them handcuff him at

23   that point?

24        A.   No.

25        Q.   Did you see a necessity of handcuffing him at

27

1    that point?

2         A.    No.

3         Q.    Was it your understanding when you allowed

4    Mr. Nelson to go to Officers Shannon and Hall, was it

5    your understanding at that point that there had already

6    been a decision related to a 5150 hold of Mr. Nelson?

7         A.    My assumption was that they were getting

8    information from him to substantiate a 5150 hold.

9         Q.    Okay.  And when you contacted -- had contact

10   with Mr. Nelson, he was -- he was verbalizing and

11   communicating, correct?

12        A.    No.  He wasn't talking at all.  His eyes were

13   really wide and looked like he had either -- well, it

14   looked like a mental illness because he had a blank

15   stare right past you.

16        Q.    Okay.  So when you first contacted -- had

17   face-to-face contact with Mr. Nelson that night, he

18   showed signs that you in your training and experience

19   believed to be indicative of his mental health

20   condition?

21        A.    Yes.

22        Q.    Okay.  So is it fair to say at that point you

23   didn't have any real question about the validity of his

24   mental health?

25        A.    Between what his ex-wife was saying and the

28

1    look he had coming down the stairs, I didn't -- I

2    believed that there was a mental health problem at that

3    time.

4        Q.   Okay.  So at that point it seemed to you that

5    the 5150 would be warranted?

6        A.   Correct.

7        Q.   Okay.  Was it your understanding from the

8    contact you had at that point with Mr. Nelson that --

9    that he was a danger to himself?

10       A.   Yes.  A danger to himself and others because

11   he looked like he was kind of -- kind of paranoid or

12   frightened of something which wasn't there.  There

13   was -- there was nothing to cause fear.  He just had

14   that far away stare.

15       Q.   Okay.  When you first contacted Mr. Nelson or

16   Mrs. Nelson, do you recall anyone saying that Mr. Nelson

17   was reporting people being on the roof?  Do you recall

18   something like that?

19       A.   Yes.

20       Q.   Do you recall from either one of Mr. or

21   Mrs. Nelson him believing that his adult son had been

22   kidnapped or something to that effect?

23       A.   Yes.

24       Q.   And are those some of the things that you took

25   into consideration?

                                                        29

1    A.   Yeah.  And they were real quick.  I mean, she

2    had -- she had those specifics that she was talking

3    about the second the door opened.

4    Q.   Okay.

5    A.   She was frustrated.

6    Q.   Sure.  Did -- and, obviously, when you arrived

7    you did not see anyone on the roof or anything to

8    validate his -- his concerns?

9    A.   Correct.

10   Q.   Do you know where Mr. Nelson went after --

11   after he went with Officer Hall and Shannon while you

12   were talking to Mrs. Taft?  Was he within the perimeter

13   of you being able to see him at that point?

14   A.   Yes.  Their car was parked right behind the

15   driveway on the street.  And so that's where they went

16   to.  I could see them.

17   Q.   So you could see them by the patrol car from

18   where you were standing?

19   A.   Yes.

20   Q.   At some point you finished up with

21   Mrs. Nelson?

22   A.   Yes.

23   Q.   Did you go back over to the patrol car where

24   Mr. Nelson was?

25   A.   Yes.

30

1       Q.   At that point where was Mr. Nelson?

2       A.   On the right side of the backseat.

3       Q.   Was he seated in the car?

4       A.   He was.

5       Q.   And at some point somebody made a decision to

6    remove Mr. Nelson from the Ironwood address; is that

7    correct?

8       A.   Yes.

9       Q.   Do you know who made that decision?

10      A.   I had input with that decision.  I can't

11   remember if I'm the only person that had the thought of

12   transporting him to Chabot College.

13      Q.   And why did you choose to transport Mr. Nelson

14   to Chabot?

15      A.   We were at that location -- and I'm only

16   speculating.

17      Q.   No.  No.  We don't want you to speculate.

18      A.   Okay.  I don't know the amount of time.

19   That's what I'm saying.  From the time that he got into

20   the car we were there waiting for an ambulance it seemed

21   like an hour.

22      Q.   Okay.

23      A.   Close to an hour.

24      Q.   And it's fair to say, I mean, we know you

25   don't know exactly the period of time.  Your best --

                                                          31

1  your best estimate of the time is fine.  We just don't

2  want it to be, you know, it was hours.  If you feel like

3  at the time it was your best idea that it was an hour,

4  that's fine.

5          So while you guys were in front of the house

6  waiting for the ambulance, what was your understanding

7  of what the delay was for the ambulance or is that

8  typical response time for the ambulance in that area?

9      A.   It is not typical.  And we kept asking for an

10  ETA on the ambulance.  And they were still, I guess, too

11  busy.  The reason -- my reasoning moving him was he was

12  really loud at times.  People were coming outside of

13  homes, and it was after midnight, looking, seeing what

14  was going on.

15          There's only -- well, there's a house -- or a

16  unit on either side of -- of Mrs. Nelson's residence.

17  And because of the noise I thought that it would be best

18  just to take him out of the neighborhood to Chabot

19  College.  It's well lit, nobody's there, and there's

20  cameras everywhere at the college.

21      Q.   Okay.  Was -- do you recall, was it your

22  understanding that the ambulance was delayed in some way

23  related to a shooting, some sort of a trauma incident?

24      A.   At one point, but it just never cleared up.

25      Q.   Was there any conversation at that point when

32

1    you were still at Ironwood about going ahead and having

2    one of you transport Mr. Nelson to the mental health

3    facility yourselves?

