# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA
--oOo--

ROY NELSON III, Successor-
in-Interest to Decedent ROY
NELSON; ORENELL STEVENS,
individually,

          Plaintiffs,

                           CASE NO.:
   vs.                 3:16-cv-7222

CITY OF HAYWARD, a municipal
corporation; MICHELLE HALL, in her
individual and official capacity
as Police Officer for the CITY OF
HAYWARD; NATHANAEL SHANNON, in his
individual and official capacity
as Police Officer for the CITY OF
HAYWARD; MATTHEW MCCREA,
in his
individual and official capacity
as Police Sergeant for the CITY OF
HAYWARD; JOHN PADAVANA, in his
individual and official capacity
as Police Officer for the CITY OF
HAYWARD and DOES 1-50, inclusive,
individually and in their official
capacity as police officers for
the City of Hayward,            CERTIFIED COPY

          Defendants.
_____/


DEPOSITION OF SERGEANT MATTHEW McCREA

TUESDAY, DECEMBER 5, 2017


(CONFIDENTIAL Page 20, Line 20 to
Page 26, Line 18 are bound separately)


REPORTED BY:  ANGELICA R. GUTIERREZ, CSR NO. 13292

1

1    had been called to have this person removed, which

2    later it was determined to be Mr. Nelson.

3        Q.   So it wasn't your understanding at the time

4    that there was a request for a 5150 detention of

5    Mr. Nelson?

6        A.   As the call unfolded, I heard the request for

7    a what's known as code two, which is an ambulance to

8    respond for a 5150 detention, and that's nothing

9    uncommon.

10        Q.   Okay.  So as you became -- I assume you were

11    listening to the radio traffic or reading your CAD for

12    further information?

13        A.   Correct.

14        Q.   Okay.  And as time passed, you gathered more

15    information about the call, correct?

16        A.   A little bit here and there, yes.

17        Q.   But at some point you did end up responding to

18    the call, correct?

19        A.   Only after Officer Shannon had requested my

20    presence.

21        Q.   Okay.  So Officer Shannon went over the radio

22    and asked for the sergeant to come to --

23        A.   Asked for the supervisor.

24        Q.   Okay.  What was your understanding why you

25    were being summoned to the area?

28

1      A.   Officer Shannon had said that he needed the

2  superior to respond as the Wrap, leg restraining

3  device, may need to be deployed.

4      Q.   Okay.  And based on my understanding, correct

5  me if I'm wrong, the supervisor would be the person who

6  had the Wrap in the vehicle; is that correct?

7      A.   That's correct.

8      Q.   Okay.  And is the supervisor the only person

9  that is permitted to carry a WRAP device?

10     A.   It's the only vehicles that have the WRAP are

11  the supervisor vehicle.

12     Q.   So for -- in order for a patrol officer to get

13  a WRAP device, they would have to summon the sergeant

14  or an acting sergeant, correct?

15     A.   They would need to summon the supervisor.

16     Q.   I'm assuming that there are supervisors above

17  the level of sergeant who could also respond with the

18  WRAP device; is that correct?

19     A.   Correct.

20     Q.   Okay.  But to your understanding, can anybody

21  below level of sergeant have a WRAP device in their

22  vehicle with the intention to use it?

23     A.   Not with the intention to use it, no.

24     Q.   What is the requirement from the supervisory

25  level of permission required to utilize the WRAP

29

1    device?

2        A.    It's -- the reason that the sergeants have the

3    WRAP in their vehicle is so that way -- it's one of

4    those calls, as I had said earlier, where a supervisor

5    is required to respond.  The sergeants are the ones

6    that have the WRAP.  They are the ones who are required

7    to respond out there to be able to evaluate the

8    situation.

9        Q.    Okay.  So would it be fair to say that when

10   somebody summons you to bring the WRAP, you would come

11   to the scene and evaluate the potential need for the

12   use of the WRAP?

13       A.    Yes.

14       Q.    Okay.  Do you have an understanding why are

15   only the sergeants allowed to have the WRAPs or are

16   allowed to give permission to use the WRAPs?

17       A.    Just how our policies and procedures are

18   written.

19       Q.    So you don't have any understanding of the

20   reason for that?

21       A.    Just the policy and procedure of the

22   department.

