# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

ROY NELSON III, Successor-
in-Interest to Decedent ROY
NELSON; ORENELL STEVENS,
individually,

        Plaintiffs,

                              CASE NO.:

      vs.                   3:16-cv-7222

CITY OF HAYWARD, a municipal
corporation; MICHELLE HALL, in her
individual and official capacity
as Police Officer for the CITY OF
HAYWARD; NATHANAEL SHANNON, in his
individual and official capacity
as Police Officer for the CITY OF
HAYWARD; MATTHEW MCCREA, in his
individual and official capacity
as Police Sergeant for the CITY OF
HAYWARD; JOHN PADAVANA, in his
individual and official capacity
as Police Officer for the CITY OF
HAYWARD and DOES 1-50, inclusive,
individually and in their official
capacity as police officers for
the City of Hayward,               CERTIFIED COPY

        Defendants.

_____/


DEPOSITION OF OFFICER BRANDON WILSON

PMK FOR THE WRAP

FRIDAY, APRIL 6, 2018


REPORTED BY:  KELLY L. MCKISSACK, CSR #13430

1

1                        I N D E X

2

3    EXAMINATION BY:                              PAGE

4    MR. BUELNA                                     6

5    MR. ROLLAN                                    47

6                        --o0o--

7

8    Appearance Page                               3

9    Exhibit Page                                  4

10   Location                                      5

11   Reporter's Certificate                       49

12   Deponent Signature Page                      50

13   Deponent Signature Waiver                    51

14   Witness Letter                               52

15   Changes and/or Corrections                   53

16   Attorney's Notes                             54

17                       --o0o--

18

19

20

21

22

23

24

25

                                                    2

```
 1                    A P P E A R A N C E S

 2

 3    For the Plaintiff:

 4          LAW OFFICES OF JOHN L. BURRIS
            Airport Corporate Centre
 5          7677 Oakport Street, Suite 1120
            Oakland, California 94621
 6          510-839-5200

 7          BY:  PATRICK BUELNA, ATTORNEY AT LAW
                 MELISSA NOLD, ATTORNEY AT LAW
 8

 9    For the Defendants:

10          CITY OF HAYWARD
            City Attorney's Office
11          777 B Street
            Hayward, California 94541
12          510-583-4460

13          BY:  RAYMOND R. ROLLAN, DEPUTY CITY ATTORNEY

14

15                            --o0o--

16

17

18

19

20

21

22

23

24

25
```

3

1                              EXHIBITS

2

3    EXHIBIT                    DESCRIPTION                    PAGE

4

5    1           Notice of Amended Depositions of          10
                 Persons Most Knowledgeable by
6                Plaintiffs and Request for Production
                 of Documents; 4 pages
7
     2           Hayward Police Department Policy          14
8                Manual for Policy 301, Handcuffing and
                 Restraints; 4 pages
9
     3           Demo - "The WRAP" by Safe Restraints,     19
10               Inc., Training Videos; 3 pages

11   4           The WRAP by Safe Restraints, Inc.,        24
                 Basic Application Manual.  Bates
12               Stamped PLTF_000004 through
                 PLTF_000044; 41 pages
13

14                            --oOo--

15

16

17

18

19

20

21

22

23

24

25

                                                               4

1          Pursuant to Notice of Taking Deposition, and

2     on Friday, April 6, 2018, commencing at the hour of

3     10:13 a.m., thereof, at 7677 Oakport Street, Suite 1120,

4     Oakland, California 94621, before me, KELLY MCKISSACK,

5     CSR No. 13430, a Certified Shorthand Reporter and

6     Deposition Officer of the State of California, there

7     personally appeared:

8

9               OFFICER BRADON WILSON,

10

11    called as a witness by the Plaintiffs, who having been

12    duly sworn by me, to tell the truth, the whole truth and

13    nothing but the truth, testified as hereinafter set

14    forth:

15

16                    --o0o--

17

18

19

20

21

22

23

24

25

5

1              OFFICER BRADON WILSON,

2      having been first duly sworn, testified as follows:

3              THE WITNESS:  (TO OATH) Yes.

4                      EXAMINATION

5    BY MR. BUELNA:  Q.  Good morning.

6        A.   Good morning.

7        Q.   If you could just please state your name for

8    the record.

9        A.   It's Bradon, B-R-A-D-O-N, Wilson, W-I-L-S-O-N.

10       Q.   All right.  And is it your understanding that

11   you're here as a person most knowledgeable for City of

12   Hayward Police Department in regards to the WRAP

13   Restraint?

14       A.   Yes, it is.

15       Q.   And this is for the lawsuit of Nelson versus

16   City of Hayward?

17       A.   To my understanding, yes.

18       Q.   Okay.  Have you ever been deposed before?

19       A.   No.

20       Q.   No.  It's your first time?

21       A.   Yes.

22       Q.   Okay.  So I'm going to tell you it's not super

23   fun, but I'm going to tell you a couple of rules that we

24   have here.  And I'll remind you if -- if we need to.

25   But they're pretty simple.

                                                          6

1          So we have a court reporter here that's

2    essentially making a written transcript of everything we

3    say.  And what that means is we can't have any uh-huhs

4    or huh-uhs because she can't interpret that very well.

5    Do you understand?

6         A.    Yes.

7         Q.    We also can't have shaking of the head or

8    nodding of the head because she can't really interpret

9    that either.  You understand?

10        A.    Yes.

11        Q.    Now, your counsel may object to some of my

12   questions.  But unless he directs you not to answer, I'm

13   still entitled to an answer.  Do you understand?

14        A.    Yes.

15        Q.    Now, I'm entitled to your best recollection,

16   but I don't want you to speculate.  And what I mean by

17   speculate is I don't want you to guess.  For example, if

18   I asked you to estimate how large my kitchen table was,

19   you wouldn't be able to give an answer, right?

20        A.    Correct.

21        Q.    But if I asked you to estimate maybe how large

22   this table is, you might be able to give me a rough

23   answer, right?

24        A.    Correct.

25        Q.    Is there any sort of medication that you've

7

1    taken this morning or any other sort of intoxicant that

2    would make your testimony unreliable today?

3        A.   No.

4        Q.   Now, one thing is important is I'm going to

5    ask you questions.  And then I ask that you give some

6    time for your counsel to object or for you to respond.

7    Because if we're both talking, then she can't feasibly

8    write down both of our answers.

9        A.   I understand.

10        Q.   You understand?

11        Now, this isn't an endurance test.  So we can

12    take a break at any time.  I just ask, if I have a

13    question pending, that you answer the question and then

14    we take a break.  You understand?

15        A.   Yes.

16        Q.   Okay.  All right.  And if at any point during

17    the deposition you remember something, your memory's

18    refreshed, it's okay to correct an answer.  I prefer you

19    correct it now than later.

20        That being said, you will get an opportunity

21    to review your transcript.  And you may make small

22    changes or large changes.  But if you make any

23    substantial changes, I have the right to question you

24    later at trial on those changes.  Do you understand?

