MICHAEL S. LAWSON (SBN 048172)
City Attorney
RAYMOND R. ROLLAN (SBN 304548)
Deputy City Attorney
CITY OF HAYWARD
777 B Street, 4th Floor
Hayward, CA 94541-5007
Tel: (510) 583-4458
Fax: (510) 583-3660

Attorneys for Defendant
The City of Hayward,

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

ROY NELSON III, successor-in-Interest to Decedent ROY NELSON; ORNELL STEVENS, individually,

Plaintiff,

v.

CITY OF HAYWARD, a municipal corporation; MICHELLE HALL, in her individual and official capacity as Police Officer for the CITY OF HAYWARD; LLOYD MCKEE, in his individual and official capacity as Police Officer for the CITY OF HAYWARD ; NATHANAEL SHANNON, in his individual and official capacity as Police Officer for the CITY OF HAYWARD; MATTHEW MCCREA, in his individual and official capacity as Police Sergeant for the CITY OF HAYWARD; JOHN PADAVANA, in his individual and official capacity as Police Officer for the CITY OF HAYWARD and DOES 1-50, inclusive, individually and in their official capacity as police officers for the City of Hayward,

Defendants.

**Case No: cv-07222-SK**

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Nelson v. the City of Hayward.
USDC Case No. cv-07222-SK

The City's MPA ISO Opposition to P's MSA
and ISO The City's Cross-Motion for MSJ

**TABLE OF CONTENTS**

TABLE OF CONTENTS....................i

TABLE OF AUTHORITIES....................iv

MEMORANDUM OF POINTS AND AUTHORITIES....................1

I. INTRODUCTION....................1

II. RELEVANT FACTS....................2

A. 911/Call for Service....................2

B. Initial contact with Decedent at Ironwood Court....................3

C. Paramedics Plus Delay....................4

D. Transport to Chabot College Parking Lot....................4

E. Chabot College Parking Lot....................5

F. The WRAP Restraint Device and Training....................5

G. Application of WRAP Restraint Device....................7

a. Plan to Apply WRAP....................7

b. Application of Handcuffs....................8

c. Application of Leg Restraint....................9

d. Decedent Unconscious....................9

H. Cause of Death....................10

III. LEGAL STANDARD....................10

IV. ARGUMENT....................10

A. THE COURT SHOULD DENY SUMMARY ADJUDICATION OF PLAINTIFFS' SECTION 1983 CLAIM BECAUSE THE UNDISPUTED FACTS SHOW THAT DEFENDANT OFFICERS' CONDUCT WAS REASONABLE....................10

1. Legal Standard of Objectively Reasonable Force....................11

2. The Decision to Apply the WRAP Was Not Severely Intrusive....................11

3. Defendant Officers Used Reasonable Force When Applying the WRAP Device....................12

Nelson v. the City of Hayward., et al.
USDC Case No. **cv-07222-SK**

ii.

The City's MPA ISO Opposition to P's MSA
and ISO The City's Cross-Motion for MSJ

i. Officer Hall and Officer Shannon's Actions Were Reasonable.......14
ii. Officer McCrea, Officer Padavana, and Officer McKee's Actions Were Reasonable..........................................................15
4. The Officers' Decision Not to Turn Decedent Over After He Was Noted To Be Unconscious is Reasonable................................................16
5. Summary Adjudication is Not Appropriate Because Plaintiffs Cannot Establish Causation............................................................16

B. QUALIFIED IMMUNITY BARS PLAINTIFFS' CLAIM AGAINST DEFENDANT OFFICERS.....................................................................17

C. NO REASONABLE JURY COULD FIND FOR PLAINTIFFS' WRONGFUL-DEATH NEGLIGENCE CLAIM..........................................................18

D. PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION OF THE ADA CLAIM SHOULD BE DENIED..........................................................19
i. The First, Second, Fifth, and Sixth Proposed Accommodations Lack Merit..........................................................................21
ii. The Third and Fourth Proposed Accommodation Do Not Establish Reasonable Accommodation..................................................21

E. PLAINTIFFS' FOURTEENTH AMENDMENT CLAIM FOR VIOLATION OF PLAINTIFFS' RIGHTS TO FAMILIAL RELATIONSHIP IS WITHOUT MERIT.......22

F. DEFENDANT CITY OF HAYWARD IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' *MONELL* CLAIM.........................................23

G. PLAINTIFFS' RELATED STATE LAW CLAIMS FAIL AS A MATTER OF LAW..............................................................................25

V. CONCLUSION..............................................................................25

# TABLE OF AUTHORITIES

**Federal Cases** **Page**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986)....10, 11

*Anderson v. Creighton*, 482 U.S. 635, 639 (1987)....17

*Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013)....25

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 324-5 (1986)....10,11

*County of Sacramento v. Lewis*, 523 U.S. 833, 846, 853 (1988)....22

*Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000)....11

*Drummond v. City of Anaheim*, 343 F.3d 1052, 1054 (9th Cir. 2003)....12

*Gilette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992)....25

*Graham v. Connor*, 490 U.S. 386,,396,397 (1989)....11

*Guillory v. County of Orange*, 731 F.2d 1379 (9th Cir. 1984)....23

*Hunter v. Bryant*, 502 U.S. 224, 229 (1991)....18

*Hayes v. County of San Diego*, 736 F.3d 1223, 1232 (9th Cir. 2013)....19

*Hayes* and *Young Han v. City of Folsom*, 695 Fed. Appx. 197, 198 (9th Cir. 2017)....19

*Johns v. Chesterfield Cty., VA.*, 216 F.3d 367, 373 (4th Cir. 2000)....20

*Kisela v. Hughes*, 138 S.Ct. 1148, 1153 (2018)....17

*Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988)....16

*Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005)....24

*Messerschmidt v. Millender,* 132 S.Ct. 1235, 1244 (2012)....17

*Monell v. N.Y. Dept. of Social Servs.*, 436 U.S. 658, 690-91 (1978),....23

*Moreland v. Las Vegas Metro Police Dept.*, 159 F.3d 365, 371-73 (9th Cir. 1998)....22

*Mullenix v. Luna*, 136 S.Ct. 305, 308, 309 (2015)....17,18

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009)..........17

*Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008)..........22

*Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001)..........20

*Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989). ..........25

*Saucier v. Katz*, 533 U.S. 194, 200, 206 (2001)..........17,18

*Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1233 (9th Cir. 2014)..........20

*Smith v. City of Hemet*, 394 F.3d 689, 705 (9th Cir. 2005)..........19

*Southern Calif. Gas. Co. v. City of Santa Ana*, 366 F.3d 885, 888 (9th Cir. 2003)..........10

*Tennessee v. Garner*, 471 U.S. 1 (1985)..........19

*U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02..........20

*Waller ex rel. Estate of Hunt v. Danville, VA*, 556 F.3d 171, 175-76 (4th Cir. 2009)..........20

**State Cases**

*Moore v. City of Berkeley*,

No. C14-00669-CRB, 2018 WL 1456628 (N.D. Cal. Mar. 23, 2018)..........20

*Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. 2010). ..........25

**Statutes**

Fed. R. Civ. P. 56(a)..........10

Fed. R. Civ. P. 56(d)(1)..........10

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This matter arises out of a detention incident involving Roy Nelson II ("Decedent"), which occurred on the early morning of December 19, 2015. During that time, Hayward Police Department ("HPD") officers responded to a call for service which indicated that Decedent was having a schizophrenic attack and was causing a disturbance at his ex-wife's house. During the interaction, the HPD officers decided to employ a WRAP restraint device to prevent Decedent from harming himself and others. While the officers held Decedent down on the ground and applied the WRAP device, Decedent physically resisted and struggled, and ultimately became unconscious. He could not be revived and ultimately died. The coroner noted his cause of death as acute methamphetamine and amphetamine intoxication associated with physical exertion.

The defendants in this case, Officer Michelle Hall, Officer Nathanael Shannon, Officer Matthew McCrea[1], Officer Lloyd McKee, and Officer John Padavana ("Defendant Officers") are sworn members of HPD. The City of Hayward is also sued.