4        A.   The mental health facility does not accept

5    anybody without medical clearance.  So I don't know that

6    there was any real discussion about driving him there.

7    That takes -- we have a small -- not a small, but a --

8    we've got eight officers for the entire shift.

9        Q.   So it's your understanding that prior to

10   taking him to a mental health facility, I'm using John

11   George as an example because that's probably where he

12   would have gone.

13       A.   Right.

14       Q.   That prior to doing -- to getting him to John

15   George, that he would have needed to go to a local

16   medical hospital for medical clearance and then would be

17   transitioned to the mental health facility?

18       A.   Correct.

19       Q.   Okay.  So then once the decision was made to

20   transfer Mr. Nelson to Chabot, then I believe

21   Officer Hall drove the patrol car over?

22       A.   Correct.

23       Q.   Were you aware that Mr. Nelson was transported

24   without -- without a seatbelt on?

25       A.   At the time no, I wasn't.

                                                              33

1    Q.   Okay.  Is it your understanding that you're

2    supposed to have individual -- civilians seatbelted

3    prior to transporting them in a patrol car?

4    A.   Yes.

5    Q.   But that wasn't something you were aware of

6    prior to the car being driven over to Chabot?

7    A.   Trying to think back.  I -- I can't recall

8    whether he was seatbelted to begin with and he was --

9    took off his seatbelt, or it wasn't applied to him.  I'm

10   not sure.

11   Q.   Okay.  Fair to say you're not sure exactly

12   what the situation was with the seatbelt because you

13   weren't participating in it?

14   A.   Correct.

15   Q.   Okay.  And that's fine because we don't want

16   you speculate on what may or may not have happened.

17   Because if you don't have direct knowledge, we prefer

18   you just to say you're not sure.

19        But in contrast to that, if somebody told you

20   later that they had done something, you can testify to

21   that.  But not necessarily things that you -- but not

22   anything you didn't see with your own eyes.

23   A.   Correct.

24   Q.   And when they went off to Chabot, is it fair

25   to say that you followed them in your patrol car?

34

1        A.    Yes.

2        Q.    Okay.

3        A.    Or I'm sorry.  He could have -- I mean,

4    Officer Hall could have followed me to -- to Chabot

5    College.  I think that's the way it actually happened.

6    I think I was in front.

7        Q.    But you went to Chabot together, essentially?

8        A.    Yes.

9        Q.    At that point when you were headed to Chabot

10   was Officer McCrea already on scene or was he not there

11   yet?

12       A.    He was not.

13       Q.    Okay.  And it was my understanding he was the

14   acting sergeant that night; is that correct?

15       A.    I believe so.

16       Q.    Is it your understanding that once you guys

17   had actually arrived at Chabot that Mr. Nelson had

18   already been evaluated for the 5150 hold, or was that

19   still pending?

20       A.    No.  There was enough reasonable suspicion

21   that he had a crisis.

22       Q.    Based on your own observations of him you had

23   already made that determination, correct?

24       A.    Correct.

25       Q.    So going over to Chabot was really essentially

                                                              35

1    to facilitate waiting for the ambulance to come in a

2    place that would potentially be less disturbing to his

3    neighbors?

4         A.   Correct.

5         Q.   And at some point there was a decision to get

6    Mr. Nelson out of the car and put him into a WRAP

7    device; is that correct?

8         A.   Yes.

9         Q.   At that point had Officer McCrea already

10   arrived on scene?

11        A.   Yes.

12        Q.   Whose -- whose decision or -- whose decision

13   was it to place Mr. Nelson into a WRAP device?

14        A.   I don't know.

15        Q.   Okay.  Is it fair to say that you did not

16   participate in any conversations regarding placing

17   Mr. Nelson into a WRAP device?

18        A.   That's correct.

19        Q.   Once the decision had been made to take

20   Mr. Nelson out of the car and to put him into a WRAP

21   device, are you aware of any sort of discussion or

22   planning between the officers of how to facilitate that?

23        A.   No.

24        Q.   So, to your knowledge, you didn't participate

25   in any sort of discussion or planning on how to

                                                            36

1    facilitate getting Mr. Nelson out of the car and into

2    the WRAP device?

3         A.   That's correct.

4         Q.   How did you become aware that the WRAP device

5    was going to be applied?  Do you recall?

6         A.   I opened up the right side rear door and

7    Mr. Nelson stepped out of the car.  And then we -- or he

8    starting walking around the back of the vehicle.  I was

9    trying to hold on to him.  And then he was taken to the

10   ground.  I don't recall who started that.  But when he

11   went to the ground I was holding his legs.

12        Q.   Okay.  We'll go back a couple steps.  Did you

13   later become aware that they had -- that the other

14   officers had had a discussion with a plan of how to get

15   him out of the car?

16        A.   I was not part of that discussion.  So I

17   didn't know that that was what was going to happen.

18        Q.   Okay.  So when you opened the car door you

19   weren't aware of a plan to do something different than

20   that, correct?

21        A.   Correct.

22        Q.   Okay.  And as a result of opening the door,

23   Mr. Nelson followed suit and got out of the car?

24        A.   Correct.

25        Q.   When Mr. Nelson got out of the car, which

37

1    officers were on the passenger side of the car at that

2    point, besides you?

3         A.   Me.

4         Q.   Just you.  When Mr. Nelson got out of the car,

5    did he verbally threaten or physically threaten you in

6    any way?

7         A.   No.

8         Q.   When Mr. Nelson got out of the car, did he

9    spit or kick or punch or do anything that caused you to

10   consider yourself to be in danger, other than his

11   generally being a large man?