23       Q.    So you're just following directions?

24       A.    Yes.

25       Q.    Fair enough.  And so from the time that  --

                                                              30

1    underneath the person and get the straps together, is

2    there any requirement that one or more of the officers

3    observes the individual being placed into the WRAP for

4    their physical wellness or check vital signs, etc.?

5        A.    Like one officer designated to?

6        Q.    Yeah.

7        A.    That's never been something we've ever

8    discussed.  If you're working on the upper portion of

9    the body or restraint or holding the person down, then

10   that would obviously be a consideration that, you know,

11   this is going be one of your responsibilities to make

12   sure this person is doing okay.

13       Q.    So it's your understanding that the person or

14   people in the vicinity of the person's head and upper

15   torso would be responsible for observing the person to

16   make sure that they're not having some kind of medical

17   emergency or medical stress?

18       A.    Correct.

19       Q.    But that's not something that, for example,

20   you as an acting sergeant would say, "Hey, Officer

21   such-and-such, you will be the person doing vitals"?

22       A.    No.

23       Q.    Okay.  And if there's multiple people standing

24   in the vicinity of the person's head, how would those

25   people know who would be the person undertaking that

                                                          68

DEPOSITION OF SERGEANT MATTHEW McCREA

1   responsibility?

2       A.   It would probably be discussed between the two

3   of them.

4       Q.   Okay.

5       A.   Or however many.  In a perfect world of using

6   the WRAP, the supervisor that's on scene would be

7   standing back and taking in the overall picture of

8   what's going on and I -- if I was out there and that

9   perfect world had existed, I would be standing there

10  and being one of the people to take into account what

11  distress, if any, this person may be in.

12      Q.   And is there any particular training of what

13  should occur if a person is noticed to have been in

14  medical distress?

15      A.   You would want to make an alert notification

16  of your observations as soon as practical, yeah.

17      Q.   Okay.  And are you meaning to say you would

18  want to alert your fellow officers of those

19  observations?

20      A.   Yes.

21      Q.   And what -- say a person is placed in a WRAP

22  device and they are overt medical emergency, what would

23  the next step be for the perspective of the people

24  applying the WRAP?

25      A.   At that point, it would be making folks aware

69

1    of what was going on and now the shift and focus is

2    from the restraint to the medical distress.

3         Q.    Okay.  So it's fair to say person noticed --

4    once somebody had noticed that the individual in the

5    WRAP was having some kind of medical emergency that you

6    would stop applying the WRAP device?

7         A.    Yeah, you would end up stopping, yes.

8         Q.    Okay.  And once the person placed in the WRAP

9    device was having a medical emergency, would you then

10   remove the WRAP device traditionally?

11        A.    It depends on how far into the process you

12   are.

13        Q.    Okay.

14        A.    If you have the thing fully on and they're in

15   the upright, seated position and they go into medical

16   distress, you would obviously undo portions of it to

17   the point where you are able to administrate.

18        Q.    So your understanding would be that you would

19   only be expected to remove the portions that would

20   interfere with providing medical care?

21        A.    Yeah.

22        Q.    Okay.  And would your understanding be that

23   that portion would be the upper body portion?

24        A.    It would most likely be the upper body portion

25   since that's where the vital organs are at.

                                                            70

1    Q.   Okay.  Obviously, just depending on what  type

2    of medical emergency the person's having?

3    A.   Right.

4    Q.   If they're bleeding out from their leg, you

5    would probably remove the leg portion?

6    A.   Correct.

7    Q.   If a person is successfully placed in a WRAP

8    and everything is closed and considered successful,

9    what do you do with the person at that point?

10   A.   So a full successful WRAP, no medical

11   anything?

12   Q.   Yeah, just under a perfect scenario when the

13   person's been properly detained and they're breathing,

14   speaking.

15   A.   At that point, it would be the assessment

16   making sure there's no medical distress.  If there's no

17   medical distress, it would be to lift the person up off

18   the ground in that seated position, placing them into

19   the backseat of the car, securing them, seat belting

20   them in, and continuing with transport.

21   Q.   Okay.  If a person -- and this would be I

22   guess whether the person is in the WRAP or not.  Have

23   you been trained on what is called a recovery position?

24   A.   In terms of a -- yeah, the first aid CPR

25   recovery position.