25        A.   Yes.

8

1     Q.    Now, as to clarify, a big change that I would

2  care about is, like, for example, if I said, what color

3  was the light?  And you said green.  And then later you

4  changed it on your transcript to red.  That would be a

5  substantial change.  You understand?

6     A.    Yes.

7     Q.    Okay.  I'd be entitled to answer -- or ask

8  questions in regards to that.  But small things aren't

9  as worrisome.  Okay.

10          Now, you mentioned this is your first depo,

11  but how long have you been working for the Hayward

12  Police Department?

13     A.    Since 2007.

14     Q.    Since 2007.  Okay.  And were -- what was your

15  job prior to working for the Hayward Police Department?

16     A.    I was a student service officer at Cal State

17  University.  It was Hayward at the time, now East Bay.

18     Q.    Okay.  And how long were you a student service

19  officer?

20     A.    I think three years.

21     Q.    Three years.  Okay.  So is there anything that

22  you did before that?

23     A.    In terms of police or just work?

24     Q.    In terms of work.

25     A.    I worked at Longs Drugs as a clerk, store

9

1   clerk.

2        Q.   Okay.  So is it fair to say since around 2003

3   you've been involved in some sort of law enforcement?

4        A.   Yes.

5        Q.   Okay.  Now, how did you learn of this

6   deposition?

7        A.   I received an e-mail from my counsel.

8        Q.   Okay.  And I'm going to mark this as

9   Exhibit 1.  This is the notice.

10            (Whereupon, Exhibit 1 was marked for

11            identification.)

12   BY MR. BUELNA:  Q.  Take a second to look through it.

13   Have you seen this piece of paper before?

14        A.   Yes, sir.

15        Q.   Do you know what it is?

16        A.   I have an understanding of it, yes.

17        Q.   And what's your understanding of it?

18        A.   This is the summons for me to come here to be

19   the person most knowledgeable for a deposition.  It asks

20   for the documents that my counsel was to supply.  And

21   then it goes over what I would be speaking on.

22        Q.   Okay.  And on Page 2, you see there's a little

23   2 on the bottom?

24        A.   Yes.

25        Q.   In number one right there it says, "Person

                                                            10

1   most knowledgeable regarding the Defendants' training

2   related specifically to the use of the WRAP device."

3           Now, it goes on, but is that what you are?

4   Are you the person most knowledgeable at the City of

5   Hayward Police Department in regards to the Defendants'

6   training related specifically to the use of the WRAP

7   device?

8       A.   To my understanding, the person most

9   knowledgeable, yes.

10      Q.   What's your understanding of the person most

11  knowledgeable?

12      A.   It's not per se the person that has the most

13  information, but more than the typical officer or

14  employee.

15      Q.   Okay.  And do you have this -- are you the

16  person most knowledgeable in regards to the defendant

17  officers' training?

18      A.   Yes.

19      Q.   Okay.  And those defendant officers you are

20  aware of?

21      A.   I know some of them.  I don't know if there's

22  more than what I know.

23      Q.   Okay.  Which ones do you know?

24      A.   I believe at the time it was Sergeant McCrea,

25  but now Officer McCrea, Officer Michelle Hall,

11

1    Officer John Padavana, Officer Nate Shannon.  That's all

2    that is, to my knowledge.  I don't know if anybody else

3    has been listed.

4        Q.    Okay.  I'm going to represent to you we added

5    one more which was Officer McKee.

6        A.    Ron McKee?

7        Q.    Yes.

8        A.    Okay.

9        Q.    William McKee.

10       A.    I'm sorry.

11       Q.    But no problem.  You don't have to remember

12   all of your colleagues names in a large office.

13       A.    He goes by Ron.

14       Q.    By Ron.  Okay.  Fair enough.  All right.

15             Now, to what extent do you have any sort of

16   expertise or knowledge in the WRAP restraint?

17       A.    I am a ACT, which stands for Arrest Control

18   Tactics, instructor for the Hayward Police Department.

19   I've been so since 2010.  The ACT instructors are the

20   ones that are tasked with teaching officers with what we

21   would normally consider martial arts, handcuffing,

22   defensive strikes, offensive strikes, and that includes

23   the WRAP.

24             I am also currently one of two coordinators

25   for the Arrest and Control Tactics Team, which is a set

                                                              12

1    of instructors.

2         Q.   Okay.  And did you go through any particular

3    training in order to become an ACT instructor?

4         A.   Yes.

5         Q.   What training is that?

6         A.   I had to do a two-week course in impact

7    weapons instruction, a two-week course in weaponless

8    defense instruction, a one-week course in advanced

9    ground control, and then a two-day course for CED,

10   Conducted Electric Device, also known commonly as Taser.

11   Those are the basic intro classes that one has to take

12   to become an instructor for the Hayward Police

13   Department.

14        Q.   Did you take any classes that are specific to

15   the WRAP restraint device?

16        A.   No.

17        Q.   Did you take any special training prior to

18   becoming an instructor in regards to the WRAP restraint?

19        A.   No.

20        Q.   How is it that you learned or were trained on

21   the WRAP restraint at all?

22        A.   It is an in-house procedure.

23        Q.   What does that mean?

24        A.   That means that the WRAP is taught through an

25   in-house.  The senior instructors will go over with the

                                                          13

1    newer instructors the procedure for instructing on the

2    WRAP.

3         Q.   And who was your senior instructor?

4         A.   At the time I got promoted or assigned as an

5    ACT instructor was Lieutenant Eric Krimm.

6         Q.   Could you spell his name.

7         A.   It's E-R-I-C for the first name, and then last

8    name is K-R-I-M-M.

9         Q.   Okay.  And when you were trained on the WRAP,

10   were you given any manuals or any sort of documents in

11   order to assist you?

12        A.   No.  Just the Policy 301, but nothing specific

13   to the WRAP.

14        Q.   I'd like to mark as Exhibit 2 the 301 Policy.

15             (Whereupon, Exhibit 2 was marked for

16             identification.)

17             MR. BUELNA:  You have that, Defense Counsel.

18             THE WITNESS:  Thank you.

19   BY MR. BUELNA:  Q.  Do you recognize that policy?

20        A.   Yes, sir.

21        Q.   What is that?

22        A.   This is Policy 301, Handcuffing and Restraints

23   from the Hayward Police Department.

24        Q.   Is this the policy that you're referring to

25   was given to you by your senior instructor?

                                                            14

1    A.    Yes, sir.

2    Q.    Okay.  So is this the -- this is the only

3  policy that Hayward Police Department has in regards to

4  the use of the WRAP restraint device; is that correct?

5    A.    No.

6    Q.    You have another policy?

7    A.    Yes.

8    Q.    What policy is that?

9    A.    Policy 300, which is our Use of Force Policy.

10    Q.    Okay.  Now, if you could turn to, it looks

11  like -- if you see there's like little 83, 84.  If you

12  go to 85, or at the bottom there's a Bates 508.  You see

13  there there's a highlighted portion?