Plaintiffs Roy Nelson and Orenell Stevens ("Plaintiffs"), who are suing on behalf of decedent, decedent's estate, and their own behalves, filed a motion for summary adjudication on their Excessive Force, Wrongful Death – Negligence, and Title II Americans with Disabilities Act (ADA) claims. Defendants herein oppose Plaintiffs' motion and moreover, bring a cross-motion for summary judgment on all claims. First, because the undisputed facts show that the officers' use of force was objectively reasonable under the circumstances, summary judgment should be granted in Defendants' favor on the Excessive Force claim. Second, even assuming that the Court should determine there was a violation, the officers are nonetheless entitled to qualified immunity, contrary to Plaintiffs' assertions. Next, since the officers used reasonable force in interacting with Decedent, Plaintiffs' wrongful death – negligence claim is also without merit. Furthermore, Plaintiffs' ADA argument is subject to summary judgment in that no reasonable juror could find that Plaintiffs have met their burden of proving that the City failed to reasonably accommodate Decedent during the incident.

[1] During the date of this incident, Officer McCrea served as Acting Sergeant.

Nelson v. the City of Hayward.
USDC Case No. **cv-07222-SK**

-1-

The City's MPA ISO Opposition to P's MSA
and ISO The City's Cross-Motion for MSJ

Defendants also seek summary judgment as to Plaintiffs' Fourteenth Amendment claim, which is subject to dismissal because Plaintiffs have no evidence showing that the officers acted with a "purpose to harm unrelated to legitimate law enforcement objectives." Furthermore, *Monell* liability cannot be established because there is no evidence that a municipal policy or custom was the moving force behind the incident. Nor is there any evidence that a failure to train caused the incident. Plaintiffs cannot meet this high burden and thus, summary judgment is proper. Finally, Defendants seek summary judgment for the remainder of Plaintiffs' state law claims – which are violations of the Bane Act, Assault, and Battery. Because these claims all depend on the officers acting unreasonably, they all fail as a matter of law with the resolution of the constitutional claim asserted under 42 U.S.C. Section 1983.

## II. RELEVANT FACTS

### A. 911/Call for Service

On December 19, 2015, at 1:08 a.m., Hayward Police received a call from Decedent's ex-wife Patsy Nelson-Taft requesting police response to her residence, located on Ironwood Court in Hayward, CA. (Declaration of Raymond R. Rollan ("Rollan Decl."), Ex. 8, at p. 1). The call for service was for an unwanted guest at a private residence. (Rollan Decl., Ex. 2, at 21:12-15.)

Officers were dispatched to the Ironwood Court location. (Rollan Decl., Ex. 1, at 17:24-25.) Officer McKee was the first to arrive on scene and spoke with Ms. Nelson-Taft. (Rollan Decl., Ex. 2, at 23:2-5.) Ms. Nelson-Taft told him that Decedent was suffering from schizophrenia and paranoia. (Rollan Decl., Ex. 2, at 23:8-18.) She also indicated that Decedent had recently been released from John George Psychiatric Facility. (Rollan Decl., Ex. 2, at 23:25-24:1-3.)

Officer McKee then spoke to Decedent, who was still inside the house, and asked him to come outside. (Rollan Decl., Ex. 2, at 25:20-22.) Decedent followed Officer McKee's orders and stepped outside. (Rollan Decl., Ex. 2, at 25:23-26:1.) Officer Hall and Officer Shannon arrived shortly and approached the house, at which point Officer McKee passed custody of Decedent. (Rollan Decl., Ex. 2, at 26:6-18.) Officer McKee continued to speak to Ms. Nelson-Taft who stated that she was remarried but allowed Decedent to come and sleep at her house every now and then. (Rollan Decl., Ex. 2, at 27:9-12.) During this interaction, Officer Hall was on her eighteenth (18) month of field training as a new

Nelson v. the City of Hayward.
USDC Case No. **cv-07222-SK**
-2-
The City's MPA ISO Opposition to P's MSA and ISO The City's Cross-Motion for MSJ

Hayward Police officer. (Rollan Decl., Ex. 1, at 21:14-15.) Officer Shannon was her Field Training Officer. (Rollan Decl., Ex.1, at 14:7-9.)

**B. <u>Initial Contact with Decedent at Ironwood Court</u>**

Upon Officer Hall and Officer Shannon's arrival at Ironwood Court, Officer McKee informed them that Decedent needed to go see the doctor. (Rollan Decl., Ex. 1, at 22:7-9.) Officer Hall estimated Mr. Nelson to be 6'4 and 300 pounds. (Rollan Decl., Ex. 1, at 20;2-4.) Officer Hall is 5'4 and 150 pounds. (Rollan Decl, Ex. 1 at 76:25.) Officer Shannon is 6'3 and 230 pounds. (Rollan Decl., Ex. 3, at 84:2.) Due to the nature of the call, Officer Hall performed a Welfare and Institutions Code Section 5150 evaluation on Decedent. (Rollan Decl., Ex. 1, at 22:5-13.) Officer Hall also called for "Code 2" non-emergency ambulance services within two to three minutes of arriving at the Ironwood Court location. (Rollan Decl., Ex. 1, at 27:2-3.) As Officer Hall was conducting the 5150 assessment, Ms. Nelson-Taft informed her that Decedent had schizophrenic tendencies and needed to go back to John George. (Rollan Decl., Ex. 1, at 22:22-25.) She stated that while everyone was sleeping, Decedent started yelling in the middle of the night saying that their 23-year-old son, Roy Nelson III had been kidnapped and that there were people on the roof. (Rollan Decl., Ex. 1, at 23:17-20.)

Officer Hall asked Decedent to come with her to her patrol car and Decedent voluntarily walked over. (Rollan Decl., Ex. 1, at 29:7-10, 15-17.) Officer Hall patted Decedent down for weapons and after not locating any weapons, she unlocked the back door of her patrol car for Decedent to get inside to wait for the paramedics. (Rollan Decl., Ex. 1, at 31:18-32:7.) Officer Hall did not place Decedent in handcuffs because although he seemed disoriented and unfocused, he was compliant and not aggressive during that time. (Rollan Decl., Ex. 1, at 24:24-25:1-4, 32:8-14.)

Once Decedent was seated in the backseat of Officer Hall's patrol car, Officer Hall asked whether he wanted to hurt himself, to which he responded yes. (Rollan Decl., Ex. 1, at 25:8-11.) Officer Hall then asked him whether he wanted to hurt other people, and Decedent said yes, then said no. (Rollan Decl., Ex. 1., at 25:10-11.) Based on the information provided by Officer McKee and Ms. Nelson-Taft, as well as Decedent's demeanor, Officer Hall determined that he was a danger to himself and others, and gravely disabled, as a result of a mental disorder, and placed him on a 5150 psychiatric hold. (Rollan Decl., Ex. 1, at 25:16-25.) They waited for ambulance services to arrive.

**C. Paramedics Plus Delay**

Paramedics Plus is a third party hired by various Alameda County agencies, including Hayward, for ambulance services.  (Rollan Decl., Ex. 3, at 149:9-19.)   The City uses Paramedics Plus to handle transports to John George because they are able to provide medical clearance.  (Rollan Decl., Ex. 3, at 50:17-25, 77:17-24.)  Because they are not able to provide this assessment, HPD Officers do not directly transport 5150 detainees to John George, though they are able to do so in limited instances such as if a subject has already received medical clearance.  (Rollan Decl., Ex. 3, at 78:1-18, Ex. 1, at 28:19-29:4.)  Officer Hall requested "Code 2" ambulance services at 1:28 a.m.  (Rollan Decl., Ex. 8, at p. 1.) She expected Paramedics Plus to arrive  no more than 10 to 20 minutes after her request was placed and expected them to transport Decedent to John George Psychiatric Pavilion.  (Rollan Decl., Ex. 1, at 27:3-7.)  At 1:54 a.m., dispatch notified Officer Hall that the ambulance services had an expected time of arrival of 8 minutes.  (Rollan Decl., Ex. 8, at p. 1.)  At 2:04 a.m., Officer Hall was notified that the ambulance was diverted for a priority medical call, and Paramedics Plus provided a new ambulance arrival time of 20 minutes.  (Rollan Decl., Ex. 8, at p. 1.)  The officers waited for approximately thirty minutes for Paramedics Plus to come to the Ironwood Court location.  (Rollan Decl., Ex. 1, at 41:19-22.)