12        A.   Well, yeah.  And his mental crisis at the

13   time.  No, I didn't have any.

14        Q.   Fair to say that other than just the general

15   concerns with a person who has mental health problems

16   that could be unpredictable, that you had no specific

17   fears of Mr. Nelson at that point or concerns about

18   Mr. Nelson at that point?

19        A.   I mean, I was fearful of what could happen.

20   And at the time I didn't -- didn't see any reason other

21   than he was -- I didn't see any exigency.  But he -- he

22   was -- I'm not even sure how he got to the ground.  But

23   I didn't see anybody -- maybe -- maybe they talked him

24   down or something.  But as we got around -- as I got

25   around the back of the vehicle he was assisted to the

                                                           38

1    ground.

2        Q.   And when he was assisted to the ground did it

3    seem that under the circumstances that he was being

4    cooperative?

5        A.   Yeah.

6        Q.   And once Mr. Nelson got onto the ground, do

7    you recall which officers were there at that point?

8        A.    Acting Sergeant McCrea, Officer Padavana,

9    Officer Suzuki, I believe.

10       Q.    And did you say Officer Hall?

11       A.    Yeah.  Officer Hall and Officer Shannon.

12       Q.    So at that point when Mr. Nelson was taken to

13   the ground, do you recall anybody other than

14   Officers McCrea, Shannon Hall, Padavana and Suzuki and

15   yourself being present?

16       A.    Yeah.  Officer Gillette was there.

17       Q.    And of the officers that you've named, do you

18   recall which ones actually had physical contact with

19   Mr. Nelson?

20       A.   I did.  Officer Padavana did.  Officer Shannon

21   did.  Officer Hall did.

22       Q.   What about Officer McCrea?  Do you recall

23   Officer McCrea participating in putting Mr. Nelson to

24   the ground?

25       A.   I don't recall.

                                                        39

1    Q.   And is it your understanding that

2  Officers Gillette and Suzuki were present, but didn't

3  have physical contact with Mr. Nelson?

4    A.   Well, later on they had some physical contact,

5  but that was CPR.

6    Q.   Okay.  Thank you for clarifying.  And I meant

7  physical contact, I did mean prior to him -- prior to

8  him becoming unresponsive.

9    A.   Not that I recall.

10    Q.   Okay.  And I only ask what you saw.  Certainly

11  something could have happened.  There was a lot going on

12  at once.  Somebody could have done anything.

13    A.   And I was all the way down at the ankles.  I

14  was holding legs.

15    Q.   Okay.  And so once Mr. Nelson was on the

16  ground, was it your understanding that somebody up

17  towards his arms and upper torso was in the process of

18  trying to handcuff him?

19       MR. ROLLAN:  Calls for speculation.

20  Objection.

21  BY MS. NOLD:  Q.  And I mean just from what you observed

22  being there.

23    A.   I didn't -- I didn't see anybody -- from where

24  I was at trying to hold his legs, I didn't see anything

25  else.

40

1    Q.   Is it fair to say that your position by his

2  legs there were other officers obstructing --

3  obstructing your view of what else was going on?

4    A.   Yes.  I was literally on the ankles.  And that

5  was -- I didn't go up any further or anything.

6    Q.   Prior to Mr. Nelson being taken out of the

7  car, do you recall having any conversation with him

8  while he was in the car or speaking to him or him making

9  any sort of comments?

10    A.   No.  No.  He was -- he was not -- he didn't

11  speak at all that I recall.

12    Q.   Okay.  And once -- once you -- when you were

13  down at Mr. Nelson's ankles, what was your understanding

14  of what was going to be going on at that point once he

15  was taken to the ground?

16    A.   Well, at that point I realized that the WRAP

17  was going to be used.  That was the first I knew of it.

18  And I just assisted with the legs to mobilize him --

19  immobilize him.

20    Q.   And while you were down do you recall any of

21  the other officers giving directions or providing

22  directions regarding the application of the WRAP or the

23  contact with Mr. Nelson?  Was there anybody in charge

24  providing assistance in telling the other officers what

25  to do?

41

DEPOSITION OF OFFICER LLOYD McKEE

1    A.   I don't recall anybody telling others what to

2  do.  Using the device is -- it's not the first thing you

3  go to, but it's used more often.  I guess each officer

4  figures what they're going to do and it just builds on

5  itself like that.

6    Q.   Okay.  And once -- at some point, obviously,

7  you said once you realized the WRAP device came out, is

8  that what caused you to know that the WRAP was going to

9  be applied?

10    A.   Yes.

11    Q.   While you were -- who was assisting you with

12  applying the WRAP device?

13    A.   Well, I had the ankles.  And the first thing

14  you do is you cross the legs at the ankles and you wrap

15  it with a small Velcro strap.

16    Q.   And were you able to apply that strap to

17  Mr. Nelson's ankles?

18    A.   Yes.

19    Q.   During the time you were doing that was

20  Mr. Nelson kicking?  Do you recall?

21    A.   He was -- I wouldn't say he was kicking.  He

22  was moving his legs.  It took myself, I believe it was

23  Officer Padavana above me.  So that would be around his

24  knees area.  And I was lifting up his legs to get the

25  WRAP underneath him.

42

1      Q.   Do you recall during that time anyone trying

2   to -- anyone explaining or trying to explain to

3   Mr. Nelson what was going on as far as being placed in

4   the WRAP device and being transported for mental health

5   treatment, anything like that?