71

1    Q.   And that's what I was referencing was a

2    recovery position related to medical distress or

3    medical emergencies.

4    A.   Yes.  It's something that's taught about,

5    yeah.

6    Q.   And what do you understand the recovery

7    position is?

8    A.   A person has -- I don't know.  It depends on

9    what the medical distress is.  You know, if they're

10   vomiting, it keeps them from aspirating and drowning in

11   their own vomit, saliva, anything along those lines.

12   It can be used for a multitude of reasons.

13   Q.   What's your understanding of what the recovery

14   position is?

15   A.   A person rolled over onto their side or

16   somewhat onto their side.  That's the best way for me

17   to describe it.

18   Q.   Okay.  And is it your understanding that the

19   recovery position is something that is typically done

20   if somebody is having breathing or respiratory

21   distress?

22   A.   Not necessarily.

23   Q.   Is it your understanding that the -- do you

24   have any understanding about whether the recovery

25   position exists for the purpose of preventing a person

72

1    from laying on their back that could potentially cause

2    problems with their organs or the ability for their

3    diaphragm to expand?  Do you have any understanding of

4    that being part of the purpose of it?

5           MR. ROLLAN:  Objection.  Calls for expert

6    opinion.

7           MS. NOLD:  Q.  What I'm asking is your

8    understanding.  I understand you're not a doctor and I

9    understand you didn't write the training.  I'm just

10   trying to understand what information you have

11   available to you as far as what, you know, the, I

12   guess, biological purpose the recovery position

13   establishes.

14        A.   I don't know.

15        Q.   Okay.  And that's fine.  You don't necessarily

16   need to know.  Some officers had done personal research

17   on topics that were outside of what we would expect

18   them to know.  Sometimes people know more about stuff

19   and some times people have had other train and go they

20   know more.  We don't know what you know pick away in

21   there.

22        A.   Right.

23        Q.   Okay.  Have you received any training as far

24   as if a person is having some sort of respiratory

25   distress what your response should be in your first

                                                          73

1    responder capacity as a police officer?

2       A.   Airway, breathing, circulation and monitoring

3    each of those.

4       Q.   Okay.  And assuming that once you're

5    monitoring one of things, if one of those things is not

6    occurring, there's obstruction to the airway or the

7    person's not breathing --

8       A.   Then you fix it.

9       Q.   Correct.  And what does fixing it mean?

10       A.   Depends on the circumstance.  Is it a choke?

11    Is the airway not tilted correctly?  If you need to

12    administer breaths, it's a whole multitude of things.

13       Q.   And fair to say that one of those things would

14    be calling an ambulance if they're not already en

15    route?

16       A.   Yes.

17       Q.   And then obviously the officers undertake

18    whatever they can medically within the course of their

19    training, whether that's CPR or applying pressure to a

20    bloody wound, or whatever you can do within the scope

21    of the tools that you have available to you, right?

22       A.   Correct.

23       Q.   Is it your understanding that a WRAP can be

24    used against individuals for, I would say, punitive

25    reasons?  Say the person is disrespectful and rude.

74

1      A.   That would be an inappropriate use of a WRAP.

2      Q.   Okay.  And so did you receive any training on

3   what would be considered inappropriate use of the WRAP?

4      A.   Yes.  It's defined in our policy.

5      Q.   What's your understanding of what

6   inappropriate use is beyond what we just established,

7   the punitive reasons --

8      A.   Just as a physical punishment.  That would be

9   inappropriate.

10      Q.   Okay.  So back to the scene.  You guys have

11   developed a plan for getting Mr. Nelson out of the car,

12   right?

13      A.   We were working on them, yes.

14      Q.   It sounded like you and Officer Shannon mainly

15   are developing a plan and Officer Hall is as a training

16   officer, probably just there to follow orders, to some

17   degree?

18      A.   She's following along, and I'm trying to -- I

19   recall trying to get her to think of formulating a plan

20   and working to formulate the plan with us for

21   experience.

22      Q.   She's not training for part of all of the

23   exercises of every call that she responds to train her,

24   to explain things to her, to become a better officer

25   going forward?

75

1    A.    Correct.

2    Q.    So what was the plan for getting Mr. Nelson

3    out of the car?