14    A.    Yes, sir.

15    Q.    If you read that, it says that your WRAP

16  restraint is made by Safe Restraints; is that correct?

17    A.    Yes.

18    Q.    All right.  And so do you know when you

19  first -- your department first acquired the WRAP

20  restraint?

21    A.    I have a general speculation.

22    Q.    I don't want you to speculate, but if you have

23  an estimate.

24    A.    Estimate.  I'm sorry.  Mid '90s, late '90s.

25    Q.    And, to your knowledge, do you know if it was

                                                        15

1    from Safe Restraints?

2         A.    Yes.

3         Q.    Okay.  And have you received new safe -- or

4    WRAP devices since then, such as --

5         A.    As in to replace them or have we been using

6    the same specific restraints since the '90s?

7         Q.    Yeah.  Have you been using -- I should

8    clarify.

9               How many WRAP restraint devices do you have at

10   the Hayward Police Department?

11        A.    I would think four to five.

12        Q.    And, to your knowledge, were all of those

13   acquired in the late '90s, or have they been acquired

14   later on since?

15        A.    I have no idea.

16        Q.    Okay.  Now, when you were trained on the WRAP,

17   were there any specific precautions that were -- that

18   were told to you about when using the WRAP?

19        A.    There was the general safety guidelines of

20   monitoring the subject for medical emergencies when a

21   subject's put into the WRAP.  Not to leave, if I recall,

22   not to leave the subject in the facedown position for

23   extended periods of time.

24        Q.    And why were you explained or -- and/or

25   trained on why you were not to leave a subject facedown

16

1   for extended period of time?

2       A.   It could cause difficulty breathing.

3       Q.   And were you trained what to do if a subject

4   expressed difficulty breathing while being in the

5   facedown position?

6       A.   Yes.  Officers are trained.  That's not

7   specific to just the ACT Program.  Officers are trained

8   to respond to medical needs.

9       Q.   And in the specific instance if someone who is

10  facedown and handcuffed expressing difficulty breathing,

11  what should the officer do?

12      A.   That would be scenario based.  So depending on

13  what is occurring, the officer should address the

14  medical need when safe to do so.

15      Q.   And would one of the ways to address it be to

16  roll the subject into a recovery position?

17      A.   That could be one, yes.

18      Q.   And what is a recovery position?

19      A.   There's two that we generally teach.

20      Q.   Okay.

21      A.   For that instance, I would say rolling them

22  over to their side.

23      Q.   Okay.  And what does rolling the person over

24  onto their side do?

25      A.   It relieves pressure from the chest.  It also

                                                        17

1   would allow, in case the subject is choking or has

2   vomited and that is the reason that they're having

3   difficulty breathing, be able to expel that from their

4   mouth.  It also allows the officers the ability to

5   better assess the subject.

6        Q.   And I'm sorry if you already said it.  So is

7   one of the reasons why you rolled on your side to

8   relieve any pressure or compression upon the subject's

9   back?

10       A.   Yes, that's the first thing I said.

11       Q.   And are Hayward Police Department officers

12  trained on the recovery position?

13       A.   Yes.

14       Q.   And are they trained, as you mentioned, to

15  monitor the breath of the subject while they're

16  facedown?

17       A.   I wouldn't say specifically facedown.  I would

18  say in general monitoring the officer -- or the subject.

19  So we don't tell them if they're facedown monitor their

20  breathing.  It's the expectation that they're monitoring

21  the subject that's in their control.

22       Q.   Throughout the entire application?

23       A.   Yes.  Because if I said just facedown, then if

24  they're on their back, that doesn't relieve the officer

25  from monitoring their breathing of the subject or the

18

1     medical condition.

2          Q.   That makes sense.

3               So, now, when you train officers, do you

4     provide them any other documents besides policies?

5          A.   No.

6          Q.   Have you -- I would like to mark this as

7     Exhibit 2.  Or sorry, 3.

8               (Whereupon, Exhibit 3 was marked for

9               identification.)

10    BY MR. BUELNA:  Q.  There you are.

11         A.   Thank you.

12         Q.   I know the front page isn't very exciting.

13    But if you turn to the second page, do you recognize

14    these photos?

15         A.   Yes.

16         Q.   What are those?  What's that photo on the

17    second page?

18         A.   The photo on the second page is a

19    demonstration using both words and photographs of the

20    step-by-step process of the application of the WRAP

21    restraint on the subject.

22         Q.   And is this similar to what the officers are

23    trained on?  I know it's brief and generalized, but is

24    this --

25         A.   This is exactly how we teach them.

                                                        19

1       Q.   This is exactly how you teach them.

2            And is this something that you learn from the

3    WRAP restraints company, or you said it was just senior

4    officers that -- or senior instructors that trained you

5    this way?

6       A.   For me it was senior instructors.  But this is

7    consistent with what we teach.

8       Q.   Okay.  All right.  And I just want to read on

9    that first one.  "Step one, control and handcuff the

10   subject.  Use techniques that do not restrict the

11   subject's breathing."  Do you see that?

12      A.   Yes, sir.  I do.

13      Q.   Is that something that is trained to Hayward

14   Police Department officers?

15      A.   We won't say specifically do not use

16   techniques to restrict the subject's breathing.  We

17   admonish them be wary of the subject's ability to

18   breathe.  But, yes, that's generally what we teach.

19      Q.   And it's my understanding that the WRAP device

20   is carried only by a sergeant; is that correct?

21      A.   Supervisors, and, if I'm not mistaken, the

22   special duty unit may have one of them, yes.

23      Q.   What's the -- what's the reasoning behind

24   that?

25      A.   We don't have many.  If the WRAP restraint is

                                                              20

1   going to be used, the supervisor should be on scene as

2   it will be a use of force.  So generally those two.  Is

3   we don't have a enough to go around, and a supervisor's

4   going to have to respond from the onset anyway.

5       Q.   Okay.  And when more -- I realize there's

6   situations where there's a lot of officers.  And there

7   may be situations where there's a few officers.  Is

8   there a recommended amount of officers that should be

9   present when applying the WRAP?

10      A.   We generally tell them that there should be at

11  least four of you.  One to control the legs, two to

12  control the upper body, and one to begin the application

13  process.  But you could do it with less, and then you

14  could do it with more.  But if too many get involved, it

15  will become a difficult process I would say.

16      Q.   And is it the supervisor or the sergeant's

17  responsibility to sort of delegate the rules, or is that

18  something that the officers just know?

19      A.   Something the officers know.  I wouldn't say

20  the supervisor needs to delegate.

21      Q.   Now, you said there has to be -- strike that.

22           You said -- you recommend that there's two

23  controlling the upper body, correct?

24      A.   Yes.

25      Q.   Now, would putting your knee on the subject's

21

1  back while they're facedown, is that consistent with the

2  techniques that they're trained on?

3       A.   We teach --

4            MR. ROLLAN:  Objection.  Vague.  You can

5  answer.

6            THE WITNESS:  We teach the officers that a

7  place that you can control the upper body is by placing

8  a knee in the upper back area, specifically the

9  shoulder.