Meanwhile, while seated in the car, Decedent was sweating profusely and he kept saying he did not want the ambulance.  (Rollan Decl., Ex. 1, at 39:15-18.)  Decedent also asked to be let out of the vehicle.  (Rollan Decl., Ex. 1, at 40:7-8.)  Then, Decedent started yelling out the window and began kicking at the patrol doors and windows from the inside the backseat.  (Rollan Decl., Ex. 1, at 42:14-18.) The officers asked Decedent to stop kicking the door and window several times and Decedent would say okay, but resume kicking a few seconds later.  (Rollan Decl., Ex. 1, at 46:18-21.)  At this point, the officers did not attempt to handcuff Decedent because his behavior presented an officer safety issue. (*See* Rollan Decl., Ex. 1, at 46:21-22.)

**D. Transport to Chabot College Parking Lot**

After repeated ambulance delays due to Paramedic Plus ambulances being diverted to priority medical calls throughout Alameda County, and Decedent's increasingly agitated behavior, Officer Shannon suggested to transport Mr. Nelson from Ironwood Court to Chabot College Parking lot, less than a mile away.  (Rollan Decl., Ex 1, at 44:8-17, 45:15-17.)  The officers decided to relocate to

Nelson v. the City of Hayward.
USDC Case No. **cv-07222-SK**                    -4-                    The City's MPA ISO Opposition to P's MSA
and ISO The City's Cross-Motion for MSJ

Chabot College parking lot because they believed being near Ms. Nelson-Taft's house caused Decedent to be more agitated. (Rollan Decl., Ex. 1, at 44:21-24.) Based on Decedent's behavior, Officer Shannon also suggested that he be placed in a WRAP restraint device to achieve control. (Rollan Decl., Ex. 1, at 43:14-16, 46:2-6.) They also relocated to Chabot College parking lot because the location offered more space and lighting to apply the WRAP device and it was more accessible for paramedics. (Rollan Decl., Ex. 1, at 44:24-45:3, 46:6-8.) During the transport to Chabot College parking lot, Officer Shannon requested that Acting Sergeant McCrea meet them at Chabot to bring the WRAP restraint device. (Rollan Decl., Ex. 4, at 28:17-29:3.) Supervisors, and in some cases, special duty units, are the only staff permitted to posses a WRAP restraint device in their vehicle, and as a matter of policy, must be present during the application of the device. (Rollan Decl., Ex. 11, at 20:19-21:4; Ex. 4, at 29:4-30:24.)

**E. <u>Chabot College Parking Lot</u>**

Acting Sergeant McCrea met Officer Hall, Officer Shannon, and Officer McKee at the Chabot College parking lot. (Rollan Decl., Ex. 4, at 28:17-20.) Once at Chabot College parking lot, the officers learned that there was an extended wait for ambulance services. (Rollan Decl., Ex. 1, at 54: 17-22.) During this time, Decedent sat across the back row of the patrol car with his back against the rear driver's side door and started kicking the patrol vehicle door and back window while demanding to be let out of the vehicle. (Rollan Decl., Ex. 7, at 3:52-4:30.) Decedent kicked the door three times. (Rollan Decl., Ex. 7, at 1:41-3:34.) Acting Sergeant McCrea again informed Decedent that they were waiting for an ambulance and instructed him to stop kicking the vehicle door or he would be placed in a WRAP restraint device. (Rollan Decl., Ex. 7, at 3:00-4:00.) Decedent responded by kicking the rear window and patrol car door with his feet three more times, which he accomplished by sitting across the back row of the patrol car with his back against the rear driver's side door. (Rollan Decl., Ex. 7, at 3:52-4:30.) Based on Decedent's repeated failure to comply with Officer McCrea's orders to stop kicking, the officers decided to place him in the WRAP device.

**F. <u>The WRAP Restraint Device and Training</u>**

The WRAP restraint device is a device consisting of an ankle strap, a leg restraint with three straps, and a chest harness. (Rollan Decl., Ex. 11., at 39:1, 5, 14.) Similar to other law enforcement

tools, the WRAP, on its own, is not an inherently dangerous instrument. (Rollan Decl., Ex. 10, at 43:3-12.) The WRAP is used to immobilize individuals who are damaging property or engaging in behavior that could cause physical harm to themselves, personnel, bystanders, or others. (Rollan Decl., Ex. 11, at 43:1-4.) The purpose of the WRAP is to stop any conflict quickly, get the suspect in a recovery position so they can breathe, to provide medical attentional, and to protect from further injury. (Rollan Decl., Ex. 10 at 19:19-25.)

Generally, at least four officers are required when a WRAP restraint device is used, but could require more depending on a subject's size. (Rollan Decl., Ex. 11., at 21:7-11.) One officer controls the legs, two control the upper body, and one officer begins the application process. (Rollan Decl., Ex. 11., at 21:11-13.) Prior to applying the WRAP restraint, officers are trained to first place a subject in handcuffs. (Rollan Decl., Ex. 11., at 38:17-20.) Then, officers are trained to control a subject and place them into a prone or facedown position. (Rollan Decl., Ex. 11., at 38:21-23.) Officers are trained to control a subject's upper and lower body. (Rollan Decl., Ex. 11., at 38:23-24.) The lower half of the WRAP restraint device is applied as follows. The first part of the WRAP that is applied is the ankle strap, which helps assist officers with the rest of the WRAP device application as it controls a subject's legs. (Rollan Decl., Ex. 11., at 38:25-39:1-3.) Next, officers are trained to lift a subject's legs up and place the leg restraint portion of the WRAP device under the subject's legs. (Rollan Decl., Ex. 11., at 39:4-6.) Then, officers wrap the leg restraint around the subject's legs and tighten down the three straps. (Rollan Decl., Ex. 11., at 39:7-9.) The officers located on top are trained to control the upper body by placing a knee in the subject's upper back or shoulder area. (Rollan Decl., Ex. 11., at 22:6-9.) Once the lower portion of the WRAP device is applied, officers are trained to roll the subject over and place the chest harness on the subject's upper body. (Rollan Decl., Ex. 11., at 39:12-15.) Once the chest harness is applied, officers are trained to attach a tether connecting the chest harness to the subject's ankles, such that a subject is seated in an L shape or a 90 degree angle. (*See* Rollan Decl., Ex. 11., at 40:10-17.)

Hayward officers are trained on general safety guidelines of monitoring a subject for medical emergencies when a subject is placed in a WRAP device. (Rollan Decl., Ex. 11, at 16:19-22.) As part of this training, officers are advised that leaving a subject, including obese individuals, in a facedown

position for extended periods of time may cause difficulty in breathing. (Rollan Decl., Ex. 11, at 16:21-17:2; 41:19-42:5.) If a subject expresses difficulty in breathing or becomes unconscious while in a facedown position, officers are trained to address the medical need **when safe to do so**. (Rollan Decl., Ex. 11, at 17:3-14.) (emphasis added) Prior to monitoring a subject's care, officers are trained to achieve de-escalation and control of the subject. (Rollan Decl., Ex. 10, at 30:10-16.) In other words, officers are trained to assess whether it is safe to turn someone over to provide medical attention or to continue to take steps to safely control a subject due to concerns that a subject may be pretending to be unconscious in order to create a false sense of security. (Rollan Decl., Ex. 11, at 35:1-25.) The officer's analysis does not change whether a subject was cooperative or resisting prior to his arrest. (Rollan Decl., Ex. 11, at 36:7-18.) This is because turning a person over who is not properly restrained exposes the officers to danger. (*See* Rollan Decl., Ex. 10, at 50:3-13.) Additionally, officers are trained to monitor a suspect in the WRAP restraint device using visual and auditory cues after it has already been applied as it is extremely difficult to monitor a suspect while applying the WRAP at the same time. (Rollan Decl., Ex. 10, at 54:1-6.) One way officers are taught to address a medical need is to place the subject in a recovery position, which is rolling a subject onto their side or in a seated position. (Rollan Decl., Ex. 11, at 17:15-24; 28:7-11.) When a subject becomes unconscious, officers are trained to call for emergency medical services, which includes an ambulance from Paramedics Plus, and the Hayward Fire Department. (Rollan Decl., Ex. 11, at 34:8-14.)