6      A.   Well, he was -- he was advised the mental

7   health treatment hospital was ultimately where he was

8   going to go for -- for care.  And he was told that.  I

9   don't recall -- I don't recall any conversation that was

10  up in his -- the WRAP has -- first thing is the strap

11  around the ankles.  And then a vest over chest -- chest

12  and back and the WRAP around the leg.  And I didn't hear

13  anybody talking between that.  I'm sure that there was

14  lots of talking, but I didn't pay attention to it.

15     Q.   Fair to say you were focused on --

16     A.   My part.

17     Q.   -- securing your portion?

18          To your knowledge, which officers were

19  assisting in applying the WRAP itself?  It sounded like

20  you and Officer Padavana near the knee area?

21     A.   He was -- yeah.  He was above me.  I had the

22  ankles.  And I'm not sure who else helped, because

23  that's a heavy part of the body.  So I'm sure somebody

24  else helped Padavana pick him up enough to get the WRAP

25  underneath his body.

                                                        43

1      Q.   Is there a set number of people that -- that's

2  necessary to apply a WRAP?  Does it depend on the size

3  of the person?

4      A.   It depends on who you're applying it to.

5      Q.   And what they're doing while you're trying to

6  apply it?

7      A.   Correct.

8      Q.   Are there any sort of set positionings when it

9  comes to applying the WRAP?  Like, is there a designated

10  foot person, a knee person, or is that just how it

11  turned out?

12      A.   It's how it turned out this time.  I mean,

13  sometimes it's one person with the ankle and the WRAP.

14  Depends on how cooperative the person is.

15      Q.   And are you aware of any weight restrictions

16  related to applying the WRAP?  Any type of high-end

17  weight that would not allow a person to fit into a WRAP

18  device?

19      A.   I'm not aware.

20      Q.   Have you ever had a situation where a person

21  was too large to get into the WRAP device?

22      A.   The straps and everything, no.  The straps are

23  long enough to where large people could still fit their

24  legs in it to mobilize them -- immobilize them.

25      Q.   So you had no reason to think that Mr. Nelson

44

1    wouldn't fit?  That was not a concern as you were going

2    forward?

3         A.   No, it wasn't.

4         Q.   Now, did Mr. Nelson successfully -- did the

5    WRAP device end up being successfully applied to

6    Mr. Nelson?

7              MR. ROLLAN:  Objection.  Vague.

8    BY MS. NOLD:  Q.  I mean, just did it get completed?

9    Was it applied in full or was it partial?

10        A.   I think it was partial, and then it was

11   removed.

12        Q.   Did you ever hear when Mr. Nelson was

13   telling -- telling the officers that he could not

14   breathe?

15        A.   I did not hear that.

16        Q.   Have you heard the -- you've seen the videos

17   where those things were said.  And although I don't

18   recall hearing that on your video, probably due to your

19   point of view, were you ever made aware that Mr. Nelson

20   had said that he couldn't breathe during this incident?

21        A.   I was -- I was made aware of that afterwards.

22   I mean, like a lot afterwards.  I didn't know that --

23        Q.   He had said it at the time?

24        A.   Right.

25        Q.   Okay.  Just for clarity, you became aware that

                                                              45

1    he had said that, but not in realtime at the time he

2    said -- for example, at the time he said "I can't

3    breathe" nobody said, whoa, he said he can't breathe or

4    anything to alert the other officers?

5          A.    Correct.  I didn't hear it.

6          Q.    That's what I mean.  If you had heard

7    Mr. Nelson say that he couldn't breathe, would you have

8    intervened in some way?

9          A.    Yes.

10         Q.    What would you have done?

11         A.    Stopped applying the WRAP until we found out

12   that he was saying that or he wasn't.

13         Q.    Okay.  And at some point in the process did

14   you become aware that Mr. Nelson was having some sort of

15   medical distress?

16         A.    I became aware of it when they started taking

17   the chest part off of him.

18         Q.    Okay.  Prior to that you hadn't been made

19   aware of Mr. Nelson having either verbally or physically

20   made indications he was having medical distress?

21         A.    Correct.

22         Q.    And when they started taking the device off of

23   him, did you make an inquiry?  How did you become aware

24   that he was having medical distress?

25         A.    I can't remember who the officer was -- was

                                                        46

DEPOSITION OF OFFICER LLOYD McKEE

```
 1   trying to get a pulse.  And they couldn't find one.  And
 2   then -- well, actually, well, I've seen the video.  So I
 3   mean, that's when I recognized that that was happening.
 4        Q.   I know it's very hard to distinguish between
 5   what you've seen and versus what your point of view was
 6   at the time.
 7        A.   That's correct.
 8        Q.   It's one of the issues with lapel cameras.
 9   And everybody recognizes that the camera's seeing things
10   you're not seeing because the camera's focusing
11   universally and you're typically focusing on one thing.
12   So really to the best of -- we want to know what you
13   knew at the time.  But I appreciate you trying to make
14   the distinction in your mind of where you became aware
15   of that.
16             So at some point you said that you saw that
17   they were trying to get a pulse.  Became aware that
18   there was something medical going on.  At that point
19   what happened from your perspective?
20        A.   From what I recall, the other officers began
21   taking off the WRAP and they started CPR chest
22   compressions.
23        Q.   Did you participate in the CPR?
24        A.   I did not.
25        Q.   Did you ever during the course of the incident
```

47

1    when Mr. Nelson was on the ground, up until the time he

2    became unresponsive, did you ever yourself see

3    Officer Shannon appear to be kneeling on Mr. Nelson's

4    back putting some portion of his body weight on

5    Mr. Nelson's back?

6        A.   No.

7        Q.   Did you at some point later become aware of

8    the fact that that had occurred?