4    A.    Well, the initial plan I had developed was to,

5    since Mr. Nelson was seated in the back of the car with

6    his back facing the driver's side rear door, was to

7    open up that door, and while he was still seated in the

8    car, at that point to be able to apply the handcuffs

9    while he was still seated in the car before having --

10   Q.    And then in the plan, the intention, once he

11   was handcuffed, was the intention --

12   A.    Was to remove him from the car and have him

13   lay down on the ground so the WRAP could be applied.

14   Q.    Okay.  Was there any discussion about

15   handcuffing Mr. Nelson without opening the car door --

16   window rolled down?

17   A.    Not that I recall.  That would have been

18   impossible to do with the car.

19   Q.    It would have been impossible to roll the

20   window down and handcuff him through the bars?

21   A.    There's not enough room to be able to do that.

22   Q.    Okay.  And do you know if -- to the best of

23   your understanding, would your arms fit through the

24   bars?

25   A.    It's a complete officer safety issue.  In my

76

1    opinion, if you get your arms through there, you can

2    get stuck, or if the person who is in the back decides

3    to go on the attack, you're stuck.  They grab your arms

4    and that would -- I would never even consider that.

5         Q.   So more not that it's impossible, more that it

6    would be unwise; is that more accurate?

7         A.   Even sitting here just trying to think of how

8    it would even be done, I can't even formulate a plan of

9    how we would do it.  So in my opinion, it would be

10   impossible.

11        Q.   Okay.  Fair enough.  Obviously, you guys

12   didn't discuss that in any regard?

13        A.   Right.

14        Q.   Okay.  Fair enough.  And so the intention

15   obviously was just to put Mr. Nelson into the WRAP

16   device, and what were you going to do with him?

17   Assuming you successfully placed the WRAP devide, what

18   was the end game on the plan?  What were you going to

19   do with him?

20        A.   The end game would have been to transport him

21   to St. Rose hospital on our own outside of the normal

22   protocol just because of the delay in ambulances.

23        Q.   Okay.  So it was the intention to go ahead and

24   go outside of protocol and self-transport him to

25   St. Rose?

77

1      A.   Yeah because it would have served the purposes

2   of exactly what medical would have done, get him there,

3   medically cleared and in the meantime maybe an

4   ambulance could have showed up and done a transport to

5   John George or we could have discuss what else would

6   have needed to be done beyond that, but never got

7   there.

8      Q.   Right.  At that point when you guys were

9   putting together a plan, what was your understanding of

10  how much time had elapsed when you had first

11  responded -- Hayward PD's first response to Ironwood up

12  to that point?

13     A.   I don't even recall how long it was.  I just

14  know that the officers had said there were several

15  delays and that multiple ambulances had been rerouted,

16  so it was becoming excessively long.

17     Q.   Okay.  So you have this discussion.  What

18  officers are present at this point besides Officer

19  Shannon and yourself?

20     A.   Let's see.  Officer McKee and I believe

21  Officer Padavana were also on scene.  I wasn't having

22  any active discussion with them.  I was more with the

23  training unit, with Officer Shannon and Officer Hall.

24     Q.   Was it your understanding Offers McKee and

25  Padavana came in response to a call for assistance in

                                                            78

1    getting Mr. Nelson into the WRAP device?

2        A.   They responded in case it needed to be

3    applied, yes.

4        Q.   And do you recall, were you the person who

5    summoned additional units?

6        A.   I had requested additional units to the scene.

7        Q.   And were Officers McKee and Padavana a part of

8    the planning process for the -- that you guys had

9    discussed about getting him out of the car and into the

10   WRAP?

11       A.   It was something that I had brought to Officer

12   Hall's attention to think about who would be in control

13   of arms, who would be in control of legs.

14       Q.   And were Officers McKee and Padavana part of

15   the conversation?  Were they given assignments with

16   that plan?

17       A.   There was nothing ever specific put in who was

18   going to do what at the time.  I was trying to work on

19   that with her, but I don't think anything was ever

20   fully put together.

21       Q.   Okay.  So it sounds like you had started to

22   put together a plan, but you guys didn't ultimately

23   come with a plan and then begin the plan; is that

24   correct?

25       A.   I'm sorry.

79

1    Q.    Let me strike that question.  Ig sounds like

2    you guys started to create a plan about who was going

3    to do what, but it sounds like you didn't complete the

4    plan?