10 BY MR. BUELNA:  Q.  What about the mid back?

11      A.   We teach them that that is an area to avoid if

12 they can.  But it's not something that we say you can't

13 do.

14      Q.   Now, the officer that -- strike that.

15           Now, is it understood by the officers that the

16 people that are towards the upper body should be ones

17 specifically monitoring the breath of the subject?

18      A.   I would say that that would make sense as

19 they're the closest to the person's upper body to be

20 able to monitor that.  But we don't specifically say,

21 you're controlling the upper body.  You're the only

22 person that can be monitoring the breath.

23           So, again, that's going to be something that

24 we tell officers that you -- in situations you need to

25 be aware of your surroundings and aware of the condition

22

1    of the subject you're in contact with.

2         Q.   Okay.  That makes sense.  And when you say --

3    strike that.

4         We've said monitoring the breath a couple of

5    times.  But what sort of techniques are officers using

6    in order to be consistent with that training?

7         A.   Visual and auditory.  So watching the subject

8    if they're actually breathing.  They can maybe listen to

9    hear if the subject may be choking.  That would be an

10   indication.  If they notice that they're no longer

11   breathing.  So there would be numerous ways for a person

12   to be able to monitor somebody for breathing.

13        Q.   Now, specifically when the subject is

14   facedown, is it best practice and are officers trained

15   that they should try to keep a visual on the subject's

16   face -- strike that.

17        When a subject is facedown and an officer is

18   trying to monitor their breath, is it best practice to

19   be able to see the subject's face?

20        A.   I wouldn't say we teach anything best

21   practice.  So we would indicate to the officers that you

22   have to be aware of the subject's condition.  I wouldn't

23   tell them that they need to see their face to be able to

24   do that.  Officers need to be making decisions on the

25   scenario and the circumstances that present themselves.

                                                          23

1          So we'll teach -- we'll give them tools, so to

2     speak, that they can then apply to the scenarios that

3     present themselves.  Because it may be that they won't

4     be able to see the subject's face.  If it's dark, they

5     can't see.  Or maybe the officer has an injury to his

6     eye.  So, again, we teach monitored best that you can.

7     We don't say best practices to turn their head and look

8     at their face to see if they're breathing.

9          Q.   But they are trained to use visual and

10    auditory cues in order to monitor their breathing?

11         A.   Yes.

12         Q.   Okay.  And one of those auditory cues is if a

13    subject expresses that he's having trouble breathing,

14    correct?

15         A.   Yes.  That can be one of them.

16         Q.   And another visual cue and/or auditory cue

17    would be if a subject becomes motionless for an extended

18    period of time, correct?

19         A.   That would be a visual cue, yes.

20         Q.   I'm going to mark this as Exhibit 4.

21              (Whereupon, Exhibit 4 was marked for

22              identification.)

23    BY MR. BUELNA:  Q.  I realize this is a large packet.

24    But you'll see at the bottom there's Bates stamps.  It

25    says PLTF, underscore, a lot of zeros and then a number.

                                                            24

```
 1    So I'm going to use that to reference what page number

 2    I'm looking at.

 3              What -- do you recognize the front page of

 4    this?

 5        A.   I recognize the logo.  I wouldn't say I

 6    recognize the specific page.

 7        Q.   You haven't been given this?

 8        A.   No.  I haven't been given this large -- well,

 9    this is repeated several times, is it not?

10        Q.   It's actually multiple manuals or packets that

11    were handed out with the WRAP device.

12        A.   Okay.

13        Q.   But not to you?

14        A.   No.  I recognize it, but not specifically

15    this.

16        Q.   And you've never received or had in your

17    possession or reviewed a manual from Safe Restraints on

18    the WRAP?

19        A.   I do have a manual from WRAP Restraints.  Yes,

20    I do.

21        Q.   You do?

22        A.   Yes.

23        Q.   And is that manual used to train officers?

24        A.   No.

25        Q.   No.  What's that manual for?
```

25

1      A.   The manual is provided by WRAP Restraints.

2   It's just the product information.  We took -- or

3   corrected.  I'm not going to say we because I didn't

4   write the original outline for it.

5           But my understanding is that our outline was

6   taken from the material here.  And as I've reviewed it,

7   it's consistent with what we teach.

8      Q.   Okay.  So this one I believe you turn the page

9   to 6.  And I'm talking about Bates numbers.

10     A.   Yes.

11     Q.   You see there's a little mark next to it.  It

12  says August or 08/14?

13     A.   Yes.

14     Q.   Which I believe means that this is the -- the

15  issued manual from 2014?

16     A.   Yes.

17     Q.   Okay.  Now, if you flip the page to 9.  I know

18  I'm making you go backwards and yours isn't bound.

19  You'll see that there's a multiple -- the device

20  actually comes in different styles or sizes.

21          Do you know which one the Hayward Police

22  Department has?

23     A.   We use the WRAP standard.

24     Q.   Okay.  And are all the WRAPs at the Hayward

25  Police Department the WRAP standard?

26

1        A.    Yes, sir.

2        Q.    Now I'm going to have you flip to 17.

3        A.    I'm there.

4        Q.    Okay.  And at the top you see where it says

5    precautions?

6        A.    Yes, sir.

7        Q.    Precaution number one, aspiration.

8    "Aspiration is possible when in the supine position.

9    Applied properly, the WRAP harness does not hinder the

10   subject's ability to breath.  To minimize respiratory

11   issues, personnel need to work quickly so the subject is

12   secured in one of the recovery positions."

13            Is that statement consistent with what the

14   Hayward Police Department trains its officers on?

15       A.    We don't necessarily say you need to work

16   quickly.  We do say that you should be applying it

17   correctly and doing so at a safe pace so that you're

18   keeping yourself safe and the subject safe.

19       Q.    Okay.

20       A.    But I do not believe we use the words, "work

21   quickly."

22       Q.    Okay.  What about minimize -- using techniques

23   to minimize respiratory issues?  Is that -- is that

24   something that officers are trained to do?

25       A.    Again, we wouldn't say something so specific

                                                        27

1    as that.  We would say something to the lines of be

2    aware of medical concerns.  Subjects on their stomach

3    could have difficulty breathing.  Place them in the WRAP

4    and try to get them seated up as safely as you can.

5         Q.   And it says there, one of the recovery

6    positions.  And you had mentioned there is two.  One is

7    on their side.  What's the other recovery position?

8         A.   Other one's going to be sitted up, up seated

9    so that they're in a typical seated position.

10        Q.   With their legs extended out?

11        A.   Yes, sir.

12        Q.   Okay.  If you look there below that, there's

13   precaution two, medical attention.  I'm going to read

14   from there.  And it says, "If a restrained subject

15   complains of or exhibits any medical concerns, seek

16   immediate medical attention.  Medical treatment can be

17   provided while the subject is restrained in the WRAP."