Hayward Police officers receive annual training on the WRAP restraint device as part of their Police Officer Standard and Training requirements. (Rollan Decl., Ex. 11., at 37:14-19.) At the time of the incident, all Defendant Officers received this training. (Rollan Decl., Ex. 11, at 37:22-38:5.)

### G. Application of WRAP Restraint Device

#### a. Plan To Apply Wrap

Officer Padavana acted as a cover officer and arrived at Chabot College parking lot to assist with the application of the WRAP restraint device. (Rollan Decl., Ex. 5, at 18:13-22.) Acting Sergeant McCrea discussed a plan with the officers to have Decedent place his hands behind his back, scoot his back up against the patrol door behind the driver's seat, then open the door to handcuff him and have him lay onto the ground for the WRAP device to be applied. (Rollan Decl., Ex. 4, at 76:4-9.) Because

of the ambulance delays, the plan was to place Decedent in the WRAP device and transport him to St. Rose Hospital directly, outside of normal HPD protocol. (Rollan Decl., Ex. 4 at 77:20-22.)

Officer McKee, who was standing on the other side of the patrol car, was not aware of Acting Sergeant McCrea's plan and was not part of the discussion on how to get Decedent out of the vehicle. (Rollan Decl., Ex. 2, at 36:15-23.) Thereafter, Acting Sergeant McCrea and Officers Hall, Shannon, and Padavana gathered by the driver's side passenger door to execute the plan. (Rollan Decl., Ex. 6, at 8:00-8:35.) Officer McKee, who was unaware of the plan, opened the door from the opposite side of where the officers were standing and let Decedent out of the patrol car. (Rollan Decl., Ex. 2, at 37:18-24.) Because the other officers did not know how Decedent got out of the vehicle, they rushed around the patrol car. (Rollan Decl., Ex. 6, at 8:35-8:50.) As Officer Hall made her way to where Decedent was, she arced her taser because she did not know whether Decedent pushed his way out of the vehicle and presented a threat to Officer McKee. (Rollan Decl., Ex. 1, at 71:15-72:2.) The officers ordered Decedent to take a few steps away from the vehicle and to get on his knees. (Rollan Decl., Ex. 6, at 8:50-9:15.) Although Decedent was non-aggressive, he tensed his body which made it difficult for the officers to take him down to the ground. (Rollan Dec., Ex. 1, at 80:4-25.) Decedent eventually got on his knees and then on the ground. (Rollan Decl., Ex. 6, at 9:09; Ex. 1, at 82:1-2.)

**b. <u>Application of Handcuffs</u>**

While securing a handcuff, Officer Shannon had his knees on the right side of Decedent's shoulder and Officer Hall had her knees on the left side of Decedent's shoulder. (Rollan Decl., Ex. 3, at 138:21-24; Ex. 1, at 83:15-24.) After twenty seconds of being on the ground, Decedent stated "I can't breathe" and Officer Hall told Decedent to "relax." (Rollan Decl., Ex. 6, at 9:20-9:28; Ex. 1., at 88:8-14.) Officer Shannon successfully placed Decedent in handcuffs shortly afterwards. (Rollan Decl., Ex. 6, at 9:40-9:43; Rollan Decl., Ex. 1, at 83:15-17.) Because Decedent continued to move and tense his body, Officer Shannon continued to apply pressure to Decedent's upper back area, despite Decedent's earlier statements. (Rollan Decl., Ex. 6, at 9:49-11:52.) At the same time, Officer Hall had her hand on Decedent's hood area to prevent Decedent from suddenly hitting the pavement with his head, and also to make sure he did not raise up off the ground. (Rollan Decl., Ex. 1, at 91:10-95:16.) Meanwhile, the other officers were applying the leg restraint and ankle restraint of the WRAP device.

**c. Application of Leg Restraint**

Acting Sergeant McCrea, Officer Padavana, and Officer McKee were on Decedent's leg area. Once Decedent got on the ground, Officer Padavana immediately applied a figure-four leg lock to achieve control of Decedent's legs while they waited for Acting Sergeant McCrea retrieve the WRAP device. (Rollan Decl., Ex. 5, at 30:22-31:8.) Acting Sergeant McCrea straightened Decedent's legs once the WRAP device was brought over. (Rollan Decl., Ex. 4, at 86:20-25.) Officer McKee was all the way down at Decedent's ankles in order to apply the ankle restraint. (Rollan Decl., Ex. 2, at 40:13-14, 41:4-5, 42:13-18.) Acting Sergeant McCrea also assisted in applying the ankle and leg restraint. (Rollan Decl., Ex. 4, at 87:14-17; 88:3-6.) Officer Padavana assisted with putting one strap (out of three) of the leg restraint part of the WRAP device. (Rollan Decl., Ex. 5, at 30:18-20.) Decedent tensed his body and moved his legs, which made it difficult for the officers to take control of his legs and place the ankle restraint. (Rollan Decl., Ex. 5, at 36:11-20; Ex. 2, at 42:21-25; *See* Ex. 4 at 126:7-17.)

**d. Decedent Unconscious**

Officer Hall noticed that Decedent was unconscious after approximately three minutes of being on the ground and subsequently informed Officer Shannon that Decedent appeared unconscious "unless he's faking it." (Rollan Decl., Ex. 6, at 12:05-12:30.) A few seconds later, Officer Hall stated "he's not doing anything" and "he's not reacting at all." (Rollan Decl., Ex. 6, at 12:05-12:30.) Officer Shannon removed pressure from Decedent's upper back area and requested "Code 3" priority medical response from Paramedics Plus. (Rollan Decl., Ex. 6, at 12:05-12:30.) Officer Hall informed the other officers that she did not think Decedent was breathing and searched for a pulse but his sweatshirt was in the way. (Rollan Decl., Ex. 6, at 12:15-12:30.) Officer Shannon told the other officers to finish securing the ankle and leg portion of the WRAP restraint device prior to rolling Decedent over. (Rollan Decl., Ex. 6, at 13:00-13:05.) Decedent was then turned over onto his back after this was accomplished. (Rollan Decl., Ex. 7, at 14:50.) Decedent was rolled over a minute and twenty seconds after Officer Hall noticed him to be unconscious. (Rollan Decl., Ex. 6, at 12:20-13:40.)

Officer Shannon and Officer Hall started monitoring Decedent's breathing and pulse and detected a faint pulse. (Rollan Decl., Ex. 6, at 13:40-14:50.) Ambulance services arrived a few minutes later. (Rollan Decl., Ex. 6, at 18:45.) He was later pronounced dead at St. Rose Hospital.

Nelson v. the City of Hayward.
USDC Case No. **cv-07222-SK**
-9-
The City's MPA ISO Opposition to P's MSA
and ISO The City's Cross-Motion for MSJ

**H. <u>Cause of Death</u>**

On December 21, 2015, Forensic Pathologist, Dr. Thomas W. Rogers, performed the autopsy on Decedent and ordered a toxicology report. (Rollan Decl., Ex. 9.) The toxicology report shows that Decedent had 0.73 mg/L of methamphetamine in his system, which falls within the potentially toxic blood methamphetamine range. (Rollan Decl., Ex. 9.) After conducting the autopsy and reviewing the toxicology report, Dr. Rogers determined Decedent's cause of death as cardiac arrhythmia due to acute methamphetamine intoxication association with physical exertion with other significant conditions of cardiomyopathy. (Rollan Decl., Ex. 9.) The autopsy report did not note any signs of neck trauma or injury nor any soft tissue damage around that area. (Rollan Decl., Ex. 9.)

## III. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when after adequate discovery, there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Southern Calif. Gas. Co. v. City of Santa Ana*, 366 F.3d 885, 888 (9th Cir. 2003).

If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue. Fed. R. Civ. P. 56(d)(1).