9        A.   Yes.

10       Q.   Was -- when you saw the video of

11   Officer Shannon with his knee or knees on Mr. Nelson's

12   back, was that consistent with how you were trained to

13   interact with people who were facedown on the ground in

14   handcuffs?

15       A.   No.  I don't know.  I mean, I don't know that

16   he was handcuffed or I don't know that that even

17   happened personally.

18       Q.   Right.  Okay.  Yeah, I understand.  I know

19   some of the portions of the video you can see bits and

20   pieces of things and some of it's unclear.

21       A.   I'm the person with the exposed arms.

22   Everybody else is in long sleeves.  So I was way down at

23   his feet.

24       Q.   Right.  We don't know who's who until we see

25   you guys.

48

1          So once it became apparent that Mr. Nelson was

2     having some sort of medical distress, at some point

3     somebody summoned emergency medical care, correct?

4          A.   Yes.

5          Q.   Do you recall after Mr. -- after it became

6     apparent Mr. Nelson was having some sort of medical

7     distress, and while, obviously, we know you're not a

8     doctor, it was apparent he was having some -- something

9     not right, correct?

10          When Mr. Nelson was turned over, do you recall

11     hearing communications from Officer Hall wherein she was

12     saying that Mr. Nelson's sweatshirt had kind of balled

13     up around his neck and knocked him out or something to

14     that effect?

15          A.   I didn't hear that.

16          Q.   You never heard that on the videos thereafter?

17          A.   No.

18          Q.   And from your perspective while the -- from

19     the time Mr. Nelson went to the ground until the time

20     Mr. Nelson was found to be unresponsive, did you ever

21     see what was going on in his upper torso, who was doing

22     what?

23          A.   I did not.

24          Q.   I mean, I know you've been there for a long

25     time.  In your 30 years with Hayward Police Department,

49

1    have you ever been trained on positional asphyxiation?

2        A.    Yes.

3        Q.    And what's your understanding of what

4    positional asphyxiation is?

5            MR. ROLLAN:   Objection.  Calls for expert

6    opinion.

7    BY MS. NOLD:  Q.   And I don't want -- I don't want you

8    to provide an expert opinion.  Just what your

9    understanding is of what that is as it applies to police

10   officers.

11       A.    Just the inability to catch -- catch a breath

12   because of the position that they're in or trouble

13   breathing based on a position they're in.

14       Q.    And the training in positional asphyxiation,

15   is that something that's like an annual training or is

16   that periodic?  Do you recall?

17       A.    With the WRAP I'm not sure if it's bi-annual

18   or annual.

19       Q.    Okay.  But it's your understanding that the

20   training relating to positional asphyxiation is a part

21   of the component of the WRAP training?

22       A.    Yes.

23       Q.    Is it your understanding that positional

24   asphyxiation is a potential -- a thing that could

25   potentially happen while the WRAP device is being

                                                              50

1    applied or during that process?

2        A.   Yes.

3        Q.   Do you recall during the positional

4    asphyxiation training receiving any information about

5    things that officers could do that could contribute to

6    positional asphyxiation or anything to avoid to avoid a

7    person potentially dying from positional asphyxiation?

8        A.   I mean, anything that obstructs their

9    breathing ability, whether -- sometimes it's -- it's

10   handcuffs and being laid down -- laid on your stomach.

11       Q.   Is it your understanding from your training or

12   experience that a person's obesity can be a contributing

13   factor to positional asphyxiation?

14       A.   Yes.

15       Q.   Did you observe Officer Hall remove her Taser

16   during this incident?

17       A.   I did not.

18       Q.   Did you remove your Taser during this

19   incident?

20       A.   Yes.

21       Q.   And at what point during the incident, if you

22   recall, did you remove your Taser?

23       A.   At the residence on Ironwood Mr. Nelson

24   started kicking the door, trying to kick the door open.

25   He was kicking on the bars that are covering the window

51

1    or the side windows.  He, I guess, built himself or

2    worked himself up enough to where he was kicking the

3    doors.  And he seemed to be close to opening the door.

4        Q.   Okay.  And at that point you brought out your

5    Taser; is that correct?

6        A.   I did.

7        Q.   What did you do with the Taser?  Did you arc

8    it?  Did you do something to just what I would call a

9    display of force?

10       A.   I believe that I did arc it, but I'm not --

11   I'm not sure that I did.  But I was -- I was trying to

12   get him just to calm down.  I didn't point the Taser at

13   him.  I just, I guess, wanted him to calm himself.

14       Q.   But you didn't deploy your Taser, correct?

15       A.   No.

16       Q.   At some point was there a figure four leg lock

17   applied to Mr. Nelson that you were aware of?

18            MR. ROLLAN:  Objection.  Calls for

19   speculation.

20   BY MS. NOLD:  Q.  I just mean with whatever you

21   witnessed or participated in.

22       A.   I don't recall.  I don't recall any figure

23   four.

24       Q.   Okay.  Is it fair to say you did not figure

25   four Mr. Nelson in a figure four leg lock?

52

1    A.   I don't recall that I did or didn't.  Seems

2  figure four would have been difficult.  I don't know

3  that it happened or not.

4    Q.   Okay.  At some point while trying to apply the

5  leg portion of the WRAP device it looks like from the

6  record that the WRAP was backwards or upside down.  Did

7  you recall that?