5    A.    I think it became more along the lines of

6    being senior officers and having used the WRAP before

7    and the understanding of it and just kind of going on

8    auto pilot.

9    Q.    Okay.  So then at some point the plan became

10   initiated, correct?

11   A.    Yes.

12   Q.    Okay.  And then what happened next?

13   A.    Officer McKee opened up the back door.

14   Mr. Nelson stepped out, and I believe it was Officer

15   Shannon had one arm.  Officer McKee had the other, and

16   they were preparing to handcuff him.

17   Q.    Was that your understanding it was part of the

18   plan that Officer McKee was going to open the car door?

19   A.    It wasn't what I was expecting, but it's not

20   unreasonable.  You've got to open the door.

21   Q.    Sure.  From what understand, I believe Officer

22   Hall and maybe Officer Shannon were trying to get

23   Mr. Nelson to put his hands behind back so that they

24   could presumably handcuff him while he was still seated

25   in the car, and then the door opened.  Is that your

80

1  understanding, that Officer McKee opened the door on

2  the other side?

3      A.   I just recall Officer McKee standing there and

4  Mr. Nelson stepping out of the car.

5      Q.   Okay.  And when Mr. Nelson -- when Officer

6  McKee opened the door and Mr. Nelson got out of the

7  car, were you startled by Mr. Nelson getting out of the

8  car?

9      A.   No.

10     Q.   Did you have any reason to believe that Mr.

11  Nelson kicked his way out of the car or escaped in some

12  way?

13     A.   No.

14     Q.   And when Mr. Nelson got out of the car, did

15  you see him threaten anybody?

16     A.   I don't recall what, if anything, he was

17  saying.

18     Q.   Were you ever made aware of Mr. Nelson making

19  any threats against anybody upon getting out of the

20  car?

21     A.   I don't recall.

22     Q.   To your knowledge, did Mr. Nelson make any

23  threats against you?

24     A.   Against me.

25     Q.   Yes.

81

1     A.   No.

2     Q.   To your understanding, did Mr. Nelson spit on

3  anybody?

4     A.   No.

5     Q.   Did Mr. Nelson head butt anybody?

6     A.   No.

7     Q.   Did Mr. Nelson punch anybody?

8     A.   No.

9     Q.   Did Mr. Nelson kick anybody?

10     A.   No.

11     Q.   When Mr. Nelson got out of the car, did he

12  appear to be compliant?

13     A.   Define "compliance," if you don't mind.

14     Q.   Sure.  Was he responding to the command when

15  he was told to get out of the car?

16     A.   I know one command that I can recall being

17  given and that was one I gave.

18     Q.   What command did you give Mr. Nelson?

19     A.   I told him to get down on his knees.

20     Q.   Okay.  And when you told Mr. Nelson to get

21  down on his knees, where was he located?

22     A.   He, just prior to that, was slightly leaning

23  against the right rear quarter panel, right rear fender

24  of the car, and I had made mention to have him step

25  away so that way we were able to get him laid down onto

82

1    the ground.  After the officers had removed him from

2    the car or near the back of the car, that's when he,

3    Mr. Nelson, literally looked over to me, and I remember

4    very specifically locking eyes with him and trying to

5    use that moment to gain the compliance and give him the

6    command, "Get down on your knees."  And I don't recall

7    how many times I had to give it, but  I know that he

8    did go to his knees because I remember saying, when I

9    reviewed my camera footage, "Okay.  There you go."

10        Q.   In that regard, did you consider him to be

11   compliant with the orders?

12        A.   We were getting some compliance, yes.

13        Q.   Did you take into consideration that, while

14   asking him to get on the ground, his physical stature

15   and maybe a delay in getting himself to his knees

16   because of his large body structure?

17        A.   I gave the command.  I know I gave the command

18   more than once, and that's not uncommon, so you end up

19   getting the compliance -- or I got the compliance to go

20   to his knees, and okay cool.

21        Q.   And he did.  At what point did you consider

22   Mr. Nelson consider to be resistive?

23        A.   Prior to him going to his knees, as they were

24   trying to walk him away from the back of the car, I

25   remember him twisting his upper body back and forth, so

83

1    it wouldn't be full-on compliance.