18            Is that something that the Hayward Police

19   Department officers are trained on?

20        A.   Yes.  If somebody's exhibiting a medical

21   emergency, you need to respond to it.

22        Q.   Okay.  And they give some examples right

23   below.  It says, "Examples of health concerns are:

24   Respiratory distress, coughing, gasping, gagging,

25   shortness of breath."  Is that something that the

                                                        28

 1   Hayward Police Department officers are trained on?

 2        A.   Yes.

 3        Q.   What about sudden quiet or inactivity,

 4   especially after a violent struggle?

 5        A.   Yes.

 6        Q.   Okay.  Chest pain shooting down -- down the

 7   arm.  Is that something they're trained on?

 8        A.   The verbal cue, yes.  We wouldn't know if

 9   they're having chest pains.  They would have to say it.

10        Q.   Okay.  And change in facial color.  Is that

11   something that they're trained on?

12        A.   That's typical of something we would say, yes.

13        Q.   An expression of elevated body temperature,

14   like I'm burning up.  Is that something they're trained

15   on?

16        A.   Yes.

17        Q.   Are they trained on mental -- or a health

18   concern of vomiting?

19        A.   Oh, yes.

20        Q.   And suspected drug behavior?

21        A.   As a health concern, I don't think we

22   specifically say that's a health concern, that suspected

23   drug behavior.  We're more along the lines of if they're

24   having a medical emergency that you can observe, you

25   have to respond to.  But suspected drug behavior is not

                                                          29

1    a medical emergency that we teach.

2        Q.   Understood.  Rather, would it be fair to say

3    if there were medical symptoms of drug use that, you

4    know, were one of these three, that would be something

5    that they would have to watch out for?

6        A.   I think just in general we teach them that --

7    to be aware of subjects under the influence, their

8    behavior and the safety precautions that come along with

9    it.

10           Again, I don't recall us in the ACT program

11   teaching that somebody under the influence of a

12   controlled substance is a medical health concern that

13   you need to call for treatment.  We teach that that is

14   a -- can be a contributing factor, and that is something

15   to be aware of.  But it's not specifically that's a

16   health concern you have to start medical services for.

17       Q.   But it may be if they -- let me put it this

18   way.  If they suspect that they may be under the

19   influence of a controlled substance and then they

20   exhibit medical symptoms of -- of respiratory distress

21   or something along those lines, then they would respond

22   to that, correct?

23       A.   Yes, that is -- that is correct.  We do say if

24   somebody you suspect under the influence of a controlled

25   substance is also displaying medical or medical needs

                                                        30

1    such as this, it would be a medical situation.  That is

2    correct.

3        Q.   And then the last one is sweating profusely.

4    Is that something that the Hayward Police Department

5    officers are trained on?

6        A.   We mention it is something to look out for,

7    but that's a difficult one to teach.  What's sweating

8    profusely?  So we just say this is stuff to look for.

9        Q.   Is it fair to say if sweating profusely was

10   combined with one of these other aforementioned medical

11   concerns, that that would be something to respond to?

12       A.   Yes.

13       Q.   Now, I'm going to have you turn to 19 now.

14   And if you look in sort of under where it says "the

15   WRAP" in big, big text.  It says "Safe Restraints

16   Incorporated.  The WRAP is the ultimate immobilization

17   system.  The WRAP can greatly reduce injuries,

18   positional asphyxia and in-custody death while

19   attempting to control a violent subject allowing medical

20   treatment while restrained."  Do you read that?

21       A.   Yes, sir.

22       Q.   Do you recognize the word "positional

23   asphyxia"?

24       A.   Yes, sir.

25       Q.   What does that word mean to you?

31

1       A.    I have like a general --

2             MR. ROLLAN:   Objection.   Calls for expert

3    opinion.

4             THE WITNESS:   I have a general understanding

5    of it as a subject in certain positions can have

6    difficulty breathing and in which case they can

7    asphyxiate from it.   That's my general knowledge of it.

8             MR. BUELNA:   Okay.   We're going to take a

9    brief break.   We're just going to go over maybe the few

10   questions I have left.   Okay.   We're off the record.

11            (Break was taken.)

12   BY MR. BUELNA:   Q.   So we're back on the record.   Same

13   rules apply as counsel mentioned.

14            I also wanted to clarify real quick when you

15   mentioned before that Officer McCrea was a sergeant,

16   what did you mean by that?

17       A.    So I apologize.   It may sound like I was

18   indicating that he got demoted, which was not the case.

19   Unfortunately, in 2015 Sergeant Lunger was shot and

20   killed on duty.   And Officer McCrea at the time was

21   placed as an acting supervisor in his stead.   So he was

22   an acting sergeant, which is a temporary position to

23   fill the need of the departments, you know, staffing.

24            So I apologize.   He was still technically the

25   rank of officer at the time, and he's maintained it.   I

                                                          32

1   just said sergeant at the time because I understand he

2   was a supervisor there.

3        Q.   Okay.

4        A.   So --

5        Q.   That's fine.  That's fine.  I just wanted to

6   clarify.  And he had said as much himself at his own

7   deposition.  I just wanted to make sure he wasn't

8   recently promoted.

9        A.   No, sir.

10       Q.   All right.  Going back to the WRAP device.  So

11  are there any specific procedures when a subject falls

12  unconscious while the WRAP is being applied?

13       A.   Depends on at what portion the WRAP is being

14  applied at.

15       Q.   Let's say the person -- the subject is

16  handcuffed, but the -- none of the other restraints have

17  yet been applied and they fall unconscious.  What would

18  be the procedures?

19       A.   Again, that would be scenario based.  It's

20  very difficult.  If the subject was violent and had

21  been, you know, resisting the officers but is now

22  handcuffed.  It could be that a carotid was just

23  applied.  Or it's too much of a scenario base because if

24  the subject regains consciousness right away and we have

25  him in the supine position giving CPR, he can then

                                                        33

1    attack the officers.

2            So we teach officers or give them the tools to

3    make a judgment at the time because.  Is it safe to now

4    apply emergency medical services?  If it's safe to do

5    so, then the officers are trained to do so.  If it's not

6    safe, then the officers need to address the safety

7    issue.

8            If they go unconscious and they feel that it's

9    a medical emergency, the procedure would be to notify or

10   call for EMS.  So that would be -- EMS is Emergency

11   Medical Services.  Which for us would include an

12   ambulance, which is Paramedics Plus.  But also the

13   Hayward Fire Department will respond when we request

14   those.  So, again, it's scenario based.  So I apologize

15   if I can't directly answer you.

16       Q.   That was fine.  Now I'm going to add another

17   step to it.

18       A.   Yes.

19       Q.   So the subject is facedown, fallen

20   unconscious, handcuffed and the ankle restraint has been

21   applied, and they fall unconscious.  What would be the

22   procedure?

23       A.   Again, the officer has to make that

24   determination or the officers on scene.  If it's safe to

25   do so, begin applying the emergency medical services.