## IV. ARGUMENT

**A. <u>The Court Should Deny Summary Adjudication Of Plaintiffs' Section 1983 Claim Because The Undisputed Facts Show That Defendant Officers' Conduct Was Reasonable.</u>**

Plaintiffs primarily contend that summary adjudication of their excessive force claim is

appropriate because the officers' extended use of body weight and compression of Decedent after he expressed and showed symptoms of respiratory distress was objectively excessive and unreasonable. Plaintiffs' argument fails for two reasons: (1) the undisputed facts establish that there was no constitutional violation because Defendant Officers acted reasonably under the circumstances, and (2) Plaintiffs' cannot prove that the Defendant Officers caused Decedent's death.

**1. Legal Standard for Objectively Reasonable Force**

When considering a claim for excessive force under the Fourth Amendment, a court must determine whether the officers' actions were "'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 397. In considering whether a particular use of force is objectively reasonable, courts must consider the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Where an excessive force claim is brought against multiple defendants, courts are required to "analyze the acts of each individual defendant." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).

**2. The Decision to Apply The WRAP Was Not Severely Intrusive**

Plaintiffs first contend that the Defendant Officers' intrusion of placing Decedent into a WRAP device is "severe compared to the minimal threat of someone scuffing the backseat of a patrol car." (Pl. MSA at 22.) Plaintiffs further assert that "Mr. Nelson was not an immediate threat to the safety of the officers or others, was not attempting to evade officers and the severity of the crime was property damage – a minimal, if not petty excuse to put someone in a WRAP device. Finally, this was not a tense situation, it was a slow-moving situation with an unarmed man that officers knew was suffering from paranoid schizophrenia and hallucinating as a result." (Pl. MSA At 22).

Plaintiffs' argument, however, neglects the fact that the WRAP device is not an inherently dangerous tool and is used to immobilize individuals who are damaging property or engaging in behavior that could cause physical harm to themselves or others. (Rollan Decl., Ex. 11, at 43:1-4.) Here, the undisputed facts show that Decedent kicked the inside of Officer Hall's patrol vehicle multiple times both at Ironwood Court and at Chabot College Parking lot despite being told by the officers to calm down and stop. In fact, the Defendant Officers' decision to employ the WRAP restraint device was a direct response to Decedent's failure to comply with Officer McCrea's commands to stop. In other words, the officers' goal in using the device was to immobilize Decedent so that he would not kick the car again, hurt himself or the officers, or damage property. In addition, the undisputed fact that Decedent was experiencing a schizophrenic episode, which made his behavior erratic and unpredictable, provided further reason to apply the WRAP device so that Decedent could be transported safely to St. Rose Hospital. Therefore, the intrusion, or the use of the WRAP restraint device, was reasonable.

**3. Defendant Officers Used Reasonable Force When Applying the WRAP Device**

Next, Plaintiffs argue "it is overwhelmingly apparent based on the undisputed facts that a reasonable jury must find that the type of force used on Mr. Nelson in the deployment of the WRAP Device was unreasonable and excessive under the circumstances." (Pl. MSA at 22).

Plaintiffs reliance on *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003) to support their motion for summary adjudication of the excessive force claim is misplaced. In *Drummond*, the plaintiff, who weighed 160 pounds, "had a history of mental illness (bipolar and schizophrenia), had run out of medication and was hallucinating and paranoid." 343 F.3d at 1054. When officers arrived to 5150 Drummond, although he never resisted, an officer "knock[ed] Drummond to the ground." *Id.* A second officer helped with the handcuffing and then one officer "put his knees into Drummond's back and placed the weight of his body on him," while the other officer put "one knee on Mr. Drummond's neck" and the other knee and the weight of his body on his back." *Id.* The officer that placed his weight on Drummond's neck was 225 pounds. *Id.* "Drummond soon fell into respiratory distress" telling the officers "he could not breathe and that they were choking him." *Id.* Twenty minutes later, officers used a "hobble restraint" to "bind Drummond's ankles" and one minute later, Drummond lost consciousness." *Id.* at 1055. Drummond offered no resistance. *Id.* The Ninth Circuit held the officers

Nelson v. the City of Hayward.
USDC Case No. **cv-07222-SK**
-12-
The City's MPA ISO Opposition to P's MSA
and ISO The City's Cross-Motion for MSJ

"should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable." *Id.* at 1059.

Here, the factual similarities to *Drummond* are limited to the following: (1) Decedent was likewise experiencing a schizophrenic episode, (2) Decedent was placed face down on the ground, (3) Decedent exclaimed that he could not breathe as the officers placed pressure on his back, and (4) officers continued to place pressure on Decedent's back despite stating he could not breathe. Several key distinguishable facts in this case, however, render *Drummond* inapplicable. First, in *Drummond*, the weight differential between Mr. Drummond and the officer that applied his body weight on his neck was significant (160 pounds v. 225 pounds), whereas here, Decedent weighed 320 pounds, and Officer Shannon weighed 230 pounds and Officer Hall, 140. Second, none of the officers in this instance knocked Decedent into the ground. Furthermore, unlike in *Drummond*, none of the officers testified that they placed their entire body weight on Decedent's back and none of the officers placed their knee on Decedent's neck. More importantly, in contrast to *Drummond*, where the subject offered no resistance to the arresting officers, Decedent continued to physically resist the officers' attempts to control him and tensed his body such that it made it difficult to apply the WRAP device. This fact is significant because Decedent's continued resistance provided Defendant Officers a reasonable basis to continue applying pressure on Decedent's back whereas that factor was absent in *Drummond*. Therefore, *Drummond* is distinguishable.

Instead, summary judgment in Defendants' favor is appropriate because this case is more similar to *Moore v. City of Berkeley*, No. C14-00669-CRB, 2018 WL 1456628 (N.D. Cal. Mar. 23, 2018)[2], wherein a court in this district rejected similar claims brought by Plaintiffs' counsel in another case involving a restraint related death of an individual with disability. In *Moore*, the decedent, who weighed 350 pounds, was reportedly experiencing a psychotic episode and needed to be taken into protective custody. *Id.* at *1. Based on prior interactions, one of the responding officers knew about the decedent's history of paranoid schizophrenia and drug abuse. *Id.* During their initial encounter at decedent's apartment, the officers engaged in a 15 to 20 minute conversation with the decedent, whose demeanor changed from bubbly to paranoid to fearful before one officer decided to take decedent into custody. *Id.*

[2] Plaintiffs' filed an appeal to this decision on April 17, 2018.

at *2. The officers grabbed decedent's wrist, and she recoiled, dragging the officers into the apartment and onto a mattress on the floor. *Id.* One of the officers, who stands over six feet tall and weighs over 200 pounds, then put his weight on decedent's lower torso to keep her hips down and control her legs. *Id.* Another officer, who weighted 130 pounds, placed pressure on decedent's shoulder blades. *Id.* Decedent, who was in a prone position, continued to struggle against the officers. *Id.* In response, the officers handcuffed decedent, and one of the officers put his weight on decedent's legs while another officer tried to hold her legs down. *Id.* Then, the officers restrained decedent's ankles with a WRAP device. *Id.* It took six officers to subdue the decedent. *Id.* at *5. At some point, decedent stopped struggling, and thereafter, stopped breathing. *Id.*

The court in *Moore* granted summary judgment on the plaintiff's Section 1983 claim stating that the use of limbs to pin down a resisting subject was warranted and reasonable. *Id.* Additionally, the court held that officers may use "physical coercion" when taking someone into custody and found

> "that although the decedent started bucking for air, nothing in the records suggested how the officers could have discerned when thrashing against arrest became bucking for air. And though Moore's weight suggested a higher risk of health problems, the officers had little choice but to restrain her once the struggle started. That being so, the force used – though fatal when combined with an enlarged heart – was reasonable based on what the officers could know at the time." *Id.*

Here, like the decedent in *Moore,* and unlike in *Drummond,* Decedent continued to struggle while the officers applied the WRAP device. Thus, the officers had no choice but to continue applying the WRAP device once the struggle ensured. Additionally, like in *Moore,* none of the officers struck, tased, kicked, or shot Decedent during the application of the WRAP device. Thus, the Defendant Officers' actions were reasonable in light of the circumstances and it is important to review each officer's involvement in the application of the WRAP device. Moreover,

**i. Officer Hall and Officer Shannon's Actions Were Reasonable**

Officer Hall and Officer Shannon's actions as it pertained to the application of the WRAP restraint were collectively limited to: (1) assisting in taking Decedent down to the ground, (2) placing pressure on Decedent's left and right upper back area while handcuffs were applied, and (3) continuing to place pressure on Defendant's back after he said he could not breathe.