8    A.   I do recall it.  I am not sure that -- I think

9  that the WRAP was -- was actually the straps were on the

10  top part and it had to be switched so that the straps

11  were underneath it.

12    Q.   Okay.  And, to your best recollection, how

13  much time was added to the application of the WRAP

14  device from it being upside down or inside out or

15  whatever the issue was?

16    A.   Twenty seconds, 30 seconds.

17    Q.   Okay.  And can you estimate about how long it

18  took to get Mr. Nelson into the device from the time

19  that you guys started trying to apply it until whenever

20  you stopped?

21    A.   My best guess would be about two minutes.

22    Q.   To your knowledge, when Mr. WRAP -- Mr. WRAP.

23  Mr. Nelson -- strike that.  It's Friday.

24        To your recollection, when Mr. Nelson was

25  being placed in the WRAP device, was there anybody that

53

1    was charged with monitoring Mr. Nelson's vital signs?

2         A.    I believe -- I believe there was, but I'm not

3    sure.

4         Q.    Okay.  Fair to say that you know that you were

5    not charged with monitoring vital signs because of your

6    position by his feet?

7         A.    Right.

8         Q.    During the WRAP training that you have

9    received, is there typically somebody who's designated

10   to be the person who is going observe the person's vital

11   signs to make sure that the person is remaining

12   medically stable while being placed in the WRAP device?

13        A.    Yes.

14        Q.    Okay.  And was that part of the training that

15   you received from the Hayward PD?

16        A.    Yes.

17        Q.    Who would typically be the person to designate

18   the person to do that?

19        A.    In my opinion the person who is closest to

20   that portion of their body is the person that's taking

21   care of that.

22        Q.    Okay.  So your understanding of, I guess, not

23   so much policy because it is not actually covered by a

24   policy, but the practice of the department would be that

25   the person who was in the -- fair to say, the best

                                                        54

1    position to be able to see the person, observe the vital

2    signs, would be the person who would be tasked with

3    monitoring that?

4         A.   Correct.

5         Q.   To your knowledge, were you ever retrained as

6    a result of the incident with Mr. Nelson?

7              MR. ROLLAN:  Objection.  Vague as to training.

8    What training?

9    BY MS. NOLD:  Q.  And I just mean anything -- any sort

10   of training or retraining, recertification, anything

11   that you understood occurred as a result of this

12   incident with Mr. Nelson specifically.

13        A.   I didn't -- did not receive any additional

14   training.

15        Q.   During the incident, did you ever see any of

16   the other officers strike Mr. Nelson in any way, either

17   with a fist or a baton, any sort of object, anything

18   like that at all?

19        A.   I did not.

20        Q.   It's fair to say that you never struck

21   Mr. Nelson with anything?

22        A.   I did not.

23        Q.   To your understanding, who was -- who was the

24   senior supervisory officer on the scene, person who

25   would have been in charge?

55

 1      A.   Acting Sergeant McCrea.  There were also three

 2 field training officers there.

 3      Q.   At that point -- okay.  Besides

 4 Officer Shannon, who were the other field training

 5 officers there?

 6      A.   Officer Padavana and Officer Suzuki.

 7      Q.   And when you have an incident where there were

 8 multiple officers involved, if, for example, there

 9 wasn't an acting sergeant there, who would be deemed to

10 be the person in charge?  The senior officer?

11      A.   Yes.

12      Q.   So --

13      A.   I'm sorry.  Not the senior officer.  I was

14 senior, but I'm not a field training officer.  And

15 that's a lower supervision position.  So it would be the

16 acting sergeant.  And then I guess the most senior FTO

17 or down the line.

18      Q.   Then those three, and then you.

19      A.   Yeah.

20      Q.   Because although you're senior in years, the

21 supervisory position takes you out of order for

22 seniority?

23      A.   Right.

24      Q.   But that incident, it was your understanding

25 that Officer McCrea was the supervisory person?

                                                          56

1       A.   Yes, as I recall.

2       Q.   Do you recall whether Officer McCrea was the

3   person who brought the WRAP device?

4       A.   I don't recall any other supervisors, and

5   they're the only ones that carry the WRAP.

6       Q.   And that was my next question.  My

7   understanding that only the supervisory personnel are

8   authorized --

9       A.   Sergeants only, sergeants and lieutenant.

10      Q.   So a sergeant or lieutenant has to be involved

11  in an incident that results in a WRAP application,

12  correct?

13      A.   Yes.

14      Q.   Okay.  And after Mr. Nelson became

15  unresponsive, how long after that did you become aware

16  that Mr. Nelson had passed away?

17      A.   I guess immediately.  I mean, there was --

18  there was a lot of CPR being done, but there wasn't

19  anything happening.

20      Q.   So it was your understanding --

21      A.   Couldn't find a pulse.

22      Q.   Sorry about that.  Your understanding, even

23  though he was not -- probably actually have a time of

24  death until some later period, to your understanding

25  Mr. Nelson never regained any sort of consciousness,

                                                            57

1    correct?

2         A.   Correct.

3         Q.   With that in mind, that the incident had

4    either been fatal or significant, were you and the other

5    officers sequestered at that point?  Do you know what I

6    mean by that?

7         A.   Yeah.  I don't recall being sequestered.

8         Q.   Do you recall having any conversations -- and

9    I don't mean on scene.  I mean once you had left the

10   scene, do you recall having any other conversations with

11   the other defendant officers prior to speaking to your

12   attorney?

13        A.   No.  I didn't speak to anybody about that.

14        Q.   Okay.  Were you -- after Mr. Nelson became

15   unresponsive, at some point did somebody in the

16   supervisory level notify you that you should go back to

17   the department or something, for example, to meet with

18   an attorney?