2        Q.   Okay.   Have you ever heard the term "walking

3    resistance"?

4        A.   Oh, yeah.

5        Q.   Is that what you consider walking resistance?

6        A.   Walking resistance would involve your legs.

7        Q.   Okay.   But he was -- he did take steps, he did

8    walk during that?

9        A.   Yes.

10       Q.   To get to the point where he could lay himself

11   down on the ground?

12       A.   Yes.   He wasn't drugged.

13       Q.   Right.   I would say there are videos that give

14   various perspectives -- from your perspective we have

15   seen the 360.   So Mr. Nelson got down onto his knees,

16   correct?

17       A.   Correct.

18       Q.   And then what happened next?

19       A.   He was placed down onto his stomach and face

20   down onto the ground so the ankle strap and leg portion

21   of the WRAP was able to become applied.

22       Q.   Okay.   And where were you at this time in

23   proximity to Mr. Nelson?

24       A.   I was standing back giving the officers room

25   so they were able to get Mr. Nelson onto the ground,

84

1    and because of the location that he was being placed

2    onto the ground, I had to go and retrieve the portions

3    of the WRAP device that were on the driver's side of

4    the car.

5        Q.    And at this point then, was Mr. Nelson

6    handcuffed?

7        A.    He was handcuffed at some point, yes.  I can't

8    recall exactly at what point the handcuffs were

9    applied.

10        Q.    But you did not participate in his

11    handcuffing?

12        A.    No.

13        Q.    Did you know who did?

14        A.    No.

15        Q.    So you went and grabbed the components for the

16    WRAP device, and at that point, you returned to where

17    Mr. Nelson was located?

18        A.    Correct.

19        Q.    At that point, do you recall if he was

20    handcuffed?

21        A.    He might have been.  I can't recall exactly.

22        Q.    Okay.  And where were the various officers in

23    relationship to Mr. Nelson's body?

24        A.    I remember two up top and I remember Officer

25    Padavana being down at the legs, and after reviewing

                                                              85

1    all the camera footage, it was Hall and Shannon were

2    the ones that I remember at the upper body.

3         Q.   And then you said Officer Padavana down at his

4    legs?

5         A.   Yes, he was helping with the legs.

6         Q.   Who else was down at Mr. Nelson's leg?

7         A.   I was.

8         Q.   Okay.  So at some point you went down by Mr.

9    Nelson's legs?

10        A.   Correct.

11        Q.   And at some point, did officer Padavana put

12   Mr. Nelson into a figure-four leg lock?

13        A.   Yes, he had him in a figure four.

14        Q.   Okay.  And did he have him in the figure four

15   when you brought over the WRAP device?

16        A.   Yes.

17        Q.   Did you ask Officer Padavana or did he on his

18   own accord remove Mr. Nelson from the figure four to

19   facilitate the WRAP being placed?

20        A.   Yes.  The figure-four hold was removed so we

21   could straighten his legs out.

22        Q.   Because obviously you couldn't put him in a

23   WRAP if the figure-four wasn't applied?

24        A.   Correct.  The WRAP is designed to be applied

25   to straight legs.

86

DEPOSITION OF SERGEANT MATTHEW McCREA

1        Q.    And to your best estimate, how long was Mr.

2    Nelson held in the figure four?

3        A.    I'm not sure.  My attention wasn't on

4    Mr. Nelson at that time; I was retrieving the WRAP

5    portions.

6        Q.    Okay.  And at that point, you guys began to

7    try to apply the WRAP device?

8        A.    That's correct.

9        Q.    Okay.  To the best of your understanding, what

10    was going on with Mr. Nelson's upper body?

11        A.    I do not remember.  I don't know.

12        Q.    Were you in a position where you weren't able

13    to see his upper body?

14        A.    I was focused on getting his legs into the

15    ankle strap, getting his ankles cross so the ankle

16    strap could be applied, and that was my job.  That was

17    my focus.  Everything else at that time, I wasn't

18    paying attention to.  I was relying on my partners to

19    be able to execute their job.

20        Q.    Okay.  I'm not sure -- do you recall making a

21    statement about, you know, when you were down Nelson's

22    legs, having, I guess what we refer to like a tunnel

23    vision, just focused in, sort of not cognizant what was

24    going on besides Mr. Nelson's legs?