                                                          34

```
 1    If there's still some type of safety concern or the WRAP

 2    is almost -- or the leg restraints put on -- you said

 3    the ankle strap.  So that means the legs should be --

 4    the leg strap should be right there.  If the officers

 5    deem that it's necessary to continue putting the strap

 6    on due to the subject's behavior and the safety

 7    concern -- because we also teach officers that subjects

 8    can bait them.

 9            By that I mean, that they can pretend to be

10    unconscious or pretend to stop fighting just to ambush

11    the officer.  In fact, on my patrol team probably about

12    three weeks ago we had a similar situation where a

13    subject was being transported.  He was in custody for a

14    theft.  He was in the backseat.  He was a large

15    individual that had just fought asset protection.  Not

16    the police, but the asset protection from the store that

17    he was arrested at.

18            While he was in the backseat he pretended to

19    go unconscious.  I don't know why but once he heard that

20    the officer was pulling over ordering an ambulance,

21    ordering this, he regained consciousness and said -- or

22    he vocalized that he wasn't actually unconscious.

23            So we teach officers that that's a tactic that

24    suspects can use against them as to lull them into a

25    false sense of security.  So, again, going back to
```

                                                              35

1    answering your question.  It's entirely on the officer's

2    judgment at the time.  If they believe that it's safe to

3    do so, then begin applying the emergency medical

4    services.  If they believe that some more steps need to

5    take to be able to safely control the subject, then they

6    do that.

7         Q.   Okay.  If the -- and I understand.  And maybe

8    that it's the totality of the circumstances that informs

9    the officers.  However, if the subject hadn't been

10   resisting prior to arrest or had been cooperative with

11   officers, would that change the analysis?

12        A.   No.  Because they still need to take the

13   information they have at the time.  Just because they

14   weren't physically restraining, if they were having

15   signs or symptoms, such as verbalization or the intent

16   to resist or they were displaying resistance prior to

17   the officer -- or not resistance, violence.  I

18   apologize.

19             Prior to the officer's contact in that

20   situation, they would still need to assess the situation

21   to determine.  So I can't give you a specific yes or no.

22   It's circumstantial.

23        Q.   When you're applying the WRAP, is there a

24   certain -- do you train officers that there's a certain

25   landscape that they should be applying it on, like a

                                                          36

```
 1   flat surface as opposed to a rolling hills or I don't
 2   know?
 3        A.   It's -- it's preferred that the subject's on a
 4   flat surface.  But it's whatever you actually have at
 5   your disposal.  Unfortunately, with this business you
 6   don't always get the preferred location you would like.
 7        Q.   But, when possible, you would prefer a flat
 8   surface, right?
 9        A.   Yes, sir.
10        Q.   And I imagine also when possible you wouldn't
11   be applying the WRAP near an exhaust pipe; is that
12   correct?
13        A.   When possible, I would say yes.
14        Q.   Now, how often are officers trained on the
15   WRAP?  Is it just once or are they trained annually?
16        A.   Annually.  The WRAP is part of our POST, which
17   is Police Officer Standard and Training.  PSP, which is
18   Perishable Skills Program outlines.  So they will get
19   trained on that annually.  And I believe that POST
20   requires them to have five and a half hours of it every
21   two years.  But we do it annually.
22        Q.   And, to your knowledge, have all the defendant
23   officers been trained annually since they began working
24   at Hayward Police Department?
25                  MR. ROLLAN:  Objection.  Calls for
```

37

```
 1    speculation.

 2              THE WITNESS:  To my knowledge, yes.  Officers

 3    are required by the police department to attend

 4    specifically those trainings.

 5    BY MR. BUELNA:  Q.  Have you personally trained any of

 6    the defendant officers in this case?

 7         A.   I've been an instructor since 2010.  I would

 8    say yes.  I can't give you a definitive yes, I have.

 9    It's not in my recollection.  I've taught many classes.

10    So --

11         Q.   You don't have a particular memory of one of

12    the defendant officers in your instruction?

13         A.   No, sir.

14         Q.   And we probably should have gone over this

15    first.  What are the general basic steps of applying the

16    WRAP device?

17         A.   The first and foremost is the subject needs to

18    be handcuffed.  We tell the officers that you cannot

19    apply the WRAP restraint device until the subject is

20    handcuffed.

21              From there we tell them to control the

22    subjects and get them into a prone position, which is --

23    prone is facedown.  Officers need to control the upper

24    body and the lower body.

25              The first part of the WRAP that we instruct
```

                                                              38

1   them to apply is the ankle strap.  That will help them

2   and assist them in the rest of the application, for the

3   fact that it helps control the legs.

4         From there the officers need to lift the

5   subject's legs up, and then they pull the leg restraint

6   portion of the WRAP below the subject.

7         From there the leg restraints are wrapped

8   around the subject's legs.  And there are three straps

9   that are then tightened down.  This is going to be

10  considered what we say is applying the lower half of the

11  WRAP.

12        From there we teach the officers to roll the

13  subject over and push him up into the recovery position

14  that we had discussed earlier.  And then place a harness

15  on the subject's upper body.  And the first portion of

16  that that needs to be applied after being put on is

17  there is a carabiner, which is a locking device on the

18  back part that needs to be interlocked with the

19  handcuffs.

20        Once it's interlocked with the handcuffs, it's

21  then tightened down to ensure that it will not open

22  during any further process.  After that the officers

23  then use the two side straps to bring the back portion

24  of the harness, the chest harness, to the front and

25  apply them to the front in a -- looks like a seat belt

39

1    buckle is the best way I would describe it, to the front

2    of it.

3            Once that is applied, officers will then

4    tighten down at the same time the two straps that I just

5    described.  But we caution them and tell them you should

6    not overtighten those straps.  And a typical way to test

7    that is to check for if you can place either a fist or a

8    hand in between the chest harness and the subject's

9    chest.

10           From there there's a tether that is at the

11   front of the chest that is long enough to reach the

12   subject's ankles.  The officers will then push the

13   subject a little bit forward to ensure that they're not

14   trying to resist or push back.  And then that is

15   attached via a carabiner similar to the one that's on

16   the back of the chest harness.  That is then tightened

17   down.

18           From there the tether is then pulled taut so

19   that way the subject -- it will keep the subject in the

20   recovery position even if they refused to or tried to

21   move backwards.

22           The leftover tether is then tied to itself so

23   that way it's not loose and somebody doesn't accidently

24   overtighten it from there.  At that point the subject is

25   what we would like to call the finished application of

                                                            40

1    the WRAP.

2         We then teach officers how to move the

3    subject, if need be, which is part of that ankle strap

4    that I mentioned earlier has a handle on it to help you.

5         We also teach officers that if the subject

6    then has become compliant or we feel will cooperate, you

7    can release the tether from the chest restraint to the

8    leg restraint.  And then we can release the tension on

9    the ankle strap, at which point they can very mildly

10   walk.  It's more of a waddle.  But we teach that

11   officers have to be holding the subject because he's

12   still -- or they, I'm sorry, not he -- they are still

13   handcuffed.  So in case they fall we want to be able to

14   prevent their fall.