Nelson v. the City of Hayward.
USDC Case No. **cv-07222-SK**

-14-

The City's MPA ISO Opposition to P's MSA
and ISO The City's Cross-Motion for MSJ

Officer Hall testified that she only used a portion of her body weight to prevent Decedent from popping up from the ground. Additionally, Officer Hall continued to tell Decedent to "relax" after he stated he could not breathe in an effort to calm him down. Contrary to Plaintiffs' assertions, Officer Hall testified that she did not pull on the hood of Decedent's sweater, but merely had her hand over that area to prevent his face from suddenly hitting the ground. Officer Shannon testified that he kept applying pressure on Decedent's back because he was physically resisting and tensing his body.

Both Officer Hall and Shannon followed HPD training on applying the WRAP device, which involves having two officers place pressure on the upper back area of a subject in order to apply handcuffs. Furthermore, in continuing to apply pressure on Decedent's back despite stating he could not breathe, Officer Hall and Shannon followed their training to assess for medical need **when safe to do so**. Specifically, they followed their training and assessed that it was unsafe to turn Decedent over and instead continued to take steps to safely control Decedent due to concerns that he was pretending to be unconscious in order to create a false sense of security. (Rollan Decl., Ex. 11, at 35:1-25.) There is absolutely no facts in the record which establish that Officer Hall and Shannon placed their whole body weight on Decedent's neck or back area, and no facts which show that Officer Hall and Shannon used anything but reasonable and limited force on Decedent during the application of the WRAP device.

**ii. Officer McCrea, Officer Padavana, and Officer McKee's Actions Were Reasonable**

The force used by Officer McCrea, Officer Padavana, and Officer McKee is collectively limited to: (1) applying the figure four leg lock to control Decedent's legs while waiting for the WRAP device, and (2) straightening Decedent's legs and applying the leg and ankle portion of the WRAP device. First and foremost, these actions do not pertain to any of the body parts which concerned the court in *Drummond.* Officer Padavana's use of the figure four leg lock, which is considered a control hold, is reasonable. *See Donovan, supra,* at *5 ("Control holds" are among the lowest levels of force available to police officers.) Additionally, all three officers followed HPD training on applying the WRAP device, which requires two or three officers to apply the leg and ankle portion of the device. Plaintiffs have presented no evidence showing how any of these officers' behaviors deviated from training on WRAP application. Instead, the undisputed facts show that Decedent physically resisted and tensed his body while the officers were applying the ankle and leg portion of the device, which made it

Nelson v. the City of Hayward.
USDC Case No. **cv-07222-SK**
-15-
The City's MPA ISO Opposition to P's MSA and ISO The City's Cross-Motion for MSJ

difficult for them to apply the restraint quickly. Finally, Plaintiffs' motion is silent as to how any of these officers' actions pertaining to the application of the WRAP device constituted excessive force. Therefore, Officer McCrea, Officer Padavana, and Officer McKee's use of force was reasonable.

**4. The Officers' Decision Not to Turn Decedent Over After He Was Noted To Be Unconscious is Reasonable**

Plaintiffs also contend that Defendant Officers decision not to turn Decedent over after they noticed he was unconscious, and Officer Shannon's subsequent command to finish the application of the leg portion of the WRAP device, constituted excessive force. Here, pursuant to training, Officer Shannon requested emergency medical services soon after he was informed that Decedent was unconscious. Additionally, he followed his training and assessed for medical need **when it was safe to do so**. Specifically, due to Decedent's size, unstable condition, and prior behavior of physically resisting the officers' attempts to restrain him, all of which presented officer safety concerns, Officer Shannon determined that it was appropriate to complete the leg portion of the WRAP device prior to turning Decedent over. His decision, and the officers' subsequent act of completing that part of the device, was reasonable under the circumstances.

**5. Summary Adjudication is Not Appropriate Because Plaintiffs Cannot Establish Causation**

"A person deprives another of a constitutional right, within the meaning of Section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which the plaintiff complains." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). Both cause-in-fact and proximate cause must be shown. *Id.*

Here, the undisputed facts illustrate that Decedent's cause of death was acute methamphetamine intoxication associated with physical exertion with other significant conditions of cardiomyopathy. (Rollan Decl., Ex. 12.) The autopsy report did not indicate any signs of neck trauma or soft tissue injury in that area. *Id.* Plaintiffs have not provided any evidence that Decedent died of any actions undertaken by Defendant Officers. Furthermore, the fact that Defendant Officers were unaware of Decedent's drug use and heart conditions illustrates that they used reasonable force based on the information and knowledge they had at the time of the interaction. Plaintiffs' inability to prove that Defendants caused

Decedent's death precludes summary adjudication of this cause of action in their favor and is fatal to their Fourth Amendment claim.

**B. Qualified Immunity Bars Plaintiffs' Claims Against Defendant Officers.**

Plaintiffs next argue that qualified immunity is improper. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). In particular, the "[u]se of excessive force is an area of law in which the results depend very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 138 S.Ct. 1148, 1153 (2018).

In determining if qualified immunity exists, the Court must generally first determine whether the alleged facts make out a violation of a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Then, if it was determined that a violation did exist, the court determines whether the right at issue was a clearly established right at the time of the alleged misconduct. *Id.* The court in *Pearson* noted that courts may forego the initial determination of whether the official acted in the reasonable belief that his actions were constitutional and determine that the state official is entitled to qualified immunity solely on the basis that the alleged right was not clearly established in the required detail. *Id.* at 236. The operation of the "clearly established" prong of the test depends substantially upon the level of generality at which the relevant legal rule is to be analyzed. *Anderson v. Creighton*, 482 U.S. 635, 639 (1987). The dispositive inquiry in determining whether a constitutional right is clearly established is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (overruled on other grounds). The relevant inquiry is whether existing precedent placed the conclusion that an officer acted unreasonably under the conditions faced "beyond debate." *Mullenix v. Luna*, 136 S.Ct. 305, 309 (2015).

Even if a plaintiff has satisfied his/her burden of proving a clearly established right was violated, the government official is nevertheless entitled to qualified immunity of he/her could have reasonable, but mistakenly, believed that he/she was complying with the law." *Messerschmidt v. Millender,* 132 S.Ct. 1235, 1244 (2012). Indeed, "[t]he qualified immunity standard gives ample room for mistaken

judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). Qualified immunity "protect[s] officers from the sometimes 'hazy border between excessive and acceptable force,' and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful. *Saucier*, 533 U.S. at 206 (quotes omitted). When the defense of qualified immunity is asserted, "the Court considers only the facts that were knowable to the defendant officers." *White*, *supra* at 550 (citations omitted).

Here, as provided above, the officers did not violate Decedent's constitutional rights. Additionally, although the *Drummond* case established that "officers [who] allegedly crushed [a subject] against the ground by pressing their [whole body] weight on his neck and torso, and continuing to do so despite his repeated cries for air, and despite the fact that his hands were cuffed behind his back and he was offering no resistance," is a violation of the Fourth Amendment, the facts of this case are sufficiently distinguishable from *Drummond* such that the officers were not put on notice that their behavior violated clearly established law. First, none of the officers here pressed their entire body weight on Decedent's neck and torso. In fact, Plaintiffs have provided no evidence of neck trauma associated with the incident. Additionally, unlike in *Drummond* where the subject was non-resistant, Decedent physically resisted and tensed his body as the officers applied the WRAP device despite the fact that he was handcuffed. Assuming Plaintiffs can show a violation, the officers are entitled to some leeway for their limited reactions to Decedent's movements. Thus, all the officers are entitled to qualified immunity. Furthermore, even if *Drummond* was found to sufficiently address the application of pressure on a subject's back despite repeated cries for air, there is no clearly established law that would have warned the officers that applying pressure on someone's legs and ankles to apply the WRAP device was a violation of the Fourth Amendment. *Mullenix*, *supra* at 308. Therefore, at the very least, Officer McCrea, Officer Padavana, and Officer McKee, whose involvement was limited to the application of the ankle and leg portion of the WRAP device, are entitled to qualified immunity.