19        A.   Yes.

20        Q.   Of course I don't want to know what the

21   conversations were with the attorney.  Just looking for

22   any conversations that occurred prior to that with any

23   other department personnel.  Do you recall any

24   conversations with anyone else?

25        A.   No.

                                                          58

DEPOSITION OF OFFICER LLOYD McKEE

1     Q.   Do you recall how many times you were

2    interviewed by the department in relationship to this

3    incident?

4     A.   Once.

5     Q.   And that was with your attorney, correct?  I'm

6    not talking about the content of the conversation.  Do

7    you recall whether he was there?

8     A.   No.  I don't recall an attorney being present.

9     Q.   Okay.

10     A.   Just two detectives and me.

11     Q.   That happens again, you should probably have

12    your attorney there.  No.  No.  No.

13     And I believe you may have answered this.  Did

14    you -- did you have any sort of disciplinary actions

15    against you related to this incident?

16     A.   No.

17     Q.   I'm going to take a quick break and go off the

18    record for five minutes.

19     (Break was taken.)

20     MS. NOLD:  We're back on the record.  Same

21    rules still apply.  I don't have any more questions.  I

22    think your attorney probably does.

23                 EXAMINATION

24     MR. ROLLAN:  I just have a few clarifying

25    questions.

59

1    Q.   So, Officer McKee, earlier you had indicated

2  that you -- that at some point when Mr. Nelson was

3  noticed to be unresponsive that the officers took the

4  chest harness portion of the WRAP off of him.

5         Is -- was it your understanding that the

6  officers placed the chest harness portion of the WRAP or

7  were you able to see that at all?

8    A.   I wasn't able to see that.

9    Q.   So you -- you -- you don't know whether the

10 officers --

11   A.   Correct.

12   Q.   -- took that off?  Okay.  Just to clarify

13 that.

14        And earlier also Ms. Nold had asked a question

15 as to whether if you had heard some -- a suspect say

16 that they could not breathe while the WRAP was being

17 applied.  And you responded that you would have stopped

18 applying the WRAP to figure out what the need was.

19        Are there instances where you would not

20 necessarily stop applying the WRAP when someone's

21 exclaiming that they couldn't breathe?

22   A.    I mean, if they're explaining that they're

23 not -- that they can't breathe, they're breathing.  So

24 lack of any other options, I assume that they're

25 breathing.

                                                    60

1      Q.   Is it your understanding that your training

2  is, as it relates to application of the WRAP, is to when

3  you notice someone is in medical distress to stop

4  application as soon as practicable or as soon as

5  possible?

6      A.   Yes.

7      Q.   And could there been situations where that

8  involves completing the leg portion of the WRAP device

9  before turning a suspect over into a recovery position?

10     A.   Yeah.  I mean, it depends on where you're at.

11  I'm at the ankles and --

12     Q.   This is just generally.

13     A.   Yeah.  How did you --

14     Q.   Do you want me to rephrase that question?

15     A.   Even -- yes, please.  I'm sorry.

16     Q.   Okay.  Is it --

17          MS. NOLD:  Hold on.  I'm going to make a

18  belated objection to referring to Mr. Nelson as a

19  suspect.  Because Mr. Nelson was not suspected of a

20  crime.  I just want that to be -- I don't want --

21          MR. ROLLAN:  Well, just generally a suspect.

22          MS. NOLD:  Right.  And I just don't want that

23  to be on the record.  No one so far has referred to him

24  as a suspect.  We all understand he wasn't convicted or

25  accused or thought to have committed any crime

                                                      61

1    whatsoever.  So I just don't want that to be something

2    that pops out about him being a suspect.

3             MR. ROLLAN:  And that was just a general

4    reference to a person for which a WRAP was being

5    applied.

6        Q.   Is it your understanding that in some

7    situations an officer might decide to complete the leg

8    portion of the WRAP device before turning or before

9    placing someone into a recovery position once they have

10   been noticed to be unresponsive?

11       A.   Yes.  You can -- you can complete your task as

12   long as it's not, I mean, impeding their -- impeding

13   their breathing.

14       Q.   And this is because part of the consideration

15   is officer safety, right?

16       A.   Correct.

17       Q.   Because there could be a situation where

18   someone is unresponsive that later then becomes

19   responsive and tries to --

20       A.   Kick.

21       Q.   Right.  Present some physical considerations

22   to the officers, correct?

23       A.   Correct.

24             MR. ROLLAN:  So those are all my follow-up

25   questions.

                                                          62

DEPOSITION OF OFFICER LLOYD McKEE

1          MS. NOLD:  Okay.  I think we're done.

2          THE COURT REPORTER:  Would you like a

3   transcript?

4          MR. ROLLAN:  Yes, please.

5   (Whereupon, at 4:07 p.m., the deposition of OFFICER

6   LLOYD MCKEE was concluded, this date.)

7

8

9                       --------------------------

10                      OFFICER LLOYD MCKEE

11

12

13                      --oOo--

14

15

16

17

18

19

20

21

22

23

24

25

63

DEPOSITION OF OFFICER LLOYD McKEE

1   STATE OF CALIFORNIA          )

2                                )  ss.

3   COUNTY OF ALAMEDA            )

4

5           I hereby certify that the witness, OFFICER
    LLOYD MCKEE, in the foregoing deposition appeared before
6   me, Kelly McKissack, a Certified Shorthand Reporter and
    a disinterested person.