25        A.    That's a fair assessment.  I'm working on the

87

1    lower portion of his body, and my focus at this time is

2    to get his legs straightened and the ankles crossed.

3         Q.    Okay.  So at that point, you and Officer

4    Padavana began trying to get Mr. Nelson's legs into the

5    WRAP?

6         A.    Correct.

7         Q.    Okay.  At any point, was Officer Shannon

8    assisting you with trying to get Mr. Nelson's legs into

9    the WRAP device?

10        A.    Not that I recall.  Not at that moment.

11        Q.    At any point, did Officer Shannon try to

12   assist in getting Mr. Nelson's lower portion into the

13   WRAP?

14        A.    I don't recall.

15        Q.    Do you recall during this scenario seeing what

16   Officer Shannon was doing at all?

17        A.    I just remember him being up on the upper end

18   of Mr. Nelson's body.  What exactly he was doing, I

19   can't recall.

20        Q.    You don't recall seeing Officer Shannon with

21   his knee on Mr. Nelson's back, sort of leaning over his

22   body towards the lower portion of his body?

23        A.    I don't remember that at all.

24        Q.    Are you familiar with the term called

25   "positional compression," sometimes referred to as

88

1      "positional asphyxiation"?

2          A.    Yes.

3          Q.    What's your understanding, based on your

4      training or your experience, what that is?

5          A.    Just having -- the body being in a position

6      where it makes it hard to breathe.

7          Q.    Okay.  Is it your understanding based on your

8      training and experience that applying pressure to

9      certain portions of a person's back or upper body can

10     restrain their ability to breathe?

11         A.    Yes.

12         Q.    And what's your understanding of what portion

13     of the person's back you're supposed to avoid to

14     prevent yourself from restricting their ability to

15     expand their lungs?

16         A.    I don't think I can give you an exact area.

17         Q.    Okay.  Well, based on your training, what are

18     the areas of a person's back that you avoid to avoid

19     causing that person to potentially have respiratory

20     problems?

21         A.    In my opinion, any portion of the person's

22     upper body if they are on the ground, any weight

23     applied can cause a distress.  Of course, obviously,

24     the main area would be direct pressure to the center of

25     the back, I would say, but if you are held down on the

                                                              89

1    ground and downward pressure is applied, it would cause

2    some type of distress, however slight.

3        Q.    Okay.  Is your understanding based on your

4    training that you're not supposed to, for example,

5    kneel in the middle of somebody's back while they're

6    handcuffed down on the ground?

7        A.    It would depend on the circumstances.

8        Q.    To your knowledge, have you ever received any

9    training that advised you not to kneel in the middle of

10   somebody's back while they were handcuffed faced down

11   on the ground?

12       A.    I don't recall ever being specifically given

13   that type of training.

14       Q.    Okay.  Do you recall any training that was

15   specific to positional asphyxiation?

16       A.    Just in, like, a classroom setting of talking,

17   yeah.

18       Q.    Okay.  Do you remember what they said, sort of

19   what the key points were, the take aways?

20       A.    You don't want to keep somebody in a position

21   where they're breathing is restricted for an undue

22   amount of time.

23       Q.    And do you recall any sort of guideline of

24   what amount of time that would be?

25       A.    No.

90

DEPOSITION OF SERGEANT MATTHEW McCREA

1    STATE OF CALIFORNIA    )
                         ) ss.
2    COUNTY OF CONTRA COSTA )

3

4        I, Angelica R. Gutierrez, a licensed Certified

5    Shorthand Reporter, duly qualified and certified as such

6    by the State of California;

7        That prior to being examined, the witness named in

8    the foregoing deposition was by me duly sworn to testify

9    to the truth, the whole truth, and nothing but the truth;

10        That the deposition was by me recorded

11    stenographically at the time and place first herein

12    mentioned, and the foregoing pages constitute a full,

13    true, complete and correct record of the testimony given

14    by the said witness;

15        That I am a disinterested person, not being in any

16    way interested in the outcome of said action, nor

17    connected with, nor related to any of the parties in said

18    action, or to their respective counsel, in any manner

19    whatsoever.

20

21           DATED:  December 5, 2017

22

23       __/Angelica R. Gutierrez_____

24        ANGELICA R. GUTIERREZ, CSR No.  13292

25

137