15        That's going to be your typical verbalization

16   of the application of the WRAP.

17   Q.   Now, are officers trained any differently --

18   strike that.

19        Are officers trained that obese persons are at

20   a higher risk for having difficulty breathing while the

21   WRAP is being applied?

22   A.   I wouldn't say trained.  I'd say maybe

23   mentioned, but it's not part of the curriculum.

24   Q.   What do you mean by mentioned?

25   A.   Subjects that are obese could have difficulty

                                                         41

1    breathing if left on their stomach would be something

2    typical that is mentioned, yes.

3         Q.   Okay.  To officers while they're being

4    trained?

5         A.   Yes.

6         Q.   And is there any training in regards to

7    subjects -- strike that.

8              Are officers trained to make any sort of

9    accommodations for people that suffer from mental

10   illnesses while the WRAP is being applied?

11        A.   I don't think I understand.

12        Q.   Let me phrase it this way.  Is it your

13   understanding that sometimes people with mental

14   illnesses require accommodations?  For example, take --

15   allowing them more time to comply with an order or

16   something along those lines?

17        A.   Well, the training we would provide on that

18   is, again, behavioral based.  So the WRAP restraint is

19   intended for subjects who are being uncontrollable and

20   violent.  Any type of interaction in regards to what

21   you're describing is deescalation or techniques in

22   verbalization of getting compliance.

23             So the WRAP restraint would not have the

24   instruction on that.  I'm sorry.  The WRAP restraint

25   wouldn't be the deescalation or the interaction.  The

                                                          42

1    WRAP restraint is specifically intended for people who

2    are not in control.  Who are potentially violent and

3    they can hurt themselves or hurt others.  So the purpose

4    of it is to immobilize them.

5         Q.   So there isn't any need to deescalate the

6    situation in order to gain compliance while applying the

7    WRAP?

8              MR. ROLLAN:  Objection.  Vague and ambiguous.

9              THE WITNESS:  Officers are taught the

10   deescalation techniques.  Our -- our instruction on the

11   WRAP is specifically the application.  So I believe what

12   you're asking for is tactics.  And the ACT program,

13   while it does go over some tactics, it is more

14   specifically in regards to techniques in response to

15   behavior.  Someone takes a swing at you, this is what

16   you should do.

17             I believe what you're talking about could be

18   covered more in a field training or a deescalation

19   training kind of thing.

20   BY MR. BUELNA:  Q.  So is it fair to say, if, you

21   know -- strike that.

22             Is it fair to say that if there's something

23   that the WRAP policy doesn't cover, the officer can rely

24   on other trainings in order to address the situation?

25             MR. ROLLAN:  Objection.  Vague.

                                                          43

1    THE WITNESS:  I would say yes.  Because I

2  understand what you're asking.  Officers do get trained

3  in how to handle situations and tactics and responses to

4  things.  That would be outside of the WRAP training.

5  BY MR. BUELNA:  Q.  But they wouldn't be prevented from

6  using those techniques or tactics while applying the

7  WRAP?

8    A.   Correct.  They could use all the techniques

9  and all the training that they have been receiving to

10  the situation.

11    Q.   Okay.  And, now, it's my understanding that

12  Officer Hall was a -- was essentially an officer in

13  training at the time.  Is there -- would that mean that

14  she hadn't received any of the WRAP device training?

15    MR. ROLLAN:  Objection.  Calls for

16  speculation.

17    THE WITNESS:  No.  She had to have gone

18  through the in-house academy.  So she would have

19  received the WRAP training, which is covered in our

20  in-house academy.

21  BY MR. BUELNA:  Q.  And are sergeants or acting

22  sergeants trained any differently on the WRAP than

23  rookie officers or other officers?

24    A.   Other than most likely receiving more training

25  on it.  And training of where it's located in the

44

1    sergeants' offices, that would be it.  And when I say

2    more training, I meant the sergeants typically have a

3    longer career than rookie officers.  So they have gone

4    through that annual POST PSP program I mentioned earlier

5    more.  That's what I meant by more training.

6        Q.   I see you anticipate.  You've already learned

7    sitting around what the lawyers mean.

8        A.   Yes.  So by that I meant they have attended

9    our training more often than rookie officers.  Rookie

10   officers maybe typically have had it once or twice.  For

11   our police department to be a sergeant you need four

12   years of patrol experience and have a minimum of two

13   years at the Hayward Police Department.

14           And then just in the typical history of our

15   police department, you know, you've been there for

16   seven, six, seven years before you get promoted.

17       Q.   Okay.  All right.  And we mentioned that

18   officers are told to stay away from placing their knee

19   on someone's mid back, correct?

20           MR. ROLLAN:   Objection.  Misstates testimony.

21           THE WITNESS:   I would say we train them that

22   that's an area they should stay away from, if they can,

23   if it's possible.

24   BY MR. BUELNA:   Q.  And would one of those areas that

25   they should stay away from, if possible, also include

                                                          45

1   the neck?

2       A.   Yes.  Again, that's situational.  So I can't

3   just say they should.

4       Q.   And the spine?

5       A.   Correct.  Also a should, if possible.

6       Q.   The recommended area is the shoulder?

7       A.   Shoulder or upper back area.  That could be

8   next to the neck, not specifically just your shoulder.

9   I'm not an expert in anatomy.  So I don't know what

10  covers shoulder, what covers not.  We give them a

11  general area.

12      Q.   Fair enough.

13           And there's a difference between monitoring

14  and moving someone into a recovery position and applying

15  CPR, correct?

16      A.   By definition, technically yes.  Because the

17  monitoring and moving will lead most likely into the

18  CPR.  CPR is a specific action.

19      Q.   But I -- strike that.

20           If a subject expresses some sort of medical

21  concern about having difficulty breathing, there's a way

22  to check on that without having to apply CPR, correct?

23           MR. ROLLAN:  Objection.  Calls for

24  hypothetical.  You can answer.

25           THE WITNESS:  I would say yes.  You can check

                                                         46

1   for somebody's breathing without applying CPR.  In fact,

2   you have to because if you start applying CPR to someone

3   that doesn't need that, you can injure them.

4          MR. BUELNA:  That's it.  All right.  That's

5   all my question.  Do you have any questions, Counsel?

6                    EXAMINATION

7          MR. ROLLAN:  I do.  Just two questions.

8      Q.   So, Officer Wilson, earlier you testified that

9   as part of the monitoring of someone for which a WRAP

10  device is being applied that officers are trained to

11  employ both visual and auditory monitoring; is that

12  correct?

13     A.   Yes.  That's what I said.

14     Q.   Are there instances where visual monitoring

15  may not be possible but auditory monitoring is possible?

16     A.   Yes.  I would say if it's too dark, it's in a

17  dark room, there's no light, you would still be able to

18  hear if the subject's choking or breathing heavily.  So,

19  yes, you could monitor through auditory without visual

20  being something that you can observe.

21     Q.   Okay.  And then, likewise, is it possible to

22  perform visual monitoring but not do auditory monitoring

23  of a suspect?