### C. No Reasonable Jury Could Find for Plaintiffs' Wrongful-Death Negligence Claim.

Plaintiffs further argue that their wrongful death/negligence claim is subject to summary adjudication in Plaintiffs' favor because "under the negligence claim, it is abundantly more certain that a

reasonable jury must find for Plaintiffs … because the jury may factor in the Defendant's poor tactics leading up to Mr. Nelson's death in the consideration of the officers' use of force." (Pl. MSA at 27.)

Claims of excessive force under California law are analyzed under the same standard of objective reasonableness used in Fourth Amendment claims. *Hayes v. County of San Diego*, 736 F.3d 1223, 1232 (9th Cir. 2013). As illustrated above, regardless of whether or not the Defendant Officers' actions here caused Decedent's death, or whether Decedent's death was caused by his own decisions to ingest toxic levels of methamphetamine, the Officers' conduct in responding to Decedent's behavior was reasonable under the circumstances. Thus, Plaintiffs cannot demonstrate that the Officers acted negligently and as such, this claim should be dismissed as a matter of law.

Additionally, Plaintiffs' reliance on *Hayes* and *Young Han v. City of Folsom*, 695 Fed. Appx. 197, 198 (9th Cir. 2017) to support their argument that tactical decisions should be considered in determining reasonableness, is improper. In *Hayes*, Sheriff's deputies shot and killed the decedent when he came toward them with a large knife in his raised right hand. 57 Cal. 4th 622, 625 (2013.) In *Han*, police officers shot and killed decedent, who had approached the officers in his room while holding a three-to-four inch camping knife. 695 Fed. Appx. at 199. Both of these rulings pertain to deadly force cases where the officers shot and killed individuals who had presented a threat. (Pl. Mot. at 27.) Plaintiffs argue that the Defendant Officers in this case used "deadly force" when they continued to apply pressure on Decedent's back while he was faced down. Deadly force, however, is defined as force "which creates a substantial risk of death or serious bodily injury." *Smith v. City of Hemet*, 394 F.3d 689, 705 (9th Cir. 2005). The most common example of "deadly force" is use of a gun to shoot a suspect. *Tennessee v. Garner*, 471 U.S. 1 (1985). That type of force is not present here.

Thus, for the reasons provided as to Plaintiffs' Fourth Amendment claim, Plaintiffs' request for summary adjudication of this cause of action should therefore be denied.

**D. <u>Plaintiffs' Motion for Summary Adjudication of the ADA Claim Should Be Denied.</u>**

Finally, Plaintiffs request that the court grant summary adjudication of their ADA claim contending that Defendants violated the ADA by failing to reasonably accommodate Mr. Nelson's disability. For the reasons set forth below, proposed accommodations[3] fail as a matter of law.

[3] (1) Remained patient with Decedent while he was in the back of the police car and reassured him that he would be safe instead of continuously threatening to put him in a restraint device; (2) Defendant Officers could have

A plaintiff alleging failure to provide reasonable accommodation in the context of an arrest must make two showings: First, he must "produc[e] evidence of the existence of a reasonable accommodation. *Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1233 (9th Cir. 2014) (citing 28 C.F.R. section 35.130(b)(7)). The plaintiff must establish that the accommodation would have actually helped the detainee, that the accommodation appeared feasible on its face, given the circumstances and what officers knew or should have known at the time, and that the benefits of providing the accommodation outweighed the burdens of doing so. *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (citing *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001)). Second, the plaintiff must establish that there is a basis in the record from which a reasonable juror could conclude that the officers failed to offer an equivalent accommodation. In other words, he must show that the action the officers took was not reasonable in light of the circumstances of the arrest, including what the officers knew or should have known regarding the arrestee's disability. *See Bates ex rel. Johns v. Chesterfield Cty., VA.*, 216 F.3d 367, 373 (4th Cir. 2000). An officer does not fail to reasonably accommodate when he selects one of two equally attractive options. *Waller ex rel. Estate of Hunt v. Danville, VA*, 556 F.3d 171, 175-76 (4th Cir. 2009). The ADA does not require a public entity to modify police or other practices where "making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. Section 35.130(b)(7)(i).

In *Moore, supra*, the plaintiff also alleged that the City of Berkeley was liable because the officers caused the decedent's excessive injury or indignity by failing to reasonably accommodate her disability in the moments leading up to and following her arrest. *Id.* at *3. The plaintiff asserted the following relevant proposals: (1) not threatened to arrest decedent and told decedent that she was being arrested for a mental health evaluation, not a warrant, (2) waited until the decedent was no longer delusional, and (3) the officer should have "dismounted" from the decedent rather than put all his weight on her, thereby (allegedly) asphyxiating her." *Id* at *5-6. The district court held that none of these

---

simply handcuffed Decedent while they waited for the ambulance; (3) Defendant Officers could have handcuffed Decedent then periodically rolled Decedent on his side in order to allow him to breathe and not left him for extended period of time on his stomach; (4) Defendant Officers could have sat Decedent up after he was handcuffed and applied the ankle straps; (5) Defendant Officers could have rolled down the windows, since there were metal bars and transported Decedent to the hospital themselves, and (6) Defendant Officers could have rolled down the windows, since there were metal bars and transported Mr. Nelson to the hospital themselves. (Pl. MSA at 30.)

proposed accommodations had merit because the plaintiff failed to present any evidence that these suggested accommodations would have actually helped change the outcome of the incident. *See Id.*

**i. The First, Second, Fifth, and Sixth Proposed Accommodations Lack Merit**

Plaintiffs' first (exercising patience while Decedent was in backseat and reassurance of safety instead of threats to place in a WRAP device), second (application of handcuffs while they waited for ambulance), and fifth (application of handcuffs and seatbelt while Decedent was in patrol car), and sixth (rolling down of windows and self-transport) proposed accommodations do not show the existence of a reasonable accommodation and fail to meet the first prong of the analysis. Similar to *Moore*, Plaintiffs here have provided no evidence establishing that these accommodations would have actually helped Decedent. Additionally, while these accommodations appear feasible on its face, the burdens of providing the accommodations would have been too burdensome. Specifically, the officers testified that the reason why they did not place handcuffs on Decedent initially was because he was complaint. However, Decedent then became agitated and started kicking from the inside of the vehicle. At that point, it would have been too dangerous for the officers to apply handcuffs from the outside of the vehicle while Decedent was inside or to take Decedent out of the vehicle and place him in handcuffs. This argument could be similarly applied to the assertion that he could have been seatbelted while he was in the patrol car. Furthermore, Officer Hall testified that she did roll down the windows of her patrol car while Decedent was in the backseat to allow air inside.

Regardless, Plaintiffs have not put forth any evidence from which a juror could conclude that implementing these accommodations would have altered the outcome of this case. Even if he was handcuffed, Decedent could have easily unbelted the seatbelt while in the vehicle and kicked the car from the inside. Plaintiffs also cannot satisfy the second step in the analysis in that they have not established that there is a basis in the record from which a reasonable juror could conclude that the officers failed to offer an equivalent accommodation. In fact, the record indicates that their decision not to handcuff nor place Decedent in a seatbelt accommodated for the fact that Decedent had began acting aggressively in the backseat of the car. Thus, the accommodations provided were reasonable.

**ii. The Third and Fourth Proposed Accommodation Do Not Establish Reasonable Accommodation**

Next, Plaintiffs third (Defendant Officers could have handcuffed Decedent then periodically

rolled Decedent on his side in order to allow him to breathe and not left him for extended period of time on his stomach) and fourth (Defendant Officers could have sat Decedent up after he was handcuffed and applied the ankle straps) proposed accommodations also fail to meet the legal standard. First, the proposed accommodations would fundamentally alter the service provided in this instance. Specifically, the WRAP restraint device is a tool that is used to quickly immobilize a subject so they can be monitored. Officers are trained to monitor a subject once the WRAP has been applied. Requiring that Defendant Officers handcuff and periodically roll Decedent on his side or to sit up Decedent after he was handcuffed to apply the ankle straps would seriously impact the way officers are trained to apply the WRAP device, which is on a subject that is face down. Furthermore, Plaintiffs have not put forth evidence from which a reasonable juror could conclude that these proposed accommodations would have saved Decedent's life. In sum, this Court should deny Plaintiffs' motion as to the ADA claim.