7
            Said witness was then and there at the time
8   and place previously stated by me placed under oath to
    tell the truth, the whole truth and nothing but the
9   truth in the testimony given on the date of the within
    deposition; that the deposition is a true record of the
10  witness' testimony as reported by me.

11          The testimony of the witness and all questions
    and remarks requested by Counsel was reported under my
12  direction and control, caused to be transcribed into
    typewritten form by means of Computer-Aided
13  Transcription.

14          I am a Certified Shorthand Reporter licensed
    by the State of California, and I further certify that I
15  am not interested in the outcome of the said action, nor
    connected with, nor related to any of the parties in
16  said action, nor to their respective counsel.  I am not
    of counsel or attorney for either or any of the parties
17  to the case named in the within caption.

18          IN WITNESS WHEREOF, I have hereunto affixed my
    signature this 20th day of April, 2018.
19

20

21  _/s/Kelly McKissack_____

22  Kelly McKissack
    Certified Shorthand Reporter
23  California License No. 13430

24                     --o0o--

25

64

1                DEPONENT SIGNATURE PAGE

2

3      I hereby certify that I have read my deposition

4  made those changes and/or corrections I deem

5  necessary, and approve the same as now written.

6  Executed this _____ day of _____, 2018

7  By:

8  _____

9  _____

10  LLOYD McKEE

11  Under Penalty of Perjury

12

13

14                   --o0o--

15

16

17

18

19

20

21

22

23

24

25

65

1              DEPONENT SIGNATURE WAIVER

2

3        The signing of the deposition by the deponent was

4    conditionally waived at the time of the taking of the

5    deposition.

6    _____

7    Barbara J. Butler, CSR #5604

8

9

10       Upon completion of the foregoing transcript, the

11   witness was notified it was ready for signature, but the

12   deposition was not signed by the witness for the

13   following reason:

14

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   BARBARA J. BUTLER & ASSOCIATES

22

23                  --o0o--

24

25

                                                          66

1                        WITNESS LETTER

2   TO:  Officer Lloyd McKee              Date: 04.24.18
      c/o Raymond R. Rollan, Deputy City Attorney
3       City Attorney's Office
        777 B Street                      Depo: 04.06.18
4       Hayward, CA  94541                Ref. #18040621C

5   RE:  Roy Nelson, III, et al. v. City of Hayward, et al.

6   Dear Officer McKee:

7        The transcript of your Deposition reported in the
    above-captioned cause has been prepared and will be
8   available at this office for your inspection and
    signature for a period of 30 days from the date of this
9   letter.
         Please contact our office between the hours of 9:30
10  a.m. and 5:00 p.m. Monday-Friday, to schedule an
    appointment.  Or, if you prefer, contact your attorney
11  to read, correct and sign the copy of your Deposition
    before a Notary Public.
12       Read the transcript making any changes and/or
    corrections necessary.  In making any changes and/or
13  corrections, please use the following guide:
         1. DO NOT WRITE on the original transcript.
14       2. SIGN UNDER PENALTY OF PERJURY at the end of
            the Deposition on the Deponent Signature Page.
15       3. List each change and/or correction on the
            Correction Sheet provided at the end of the
16          Deposition. Signature is required at the bottom
            of the Correction Page.
17       4. Forward the signed Deponent Signature Page
            and Correction Sheet to:
18                  Barbara J. Butler & Associates
                    Certified Court Reporters
19                  P.O. Box 3508
                    Santa Clara, California  95055
20                  (510) 832-8853 or (408) 248-2885

21       Upon receipt of items requested in this letter, I
    will forward copies of same to all Counsel.

22
                         Sincerely,
23
                         /s/Barbara J. Butler
24                       Barbara J. Butler, CSR

25  cc:  All Counsel

                                                            67

1      DEPONENT'S CHANGES/CORRECTION SHEET AND REASON

2  RE:  Roy Nelson, III, et al. v. City of Hayward, et al.

3  Depo: 04.06.18                    Ref. #18040621C

4  Note:  If you are adding to or deleting from your
   testimony, print the exact words you want to add or
5  delete.  Specify with "Add" or "Delete" and sign below.

6  PAGE     LINE        Change/Add/Delete

7  ____     ____     _____

8  ____     ____     _____

9  ____     ____     _____

10 ____     ____     _____

11 ____     ____     _____

12 ____     ____     _____

13 ____     ____     _____

14 ____     ____     _____

15 ____     ____     _____

16 ____     ____     _____

17 ____     ____     _____

18 ____     ____     _____

19 ____     ____     _____

20 ____     ____     _____

21 ____     ____     _____

22 I hereby certify that I have read my deposition
   transcript, made those changes and corrections that I
23 deem necessary and approve the same as now true and
   correct.

24
   DATE: _____    Signature_____
25                           LLOYD McKEE

                                                          68

DEPOSITION OF OFFICER LLOYD McKEE

1                    ATTORNEY'S NOTES

2     Page # Line #

3     _____/_____/_____

4     _____/_____/_____

5     _____/_____/_____

6     _____/_____/_____

7     _____/_____/_____

8     _____/_____/_____

9     _____/_____/_____

10    _____/_____/_____

11    _____/_____/_____

12    _____/_____/_____

13    _____/_____/_____

14    _____/_____/_____

15    _____/_____/_____

16    _____/_____/_____

17    _____/_____/_____

18    _____/_____/_____

19    _____/_____/_____

20    _____/_____/_____

21    _____/_____/_____

22    _____/_____/_____

23    _____/_____/_____

24    _____/_____/_____

25    _____/_____/_____

69