24     A.   Again, yes.  A situation I could think of

25  would be if you're going into a bar.  There's loud music

                                                    47

1   or if there's been a fight, and you see a subject on the

2   ground and you could tell that they're vomiting or

3   choking.  You could visually see the medical emergency

4   without having to hear it because your inability to hear

5   it, I guess you could say.

6        Q.   So is it your understanding that in some

7   situations either visual or auditory monitoring is

8   sufficient for the purposes of monitoring someone for

9   which a WRAP is being applied?

10       A.   Yes.  You could use just one or the other,

11  yes.

12       Q.   Okay.  Those are all my questions.

13            MR. BUELNA:  Thank you.

14            THE COURT:  Would you like a transcript?

15            MR. ROLLAN:  Yes, please, as soon as possible.

16  (Whereupon, at 11:21 a.m., the deposition of OFFICER

17  BRADON WILSON was concluded, this date.)

18

19

20                      --------------------------

21                      OFFICER BRADON WILSON

22

23

24                      --oOo--

25

                                                              48

STATE OF CALIFORNIA )
) Ss.
COUNTY OF ALAMEDA )

I hereby certify that the witness, OFFICER BRADON WILSON, in the foregoing deposition appeared before me, Kelly McKissack, a Certified Shorthand Reporter and a disinterested person.

Said witness was then and there at the time and place previously stated by me placed under oath to tell the truth, the whole truth and nothing but the truth in the testimony given on the date of the within deposition; that the deposition is a true record of the witness' testimony as reported by me.

The testimony of the witness and all questions and remarks requested by Counsel was reported under my direction and control, caused to be transcribed into typewritten form by means of Computer-Aided Transcription.

I am a Certified Shorthand Reporter licensed by the State of California, and I further certify that I am not interested in the outcome of the said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel. I am not of counsel or attorney for either or any of the parties to the case named in the within caption.

IN WITNESS WHEREOF, I have hereunto affixed my signature this 20th day of April, 2018.

__/s/Kelly McKissack___________

Kelly McKissack
Certified Shorthand Reporter
California License No. 13430

--o0o--

1                 DEPONENT SIGNATURE PAGE

2

3      I hereby certify that I have read my deposition

4  made those changes and/or corrections I deem

5  necessary, and approve the same as now written.

6  Executed this _____ day of _____, 2018

7  By:

8  _____

9  _____

10  BRANDON WILSON

11  Under Penalty of Perjury

12

13

14                   --o0o--

15

16

17

18

19

20

21

22

23

24

25

50

1          DEPONENT SIGNATURE WAIVER

2

3       The signing of the deposition by the deponent was

4    conditionally waived at the time of the taking of the

5    deposition.

6    _____

7    Barbara J. Butler, CSR #5604

8

9

10      Upon completion of the foregoing transcript, the

11   witness was notified it was ready for signature, but

12   the deposition was not signed by the witness for the

13   following reason:

14

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   BARBARA J. BUTLER & ASSOCIATES

22

23               --o0o--

24

25

51

1                          WITNESS LETTER

2    TO:  Officer Brandon Wilson             Date: 04.24.18
       c/o Raymond R. Rollan, Deputy City Attorney
3         City Attorney's Office
          777 B Street                    Depo: 04.06.18
4         Hayward, CA  94541              Ref. #18040621A

5    RE:  Roy Nelson, III, et al. v. City of Hayward, et al.

6    Dear Officer Wilson:

7         The transcript of your Deposition reported in the
     above-captioned cause has been prepared and will be
8    available at this office for your inspection and
     signature for a period of 30 days from the date of this
9    letter.
          Please contact our office between the hours of
10   9:30 a.m. and 5:00 p.m. Monday-Friday, to schedule an
     appointment.  Or, if you prefer, contact your attorney
11   to read, correct and sign the copy of your Deposition
     before a Notary Public.
12        Read the transcript making any changes and/or
     corrections necessary.  In making any changes and/or
13   corrections, please use the following guide:
          1. DO NOT WRITE on the original transcript.
14        2. SIGN UNDER PENALTY OF PERJURY at the end of
             the Deposition on the Deponent Signature Page.
15        3. List each change and/or correction on the
             Correction Sheet provided at the end of the
16           Deposition. Signature is required at the bottom
             of the Correction Page.
17        4. Forward the signed Deponent Signature Page
             and Correction Sheet to:
18               Barbara J. Butler & Associates
                 Certified Court Reporters
19               P.O. Box 3508
                 Santa Clara, California  95055
20               (510) 832-8853 or (408) 248-2885

21        Upon receipt of items requested in this letter, I
     will forward copies of same to all Counsel.
22
                         Sincerely,
23
                         /s/Barbara J. Butler
24                       Barbara J. Butler, CSR

25   cc:  All Counsel

                                                           52

1   DEPONENT'S CHANGES/CORRECTION SHEET AND REASON

2 RE:  Roy Nelson, III, et al. v. City of Hayward, et al.

3 Depo: 04.06.18      Ref. #18040621A

4 Note:  If you are adding to or deleting from your
  testimony, print the exact words you want to add or
5 delete.  Specify with "Add" or "Delete" and sign below.

6 PAGE  LINE   Change/Add/Delete

7 \_\_\_\_  \_\_\_\_  _____

8 \_\_\_\_  \_\_\_\_  _____

9 \_\_\_\_  \_\_\_\_  _____

10 \_\_\_\_  \_\_\_\_  _____

11 \_\_\_\_  \_\_\_\_  _____

12 \_\_\_\_  \_\_\_\_  _____

13 \_\_\_\_  \_\_\_\_  _____

14 \_\_\_\_  \_\_\_\_  _____

15 \_\_\_\_  \_\_\_\_  _____

16 \_\_\_\_  \_\_\_\_  _____

17 \_\_\_\_  \_\_\_\_  _____

18 \_\_\_\_  \_\_\_\_  _____

19 \_\_\_\_  \_\_\_\_  _____

20 \_\_\_\_  \_\_\_\_  _____

21 \_\_\_\_  \_\_\_\_  _____

22 I hereby certify that I have read my deposition
  transcript, made those changes and corrections that I
23 deem necessary and approve the same as now true and
  correct.

24

  DATE: _____  Signature_____
25           BRANDON WILSON

                   53

1                    ATTORNEY'S NOTES

2  Page # Line #

3  _____/_____/_____

4  _____/_____/_____

5  _____/_____/_____

6  _____/_____/_____

7  _____/_____/_____

8  _____/_____/_____

9  _____/_____/_____

10 _____/_____/_____

11 _____/_____/_____

12 _____/_____/_____

13 _____/_____/_____

14 _____/_____/_____

15 _____/_____/_____

16 _____/_____/_____

17 _____/_____/_____

18 _____/_____/_____

19 _____/_____/_____

20 _____/_____/_____

21 _____/_____/_____

22 _____/_____/_____

23 _____/_____/_____

24 _____/_____/_____

25 _____/_____/_____

54