**E. <u>Plaintiffs' Fourteenth Amendment Claim for Violation of Plaintiffs' Rights to Familial Relationship is Without Merit.</u>**

Plaintiffs' complaint alleges that HPD officers violated their Fourteenth Amendment rights to a familial relationship with Decedent. The Fourteenth Amendment governs federal claims brought by family members of a deadly force decedent. *Moreland v. Las Vegas Metro Police Dept.*, 159 F.3d 365, 373-73 (9th Cir. 1998). To prevail on such a claim, Plaintiffs must demonstrate that the officers' use of force "can properly be characterized as arbitrary, or conscious shocking, in a constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1988).

Courts employ the stringent "purpose to harm" standard in circumstances when officers have little to no opportunity to engage in actual deliberation. When officers are in a confrontation with a suspect and must make decisions "in haste, under pressure, and frequently without the luxury of a second chance." *Lewis*, 523 U.S. 833 at 853. Plaintiffs must prove subjective malice on the part of the officers. *Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008) ("*Lewis* and our cases … require that when an officer encounters fast-paced circumstances presenting competing public safety obligations, the purpose to harm standard must apply."); *Moreland*, 159 F.3d at 372 ("the critical consideration [is] whether the circumstances are such that 'actual deliberation' is practical.") As the events in this case unfolded rapidly, the Defendant Officers' conduct violated the Fourteenth Amendment only if they acted "with a purpose to harm unrelated to legitimate law enforcement objectives." *Hayes, supra,* at 1230.

Nelson v. the City of Hayward.
USDC Case No. **cv-07222-SK** -22- The City's MPA ISO Opposition to P's MSA and ISO The City's Cross-Motion for MSJ

First, since the Defendant Officers used objectively reasonable force, there can be no violation of the Fourteenth Amendment. *Moreland*, 159 F.3d at 371 n.4. However, even if a factual question precludes summary judgment on whether use of force was reasonable in this case, Defendants are nonetheless entitled to summary judgment on the Fourteenth Amendment claim. Here, the critical timeframe as it relates to the Fourteenth Amendment claim is when the officers instructed Decedent to get on the ground to apply the WRAP restraint device. It is undisputed that while he was on the ground, Decedent immediately resisted and tensed his body when the officers attempted to control his legs. From that moment on, the officers were in "an escalating situation" and had no time for "actual deliberation." Thus, in placing weight on Decedent in order to achieve control so that the WRAP device could be applied, the officers acted in furtherance of a legitimate law enforcement objective. The WRAP device was used to prevent Decedent from harming himself and others and to transport him safely to St. Rose Hospital to receive medical attention. Plaintiffs point to no evidence that any officer acted with a purpose to harm, and no evidence that their purpose was unrelated to a legitimate law enforcement objective. The evidence is undisputed that the officers' purpose was to prevent Decedent from kicking the inside of the patrol car and to get help for Decedent by getting him the medical and psychiatric attention he needed. Thus summary judgment on this claim is proper.

### F. Defendant City of Hayward is Entitled to Summary Judgment on Plaintiffs' *Monell* Claim.

Plaintiffs' third cause of action alleging municipal liability is equally subject to summary judgment. A governmental entity cannot be held solely liable because it employs a tortfeasor, and plaintiff cannot use the theory of respondeat superior to hold a municipality liable under 42 U.S.C. Section 1983. *Guillory v. County of Orange*, 731 F.2d 1379 (9th Cir. 1984). Under *Monell v. N.Y. Dept. of Social Servs.*, 436 U.S. 658, 690-91 (1978), a municipality may be liable when a policy causes an employee to violate another's constitutional right. A plaintiff can establish *Monell* liability: (1) by showing a longstanding [unconstitutional] practice or custom which constitutes the standard procedure of the local governmental entity; (2) by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (3) by showing that an official with final policymaking

Nelson v. the City of Hayward.
USDC Case No. **cv-07222-SK**

-23-

The City's MPA ISO Opposition to P's MSA
and ISO The City's Cross-Motion for MSJ

authority either delegated that authority to, or ratified the decision of, a subordinate." *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005).

Plaintiffs allege three theories of *Monell* liability based on the underlying claim for violation of the Fourth Amendment by the Defendant Officers: (1) unspecific acts of excessive force by members of Hayward Police Department amount to a custom or practice of HPD; (2) HPD's excessive force policies are unconstitutional and/or officers are not adequately trained in the proper use of force; and (3) the Defendant Officers were not disciplined for prior, unspecified conduct.

First and foremost, this claim fails because Plaintiffs cannot allege a constitutional violation. Assuming, *arguendo*, that Plaintiffs are able to prove a constitutional violation, this claim nonetheless fails because Plaintiffs have provided no evidence of any policy statements, regulations, officially adopted or promulgated decisions, customs or practices by which a city or its agents or employees allegedly caused the claims constitutional deprivation – the use of excessive force. To the contrary, during the time of this incident, the City had a use of force policy which regulated allowable use of force by officers in the field and such policy comports with *Graham* standards. (Rollan Decl., Ex. 12.) Thus, with a policy of using reasonable force, Plaintiffs will be unable to prove that the policy is the moving force behind the alleged injury. Additionally, Plaintiff cannot show that an official with "final-policy making authority" performed the unconstitutional act. In fact, the Defendant Officers did not have final policy-making authority for the City and Plaintiffs have no evidence to support this element.

Plaintiffs' failure to train claim fails in that, consistent with the Fourth Amendment, the City's use of force policy requires use of reasonable force during arrests. All Defendant Officers received training in the use of force and were required to adhere to the written policy. The Defendant Officers received training which complied with the state Police Officers Standards and Training (P.O.S.T.) standards. Therefore, with all the training in lawful use of force, it cannot be stated that an official with the City was deliberately indifferent to the rights of persons with whom the police interact. Plaintiffs have not, and cannot identity any provision of the HPD policies that is not constitutional.

Finally, Plaintiffs' failure to discipline claim fails in that their vague, unsupported assertions that the officers engaged in misconduct in the past without consequences in insufficient to establish municipal liability. Plaintiffs also contend that the City ratified the Defendant Officers' conduct because

Nelson v. the City of Hayward.
USDC Case No. **cv-07222-SK**
-24-
The City's MPA ISO Opposition to P's MSA
and ISO The City's Cross-Motion for MSJ

it did not discipline them for this incident. Failure of a police department to discipline in a specific instance, however, is not an adequate basis for municipal liability. *Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989). The fact that the City did not discipline Defendant Officers for this incident does not establish that policymakers "made a deliberate choice to endorse" their actions. *Gilette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992). As Plaintiffs cannot provide any evidence to establish *Monell* liability, the City is entitled to summary judgment as to this claim.

**G. Plaintiffs' Related State Law Claims Fail As A Matter of Law.**

Furthermore, because Plaintiffs have not and cannot proffer evidence establishing that Defendant Officers used unreasonable force, all of Plaintiffs' remaining state law claims, which include claims for Violation of the Bane Act, Assault, and Battery are subject to summary judgment.

When a plaintiff "asserts no California right different from the rights guaranteed under the Fourth Amendment …the elements of the excessive force claim under Section 52.1 are the same as under Section 1983." *Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013). Here, Plaintiffs' cause of action for violation of California Code Section 52.1 is premised on the alleged violation of the Fourth Amendment. Because Plaintiffs' Section 1983 claim is without merit, this claim also fails.

Finally, as to Plaintiffs' assault and battery claims, "it is clear that an assault and battery claim against a police officer requires that unreasonable force be established." *Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. 2010). Because the undisputed facts establish that Defendant Officers acted reasonably, Plaintiffs cannot prove their state law claims for either assault or battery. Accordingly, all Defendants are entitled to judgment as a matter of law as to these claims.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Adjudication should be denied, and Defendants' Cross-Motion for Summary Judgment should be granted and judgment entered accordingly.

DATED: January 14, 2019

Respectfully submitted,

MICHAEL S. LAWSON, City Attorney

By: ______________________________

Raymond Rollan, Deputy City Attorney
Attorneys for Defendant