1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7    ROY NELSON, et al.,                              Case No.  16-cv-07222-SK

8                    Plaintiffs,

9          v.                                        **ORDER DENYING AND PARTIALLY**
                                                     **GRANTING CROSS-MOTIONS FOR**
10   CITY OF HAYWARD, et al.,                         **SUMMARY JUDGMENT**

                     Defendants.                     Regarding Docket Nos. 78, 82, 83, 84
11

12          This matter comes before the Court upon consideration of the parties' cross-motions for

13   summary judgment.  Having carefully considered the parties' papers, relevant legal authority, and

14   the record in the case, and having had the benefit of oral argument, the Court hereby DENIES the

15   motion for summary judgment by Roy Nelson, III and Orenell Stevens ("Plaintiffs") EXCEPT as

16   to Defendants' qualified immunity claim and likewise DENIES the motion for summary judgment

17   by the City of Hayward and police officers Michelle Hall, Nathanael Shannon, Matthew McCrea,

18   John Padavana, and Lloyd McKee, in their individual and official capacities as Police Officers for

19   the City of Hayward ("Defendants")[1] EXCEPT as to three of Plaintiffs' four theories of claims for

20   liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978).

21   The Court GRANTS summary judgment in favor of Plaintiffs as to Defendants' claim of qualified

22   immunity; Defendants may not raise this defense at trial.  The Court GRANTS summary judgment

23   in favor of Defendant City of Hayward as to Plaintiffs' *Monell* claims premised on ratification,

24   failure to discipline, and unconstitutional practice.  The Court sets forth its reasoning below.

25   / / /

26

27          [1]  Defendants Michelle Hall, Nathanael Shannon, Matthew McCrea, John Padavana, and
     Lloyd McKee are referred to as the "individual officer Defendants."  The City of Hayward is
28   referred to as the "City," and the City of Hayward Police Department, associated with the City but
     not an independent Defendant, is referred to as the "Department."

United States District Court
Northern District of California

**BACKGROUND**

On December 19, 2015 at 1:06 a.m., the Hayward Police Department received a call for help from Patsy Nelson Taft. (Dkt. 78-11 (Buelna Dec. Ex. 11).) The initial dispatch reported that the call involved an unwanted guest at a private residence. (Dkt. 82-2 (Rollan Dec. Ex. 2 at 21:15).) Within ten to fifteen minutes, several officers had responded to the call, arriving at Taft's residence on Ironwood Court. (Dkt. 78-1 (Buelna Dec. Ex. 1 at 18:6, 12-13); Dkt. 78-11 (Buelna Dec. Ex. 11).) Officer Lloyd McKee was first to arrive, closely followed by Officers Michelle Hall and Nathanael Shannon. (Dkt. 78-2 (Buelna Dec. Ex. 2 at 22:4-14); Dkt. 78-1 (Buelna Dec. Ex. 1 at 18:6, 12-13).) Upon arriving at the residence, McKee spoke with Taft, who informed him that she had called the police because her ex-husband, who was staying on her couch that night, was in the midst of a mental health episode. (Dkt. 78-2 (Buelna Dec. Ex. 2 at 23:2-19).) McKee immediately recognized Taft's ex-husband, Roy Nelson, when he saw him coming down the stairs. (Dkt. 78-2 (Buelna Dec. Ex. 2 at 24:22-25).).

According to McKee, Nelson had been "well known" to the police department in the 1990s. (Dkt. 78-2 (Buelna Dec. Ex. 2 at 24:11-21).) And as McKee informed Hall when she arrived at the residence, "he remembered Mr. Nelson from selling drugs and that he threw another officer off of a second story building." (Dkt. 82-1 (Rollan Dec. Ex. 1 at 20:13-22).) Nelson was "approximately 6'4, over three hundred pounds" on the night of December 19, 2015. ((Dkt. 82-1 (Rollan Dec. Ex. 1 at 20:4).) Though he had always been a "stocky, strong person," the individual officer Defendants recognized in 2015 that Nelson was "out of shape." (Dkt. 78-2 (Buelna Dec. Ex. 2 at 25:9-10).) McKee recalls that Nelson was wide-eyed and silent descending the stairs. (Dkt. 78-2 (Buelna Dec. Ex. 2 at 28:12-15).) It was immediately clear to him that Nelson was having a mental health problem that warranted an evaluation of whether he should be detained under Cal. Welf. & Inst. Code § 5150 because he posed a danger to himself or others or was gravely disabled: "there was nothing to cause fear. He just had that far away stare." (Dkt. 78-2 (Buelna Dec. Ex. 2 at 28:9-29:14).) McKee continued speaking with Taft while Hall spoke with Nelson to gather information to substantiate placing him under a 5150 psychiatric hold. (Dkt. 78-2 (Buelna Dec. Ex. 2 at 28:3-8).)

United States District Court
Northern District of California

1    Hall was a new officer undergoing phase four of her field training on December 19, 2015,

2    and she was riding with her field training officer, Shannon. (Dkt. 82-1 (Rollan Dec. Ex. 1 at 14:1-

3    9).) Upon arrival at Taft's Ironwood Court residence, Hall requested a "Code 2" ambulance for a

4    5150 hold and began gathering information to substantiate the hold. (Dkt. 82-1 (Rollan Dec. Ex. 1

5    at 22:5-13).) Taft informed Hall that Nelson had schizophrenic tendencies and had just been

6    released from John George Psychiatric Hospital. (Dkt. 82-1 (Rollan Dec. Ex. 1 at 22:22-25; 23:1-

7    11).) After being discharged from the hospital, Nelson had taken a taxi to Taft's house, and he

8    had left all of his medications and clean clothing with the taxi driver, as collateral for the ride.

9    (Dkt. 78-1 (Buelna Dec. Ex. 1 at 38:21-25).) Taft allowed Nelson to sleep on the couch, but he

10    began yelling in the middle of the night, hallucinating that their 23-year-old son had been

11    kidnapped and that there were people on the roof of the house. (Dkt. 78-1 (Buelna Dec. Ex. 1 at

12    23:17-21; 24:1-18).)

13    Hall observed that Nelson "seemed disoriented, not focused," but he was able to follow her

14    directive that he remove his hands from his pockets and give answers to her questions about his

15    mental state. (Dkt. 78-1 (Buelna Dec. Ex. 1 at 25:2-6).) Hall walked Nelson over to her patrol

16    car. (Dkt. 78-1 (Buelna Dec. Ex. 1 at 25:7-8).) She patted him down to check for weapons; he

17    had none. (Dkt. 82-1 (Rollan Dec. Ex. 1 at 31:18-25).) Nelson voluntarily got into the backseat of

18    the patrol car, and Hall did not handcuff him beforehand because he was nonaggressive and she

19    had no reason to believe he would be violent. (Dkt. 82-1 (Rollan Dec. Ex. 1 at 1-14).) Inside the

20    car, with Hall in the front seat and Nelson in the back, Nelson equivocated when asked if he

21    wanted to hurt himself or others. (Dkt. 78-1 (Buelna Dec. Ex. 1 at 25: 7-15).) Hall concluded

22    from his responses and his demeanor that he was a danger to himself and gravely disabled. (Dkt.

23    78-1 (Buelna Dec. Ex. 1 at 25:25).) She completed the 5150 hold form and intended to wait for

24    the Code 2 ambulance she had called when she first arrived on the scene. (Dkt. 78-1 (Buelna Dec.

25    Ex. 1 at 26:20-27:7).)

26    The ambulance Hall called was delayed; with Nelson in the back of Hall's patrol car, the

27    officers waited for between thirty minutes and an hour. (Dkt. 82-1 (Rollan Dec. Ex. 1 at 41:11-

28    22); Dkt. 78-2 (Buelna Dec. Ex. 2 at 31:19-23).) In the back of the car, even with the windows

United States District Court
Northern District of California

cracked, Nelson was sweating profusely.  (Dkt. 82-1 (Rollan Dec. Ex. 1 at 39:9-18).)  He told the officers that he did not want to leave and he did not want the ambulance.  (Dkt. 82-1 (Rollan Dec. Ex. 1 at 39:16-18).)  He wanted to get out of the car.  (Dkt. 82-1 (Rollan Dec. Ex. 1 at 40:8).)  He had not taken his medications since the previous day.  (Dkt. 82-1 (Rollan Dec. Ex. 1 at 40:12-14).)  He begged Hall not to kill him "in a very soft voice."  (Dkt. 82-1 (Rollan Dec. Ex. 1 at 42:4-8).)  He began hallucinating again, calling out for "Petey" and his uncle, unable to clarify his comments to Hall.  (Dkt. 82-1 (Rollan Dec. Ex. 1 at 42:14-18).)

During the wait, McKee informed Hall of his previous knowledge of Nelson.  (Dkt. 82-1 (Rollan Dec. Ex. 1 at 41:4-10).)  Also during the wait, Nelson began kicking the door of the patrol car and the bars on the car windows.  (Dkt. 78-2 (Buelna Dec. Ex. 2 at 51:23-52:13).)  Fearing he was close to opening the door, McKee got out his taser and pointed it at Nelson but did not shoot it.  (Dkt. 78-2 (Buelna Dec. Ex. 2 at 51:23-52:13).)

Shannon and McKee decided to move Nelson to a nearby parking lot at Chabot University.  (Dkt. 82-1 (Rollan Dec. Ex. 1 at 45:15-17); Dkt. 78-2 (Buelna Dec. Ex. 2 at 31:5-12).)  They thought that remaining near Taft's residence might be agitating Nelson, and they wanted to find a better lighted, less residential area because they thought they might have to place Nelson in a full-body restraining device, called a "WRAP."  (Dkt. 78-1 (Buelna Dec. Ex. 1 at 44:21-45:3).  Nelson was becoming increasingly agitated inside the patrol car, and given his behavior and his size, the officers anticipated needing backup and more space to apply the WRAP device.  (Dkt. 78-1 (Buelna Dec. Ex. 1 at 46:2-14).)

The officers drove to the Chabot parking lot, where Shannon called the supervisor, Officer Matthew McCrea, because only supervisors carry the WRAP device and a supervisor must be present when the device is deployed.  (Dkt. 82-4 (Rollan Dec. Ex. 4 at 30:2-18).)  When McCrea arrived, he developed a plan to open the driver's side rear door of the car, apply handcuffs to Nelson and proceed with putting on the WRAP Device from there.  (Dkt. 82-4 (Rollan Dec. Ex. 4 at 76:4-13).)  McCrea intended to transport Nelson to St. Rose's hospital in the back of the patrol car, given the delay in ambulances, after they placed Nelson in the WRAP device.  (Dkt. 82-4 (Rollan Dec. Ex. 4 at 77:20-22).)  Unaware of McCrea's plan, McKee opened the passenger side

1    rear door of the patrol car, and Nelson exited the car.  (Dkt. 78-2 (Buelna Dec. Ex. 2 at 36:19-

2    37:11).)  McCrea was not surprised by Nelson's exit; however, Hall thought perhaps Nelson had

3    escaped from the car by kicking the door.  (Dkt. 78-3 (Buelna Dec. Ex. 3 at 81:5-13; Dkt. 82-1

4    (Rollan Dec. Ex. 1 at 71:23-72:2).)  McCrea told Nelson to get on his knees, and Nelson did so.

5    (Dkt. 78-3 (Buelna Dec. Ex. 3 at 83).)  Before kneeling, Nelson twisted his upper body back and

6    forth, but he ultimately complied with officers.  (Dkt. 78-3 (Buelna Dec. Ex. 3 at 83:23-25); Dkt.

7    78-2 (Buelna Dec. Ex. 2 at 39:2-5).)

8            Once Nelson was on the ground, face down and on his stomach, the individual officer

9    Defendants began applying the WRAP device.  (Dkt. 78-3 (Buelna Dec. Ex. 3 at 84:19-21).)

10   Officer John Padavana put Nelson's legs in a figure-four lock, and McCrea went to get the WRAP

11   device from his patrol car.  (Dkt. 78-3 (Buelna Dec. Ex. 3 at 86:14-16).)  The officers straightened

12   Nelson's legs and began applying the device.  (Dkt. 78-3 (Buelna Dec. Ex. 3 at 86:17-25).)

13   McCrea worked to fasten the ankle strap.  (Dkt. 78-3 (Buelna Dec. Ex. 3 at 87:14-16).)  McKee

14   restrained Nelson's ankles.  (Dkt. 78-2 (Buelna Dec. Ex. 2 at 43:20-21).)  Padavana restrained the

15   middle portion of Nelson's legs.  (Dkt. 78-2 (Buelna Dec. Ex. 2 at 42:22-23).)  Padavana struggled

16   to control Nelson's legs, as Nelson had tensed them once down on the ground.  (Dkt. 82-5 (Rollan

17   Dec. Ex. 5 at 36:11-15).)  Positioned at the top of Nelson's body, Shannon and Hall placed Nelson

18   in handcuffs.  (Dkt. 82-1 (Rollan Dec. Ex. 1 at 82:9-83:17).)  Shannon, who is 6'3" and weighed

19   between 230 and 240 pounds at the time, reports that he restrained Nelson by putting his weight

20   on Nelson's right shoulder.  (Dkt. 82-3 (Rollan Dec. Ex. 3 at 84:2-12; 138:21-24).)  Hall reports

21   that she restrained Nelson by placing her weight "on the left side of his upper body on his back."

22   (Dkt. 82-1 (Rollan Dec. Ex. 1 at 83:23-24); Dkt. 78-5 (Buelna Dec. Ex. 5 at 9:09).)  Hall claims

23   that she was not applying very much pressure at all to Nelson's back – just enough to hold him

24   down if he had reared upward.  (Dkt. 82-1 (Rollan Dec. Ex. 1 at 94:7-9).)  She also recalls holding

25   the neck of Nelson's sweatshirt to help maintain her control of him.  (Dkt. 82-1 (Rollan Dec. Ex. 1

26   at 93:18-21).)

27           As the officers continued to struggle to apply the WRAP device, Hall heard Nelson say

28   that he could not breathe.  (Dkt. 82-1 (Rollan Dec. Ex. 1 at 88:8-11); Dkt. 78-5 (Buelna Dec. Ex. 5

United States District Court
Northern District of California

1    at 9:26).)  She told him to relax, and the officers continued applying the device.  (Dkt. 82-1

2    (Rollan Dec. Ex. 1 at 88:14-16).)  Nelson struggled to roll to his side; the officers rolled him back

3    onto his stomach and continued applying the WRAP device, with Shannon's knee once again

4    across Nelson's upper back and Hall's hand on his hood.  (Dkt. 78-5 (Buelna Dec. Ex. 5 at 9:50-

5    10:10).)  After about three minutes on the ground, Hall informed Shannon that Nelson was

6    unconscious and nonreactive.  (Dkt. 78-5 (Buelna Dec. Ex. 5 at 12:05-12:30).)  Shannon lifted his

7    knee from Nelson's back and upgraded the ambulance request to an emergency.  (Dkt. 78-5

8    (Buelna Dec. Ex. 5 at 12:15-12:30).)  Hall searched for a pulse, but the sweatshirt was in the way.

9    (Dkt. 78-5 (Buelna Dec. Ex. 5 at 12:15-12:30).)  The individual officer Defendants continued

10   applying the WRAP device, even as Hall informed the other officers that she did not think that

11   Nelson was breathing.  (Dkt. 78-5 (Buelna Dec. Ex. 5 at 12:30-12:55).)  Shannon instructed the

12   other officers to finish applying the WRAP device before rolling Nelson over.  (Dkt. 78-5 (Buelna

13   Dec. Ex. 5 at 12:55-13:15).)  Once the WRAP device had been completely applied, one minute

14   and twenty seconds after Hall noticed Nelson was unconscious, the officers rolled Nelson onto his

15   back.  (Dkt. 78-5 (Buelna Dec. Ex. 5 at 13:40).)  Nelson was taken by ambulance to St. Rose

16   Hospital, where he was pronounced dead.  (Dkt. 78-16 (Buelna Dec. Ex. 16).)

17        The WRAP device is a full body restraint system in use by the Department since the 1990s.

18   (Dkt. 78-8 (Buelna Dec. Ex. 8 at 15:24).)  The Department has four to five WRAP devices.  (Dkt.

19   78-8 (Buelna Dec. Ex. 8 at 16:11).)  Only supervisors can carry the WRAP device in their

20   vehicles, and a supervisor must be present for a WRAP device to be used.  (Dkt. 78-3 (Buelna

21   Dec. Ex. 3 at 29:20-23).)  All of the Department's officers receive annual training regarding the

22   WRAP device.  (Dkt. 82-11 (Rollan Dec. Ex. 11 at 37:16-21).)  And the training is based largely

23   on the manual for use that comes with the WRAP device.  (Dkt. 78-8 (Buelna Ex. 8 at 19:25; 26:5-

24   7).)  The WRAP manual calls for application by two to four people, and specifically notes that

25   "[i]t is essential to minimize the time the subject is restrained face down to reduce the possible

26   risks associated with respiratory fatigue."  (Dkt. 78-7 (Buelna Dec. Ex. 7 at 6).)  There is no

27   specific policy requiring that the officer closest to a subject's head when applying the WRAP

28   device be responsible for monitoring the subject's breathing.  (Dkt. 82-11 (Rollan Dec. Ex. 11 at

United States District Court
Northern District of California

6

22:16-25).)  Officers are taught that the appropriate area to apply pressure on the upper body during application is the shoulder or upper back area.  (Dkt. 78-8 (Buelna Dec. Ex. 8 at 46:5-8).)  The Department teaches officers about the risks of positional asphyxia and instructed that when a subject lying face down during WRAP device application is having difficulty breathing, they should roll the subject into a recovery position on his side or sitting up when safe to do so.  (Dkt. 82-11 (Rollan Dec. Ex. 11 at 17:3-25); Dkt. 78-8 (Buelna Dec. Ex. 8 at 28:8-11).)  Officers are taught that obesity may increase the risk of positional asphyxia.  (Dkt. 78-2 (Buelna Dec. Ex. 2 at 51:3-14).)  Whether it is safe to move a subject into a recovery position is left entirely to the officer's discretion.  (Dkt. 78-8 (Buelna Dec. Ex. 8 at 36:1-6).)  The Department also teaches officers that subjects may bait them during the application of a WRAP device by pretending to be unconscious.  (Dkt. 82-11 (Rollan Dec. Ex. 11 at 35:1-17).)  Officers receive annual training on performing mental health commitments.  (Dkt. 78-2 (Buelna Dec. Ex. 2 at 18:5-8).)  The Department's policy on the reasonable use of force outlines seventeen factors for determining when the exercise of force is appropriate.  (Dkt. 82-12.)

## ANALYSIS

### A.  Applicable Legal Standard on Motion for Summary Judgment.

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party."  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party.  *Anderson v. Liberty Lobby,*

United States District Court
Northern District of California

*Inc.*, 477 U.S. 242, 248-49 (1986).  A fact is "material" if it may affect the outcome of the case.  *Id.* at 248.  If the party moving for summary judgment does not have the ultimate burden of persuasion at trial, that party must produce evidence which either negates an essential element of the non-moving party's claims or that party must show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party meets his or her initial burden, the non-moving party must go beyond the pleadings and, by its own evidence, set forth specific facts showing that there is a genuine issue for trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  In addition, the party seeking to establish a genuine issue of material fact must take care to adequately point a court to the evidence precluding summary judgment because a court is "not required to comb the record to find some reason to deny a motion for summary judgment."  *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (citation omitted).  If the non-moving party fails to point to evidence precluding summary judgment, the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 323.

**B.      Cross-Motions for Summary Judgment.**

Plaintiffs move for summary judgment against Defendants on their claims for excessive force, wrongful death, and violation of the Americans with Disabilities Act ("ADA").  (Dkt. 78, 83.)  Defendants cross-move for summary judgment against Plaintiffs on all of Plaintiffs' claims.  (Dkt. 82, 84.)  The parties agreed at oral argument, though, that causation – whether the alleged violations of Nelson's Constitutional rights caused his death – is a disputed factual issue.  Thus, all parties agree that the jury must consider that issue.[2]

---

[2]  Plaintiffs' expert opined that "the primary factor that caused Mr. Nelson's death was restraint asphyxia as a result of the officers' compression."  (Dkt. 83 at 17.)  In contrast, relying on the coroner's report, Defendants argue that Nelson's cause of death was "cardiac arrhythmia due to acute methamphetamine intoxication association with physical exertion with other significant conditions of cardiomyopathy" and maintain that "Plaintiffs have not provided any evidence that

As discussed *supra*, the factual record in this case is dense, and the parties rely heavily on deposition testimony of the individual officer Defendants and body camera footage of the incident. With regard to all but three of Plaintiff's *Monell* claims, the Court is convinced that Plaintiffs have adduced sufficient evidence to survive summary judgment. Further, taking all the facts in the light most favorable to Defendants, Plaintiffs prevail on the issue of qualified immunity, and Defendants are foreclosed from bringing this defense at trial. Resolution of the remainder of the issues raised in this case will require parsing, sifting, and credibility determinations by the jury as factfinder, and thus summary judgment is not appropriate for those claims.

       1.  <u>Fourth Amendment Claim for Excessive Force</u>

When evaluating Fourth Amendment Claims for excessive use of force, courts apply an objective reasonableness inquiry: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them," with "allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The typical analysis involves three steps, including assessment of (1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force used; (2) the government's interest in the use of force; (3) the balance between the severity of the intrusion and the level of government need. *See Glenn v. Washington Cty.*, 673 F.3d 864, 871 (9th Cir. 2011). Summary judgment is almost never appropriate on an excessive force claim and must be "granted sparingly" "[b]ecause [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

Granting summary judgment for either Plaintiffs or Defendants on the claim for Fourth Amendment violation (excessive force) is not appropriate because of the disputed facts. Plaintiffs contend that no reasonable jury could find that Defendants behaved reasonably in continuing to

---

Decedent died of any actions undertaken by Defendants Officers." (Dkt. 82 at 15, 21.)

restrain Nelson after he showed signs of respiratory distress and lost consciousness.  (Dkt. 78 at 19.)  Meanwhile, Defendants assert that no reasonable jury could conclude the Defendant officers behaved unreasonably under the circumstances.  (Dkt. 82 at 15.)  As described above, this case presents disputed, material facts, and many of the inferences to be drawn from them go directly to the objective reasonableness of the officers' actions.  There is a dispute about whether an objectively reasonable officer could decide not to move Nelson into a recovery position immediately after Nelson said that he could not breathe.  Factors showing the decision to restrain Nelson in a WRAP device and the manner in which he was restrained were *not* objectively reasonable are the following:  Nelson was handcuffed, prone, experiencing a mental health episode, and lacked a weapon when Defendants applied the WRAP device.  Plaintiffs also argue that Defendants were biased against Nelson because of their previous interactions and thus that they did not respond as quickly or as objectively as they should have.  Factors showing the decision to restrain Nelson in the WRAP device and the way that the individual officer Defendants did so were objectively reasonable are the following:  Nelson was a large man with a known history of violent interactions with law enforcement; Nelson had been behaving erratically and was periodically noncompliant during his encounter with the officers, including during application of the WRAP device; and Defendants were trained to evaluate officers' safety first, when applying a WRAP device, before responding to a subject's complaints.  The facts of this case likewise present the need for multiple complex credibility determinations.  Those tasks are best left to the jury as factfinder.

The critical evidence in this case consists of body camera footage, which both Plaintiffs and Defendants cite.  Though the footage at issue shows the same events, the parties have different theories and interpretations of what happened on December 19, 2015.  In interpreting what the body worn cameras show, both sides rely heavily on deposition testimony from the officers on scene, as well as from Brandon Wilson, the officer designated by the Department as the person most knowledgeable about the WRAP device, its use, and associated training.  They also rely on audio recordings from the dispatch center, medical records, the coroner's report, and an expert report of Dr. Daniel J. Spitz, a forensic pathologist presented by Plaintiffs.  The parties' theories

formed in reliance on this evidence reveal pointed disputes as to several material facts, on which the outcome of the case will hinge.

Several of the facts the parties dispute and the inferences that may be drawn from them go to the reasonableness of the officers' actions, which is at the heart of nearly every claim in this case. For example, the parties disagree about whether it was safe for the officers to turn Nelson over before completing application of the WRAP device. *Compare* (Dkt. 78 at 22 ("Mr. Nelson was not an immediate threat to the safety of officers or others") *with* (Dkt. 82 at 20 ("Specifically, [the officers] followed their training and assessed that it was unsafe to turn Decedent over and instead continued to take steps to safely control Decedent due to concerns that he was pretending to be unconscious in order to create a false sense of security.").) Similarly, the parties dispute whether Nelson resisted during the application of the WRAP device. *Compare* (Dkt. 78 at 22 ("Even when officers were placing Mr. Nelson in the WRAP device the extent of any resistance amounted to him bending his leg and turning on his side after complaining that he could not breathe") *with* (Dkt. 82 at 18 ("Decedent continued to physically resist the officers' attempts to control him and tensed his body such that it made it difficult to apply the WRAP device") *and* (Dkt. 84 at 10 ("the Officers continued to apply pressure ***because*** Decedent resisted and refused to relax").) There is likewise substantial disagreement over how much weight the officers placed on Mr. Nelson's back. *Compare* (Dkt. 78 at 15-16 ("Defendant Shannon continued to compress Mr. Nelson's back") *and* (Dkt. 83 at 11-12 ("Defendants used their body weight to compress Mr. Nelson's back […] the body worn cameras captured Defendant Shannon placing his entire body weight on Mr. Nelson") *with* (Dkt. 82 at 18 ("none of the officers testified that they placed their entire body weight on Decedent's back") and 23 ("none of the officers here pressed their entire body weight on Decedent's neck and torso").)

And the parties dispute where Defendants placed their knees on Nelson's back. *Compare* (Dkt. 78 at 15-16 ("Defendant's knee was pressed over Mr. Nelson's spine and neck […] spine and upper back […] upper back again […] compressing his back") and 24 ("Defendant Shannon kept his knee leveraged on Mr. Nelson's mid-back and particularly over his spine") *and* (Dkt. 83 at 12 ("the body worn cameras captured Defendant Shannon […] placing his knee on Mr. Nelson's

neck") *with* (Dkt. 82 at 13 ("Officer Shannon had his knees on the right side of Decedent's shoulder and Officer Hall had her knees on the left side of Decedent's shoulder").)  The parties also disagree about how Hall handled Nelson's head, including whether placement of her hand on Nelson's sweatshirt exacerbated his difficulty in breathing.  *Compare* (Dkt. 78 at 24 ("Defendant Hall had a knee and a hand pulling Mr. Nelson's sweatshirt choking him which she acknowledges may have knocked him out") *and* (Dkt. 83 at 12 ("the body camera captured Defendant Hall tugging on Mr. Nelson's hood choking him") *with* (Dkt. 82 at 13 ("Officer Hall had her hand on Decedent's hood area to prevent Decedent from suddenly hitting the pavement with his head, and also to make sure he did not raise up off the ground") *and* (Dkt. 84 at 9 ("Officer Hall choking Decedent by tugging on his hood is entirely unsupported by the record which shows no evidence of neck trauma associated with suffocation or choking").)  Review of the footage does not resolve these disputes.  For these reasons, the issue of whether the individual officer Defendants used excessive force must go to the jury.

> 2.  <u>Qualified Immunity on the Excessive Force Claim</u>

Defendants are not entitled to qualified immunity because legal precedent at the time of the incident clearly illustrate that, if the Court interprets the facts most favorably to Plaintiffs, Defendants' use of force was excessive.  The assertion of qualified immunity requires the reviewing court to address two questions: whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the officers' conduct violated a constitutional right and whether the right at issue was clearly established at the time of the alleged violation.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  This is not a rigid inquiry, and the second question may be addressed before the first, particularly in cases still subject to factual development.  *Pearson v. Callahan*, 555 U.S. 223, 239 (2009); *Henderson v. City and Cnty. of San Francisco*, No. C-05-234 VRW, 2006 WL 3507944 (N.D. Cal. Dec. 1, 2006) ("If the court finds a material factual dispute whether a constitutional violation has occurred, then the court determines whether the right infringed was clearly established at the time of the alleged violation.") (citing *Wilson v. Layne*, 526 U.S. 603 (1999)).  "'[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal

reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citation omitted)).  Thus, if an official could reasonably have believed she was complying with established law at the time of the violation, qualified immunity may be appropriate even where a constitutional right was violated.  *Id.*  The merits of an excessive force claim are distinct from the legal question of whether qualified immunity is warranted; in excessive force cases, "qualified immunity requires an analysis not susceptible of fusion with the question whether unreasonable force was used."  *Saucier*, 533 U.S. at 197.

As discussed *supra*, the merits of the excessive force claim in this case are appropriate for decision by the jury, given the number of disputed material facts to be sifted and credibility determinations to be made here.  In weighing the qualified immunity question, the Court moves directly to a determination of whether a reasonable officer would have known that the force used on Nelson violated law clearly established at the time of the incident.  Having made that inquiry, the Court concludes that Defendants are not entitled to qualified immunity as a matter of law because clearly established precedent at the time of the incident showed that the amount of force used by the officers was excessive, with the facts interpreted most favorably to Plaintiffs, and a reasonable officer on the scene would have recognized that.

Plaintiffs cite precedent in existence at the time of Nelson's death:  *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1053 (9th Cir. 2003).  In *Drummond*, the plaintiff had a history of mental illness, and his fiancée called the police during an episode of paranoid hallucination.  *Id.*  A rookie police officer and her training officer responded to the call, but could not justify placing Mr. Drummond under a hold for psychiatric evaluation.  *Id.*  The next night, a neighbor – who feared Mr. Drummond would dart into traffic during his hallucinations – called officers.  *Id.*  Officers arrived, substantiated the need for a hold for psychiatric evaluation, and awaited the ambulance.  *Id.*  While waiting, they placed Drummond on his stomach and applied pressure to his back, and he then repeatedly told them he could not breathe.  *Id.* at 1054-55.  The officers applied a restraint to his ankles, and Drummond lost consciousness.  *Id.* at 1055.  Immediately after Drummond lost consciousness, the officers turned him onto his back.  *Id.*  They

United States District Court
Northern District of California

could not revive Drummond, who remained unconscious and in a permanent vegetative state.  *Id.*

Applying the *Graham* balancing test, the Ninth Circuit held that the officers' use of force was constitutionally excessive.  *Id.* at 1056-60.  The court noted that the force used was both severe and minimally necessary because the Plaintiff was mentally ill, already restrained, not accused of a crime, and did not resist once on the ground.  *Id.* at 1056-58.  Weighing the severity of the force against the minimal need for it, the Ninth Circuit concluded that "[t]he officers – indeed, any reasonable person – should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable."  *Id.* at 1059.  Further, publicity surrounding similar uses of force by police and specific training they received related to positional asphyxia put the officers on notice that such force was unreasonable.  *Id.*  The court observed that nationally, multiple legal precedents indicated the risk of "'compression asphyxia,'" where "prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining officers."  *Id.* at 1056-57 (collecting cases).

Plaintiffs correctly argue that *Drummond* almost exactly mirrors the facts at issue here and that Defendants should have known that the amount of force they exerted and the manner in which they exerted it was constitutionally unreasonable.  (Dkt. 78 at 25-26.)  The Court finds it difficult to imagine a clearer parallel to the facts of this case than *Drummond*.  As was true for Drummond, officers detained Nelson, who was mentally ill, pursuant to a 5150 hold and, while waiting for the ambulance to pick him up, restrained him in a prone position and continued to apply weight to his back even after he said he could not breathe.  Nelson was unarmed, handcuffed, restrained at the ankles, and suspected of no crime when Defendants made their decision to continue applying the WRAP device after he cried out that he was suffocating and after he lost consciousness.  Like the officers in *Drummond*, the officers here were aware of the risks of positional asphyxia and had received specific training regarding those risks.

Defendants' attempt to distinguish *Drummond* is unconvincing.  Defendants contend that *Drummond* is not analogous to this case because the officers here did not press as much weight on Nelson as the *Drummond* officers did, because there is no evidence of trauma to Nelson's neck,

14

1    and because Nelson, unlike the plaintiff in *Drummond*, resisted while being restrained.  (Dkt. 82 at

2    23.)  Defendants further argue that the weight ratios between the detaining officers and the

3    Plaintiffs were different across the two cases.  (Dkt. 84 at 8.)  The issues of resistance and how

4    much weight Defendants put on Nelson's body are disputed issues of fact, and the Court must give

5    the interpretation most favorable to Plaintiffs under this analysis.  The lack of evidence of trauma

6    to the neck does not distinguish this case from Drummond, either.  *Drummond* did not turn on the

7    lack of evidence or existence of evidence of trauma to the neck.

8         Construing Fourth Amendment jurisprudence to permit claims of excessive force only

9    where there was an identical weight differential between officers and plaintiffs in prior cases

10   would vitiate a crucial constitutional protection.  "Fair notice" does not require exact identity of

11   facts; "[o]therwise, officers would escape responsibility for the most egregious forms of conduct

12   simply because there was no case on all fours prohibiting that particular manifestation of

13   unconstitutional conduct."  *Drummond*, 343 F.3d at 1061 (citing *Anderson v. Creighton*, 483 U.S.

14   635, 640 (1987) (quotation marks omitted).  Here, there is a case almost directly on point on the

15   major issues.  *Drummond* was a clear directive to officers not to continue compressing a restrained

16   person's back after he says he cannot breathe.  The facts here are actually more egregious than the

17   ones in *Drummond*, because here, Defendants waited one minute and 20 seconds after Hall noticed

18   that Nelson had lost consciousness before turning Nelson over.  In *Drummond*, the officers

19   immediately after noticing that Drummond was unconscious, checked his pulse and then turned

20   him over to administer CPR.  343 F.3d at 1055.  The Court in *Drummond* nonetheless found a

21   violation of the plaintiff's Constitutional rights under less severe facts than here.

22        Small factual differences such as those Defendants emphasize do not obscure the clarity of

23   *Drummond*'s instruction.  Accordingly, Defendants had fair warning that the amount of force they

24   used on Nelson was constitutionally excessive, and it would have been clear to a reasonable

25   officer on the scene that the force used on Nelson was unlawful.  The individual officer

26   Defendants therefore are not entitled to qualified immunity.

27        3.  Wrongful Death Under California Law

28        Summary judgment is inappropriate on Plaintiffs' wrongful death claim because it, like the

United States District Court
Northern District of California

United States District Court
Northern District of California

1  excessive force claim, turns on factual determinations of reasonableness.  "[P]ublic employees in

2  California are statutorily liable to the same extent as private persons for injuries caused by their

3  acts or omissions."  *Hayes v. Cty. Of San Diego*, 57 Cal. 4th 622, 628-29 (2013).  Thus, to support

4  a negligence finding, a plaintiff must show that the defendant public employee had a duty to

5  exercise due care, that he breached that duty, and that the breach was the proximate or legal cause

6  of the resulting injury.  *Id.*  The California Supreme Court "has long recognized that peace officers

7  have a duty to act reasonably when using deadly force."  *Id.* at 629.  And "[t]he reasonableness of

8  an officer's conduct is determined in light of the totality of the circumstances."  *Id.*  "In police

9  cases, as well as others, the conduct in question 'must always be gauged in relation to all the other

10  material circumstances surrounding it and if such other circumstances admit of a reasonable doubt

11  as to whether such questioned conduct falls within or without the bounds of ordinary care such

12  doubt must be resolved as a matter of fact rather than of law."  *Young Han v. City of Folsom*, 695

13  F. App'x 197, 198-99 (9th Cir. 2017) (quoting *Grudt v. City of Los Angeles*, 86 Cal. Rptr. 465,

14  468 (1970)).  At issue here will be whether the individual officer Defendants were negligent or

15  whether they acted reasonably in using deadly force on Nelson.  Whether their conduct falls within

16  the bounds of ordinary care given the totality of the circumstances is a question that must be

17  resolved as a matter of fact.  Summary judgment is therefore inappropriate on Plaintiffs' wrongful

18  death claim.

19        4.  <u>Americans with Disabilities Act Reasonable Accommodation Claim</u>

20        Plaintiffs' ADA claim is not appropriate for summary judgment.  "To state a claim under

21  Title II of the ADA, a plaintiff generally must show: (1) she is an individual with a disability; (2)

22  she is otherwise qualified to participate in or receive the benefit of a public entity's services,

23  programs or activities; (3) she was either excluded from participation in or denied the benefits of

24  the public entity's services, programs or activities or was otherwise discriminated against by the

25  public entity; and (4) such exclusion, denial of benefits or discrimination was by reason of her

26  disability.  *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in*

27  *part, cert. dismissed in part sub nom. City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct.

28  1765, 191 L. Ed. 2d 856 (2015).  When a Title II claim is based on the failure to provide a

reasonable accommodation under 28 C.F.R. § 35.130(b)(7), the plaintiff bears the initial burden of establishing that reasonable accommodations exist, and the public entity may defeat the claim by showing that making the accommodations would fundamentally alter the nature of the service, program, or activity under 28 C.F.R. § 35.130(b)(7)(i).  *Id.*  Plaintiffs propose six reasonable accommodations that officers could have taken to deescalate their encounter with Mr. Nelson and avoid positional asphyxiation, given his obvious mental disability.  (Dkt. 78 at 30.)  Defendants counter that at least some of the accommodations would have altered the nature of the service provided.  (Dkt. 82 at 27.)  The Court imagines that a reasonable jury, taking into consideration all of the circumstances, could find for either side.  And "the reasonableness of an accommodation is ordinarily a question of fact."  *Sheehan*, 743 F.3d at 1233.  Accordingly, summary judgment on Plaintiffs' ADA reasonable accommodation claim is not warranted.

　　　　5.   Fourteenth Amendment Familial Relationship Claim

　　　　Defendants are not entitled to summary judgment on Plaintiffs' Fourteenth Amendment Claim.  Family members of a person who alleges wrongful use of deadly force may bring a claim for loss of familial relationship under the Fourteenth Amendment's substantive due process clause. To prevail on such a claim, Plaintiffs must demonstrate that the officers' use of force "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense."  *Cnty. Of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998).  Plaintiffs must show a purpose to harm on the part of the defendant, *Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008), that is deliberate even in the midst of a rapidly unfolding scenario, *Moreland v. Las Vegas Met. Police Dept.*, 159 F.3d 365, 372 (9th Cir. 1998).  A reasonable jury could find that police officers had a deliberate purpose to harm Nelson.  One reading of the facts suggests that the officers may have been biased against Nelson based on his previous reputation with the Department, which they had time to discuss with one another as they waited for the ambulance with Nelson stowed in the patrol car. The subsequent aggression with which they subdued Nelson, including Hall's decision to force his head into the ground, could be interpreted to corroborate that theory.  Summary judgment is therefore not justified as to Plaintiffs' Fourteenth Amendment claim.

/ / /

United States District Court
Northern District of California

6. _Monell_ Claims

A local government unit may be held civilly liable under § 1983 where an alleged constitutional violation is the result of policy or custom. _Monell_, 436 U.S. at 690-91. "To prevail on a _Monell_ claim, [a plaintiff] must 'establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to [plaintiff]'s constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" _Boss v. City of Mesa_, 746 F. App'x 692, 695 (9th Cir. 2018) (citing _Oviatt ex rel. Waugh v. Pearce_, 954 F.2d 1470, 1474 (9th Cir. 1992)). Bare allegations that a municipal defendant has "an unconstitutional policy are insufficient to survive summary judgment." _Id._

Plaintiffs propound multiple theories of _Monell_ liability against the City, as follows: (1) the City had a policy of retaining as police officers persons it knew or should have known had dangerous propensities to use excessive force; (2) the City inadequately supervised, trained, and disciplined such personnel; (3) the City inadequately trained personnel regarding interaction with disabled persons; that it inadequately disciplined officers for excessive force; (4) the City ratified the intentional misconduct of police officers; (5) the City inadequately investigated claims for excessive force; and (6) the City's policies regarding detention are unconstitutional. (Dkt. 1 at 10-12.) In essence, these allegations reduce to four types of _Monell_ claim: ratification, failure to discipline, failure to train, and unconstitutional policy or custom.

To survive a motion for summary judgment on a ratification theory, a plaintiff must adduce evidence that a municipal entity's final policymaker approved both her subordinate's decision and the improper basis for that decision. _Ellins v. City of Sierra Madre_, 710 F.3d 1049, 1066-67 (9th Cir. 2013) (citing _Christie v. Iopa_, 176 F.3d 1231 (9th Cir. 1999)). Plaintiffs have not adduced any evidence of a decision by a City of Hayward policymaker approving Defendants' use of force or their rationale for use of force. Accordingly, summary judgment is GRANTED as to Plaintiffs' _Monell_ claim premised on ratification.

To survive a motion for summary judgment on a theory of failure to discipline, a plaintiff must adduce evidence of "specific incidents of supervisors' failure to discipline for or deliberate

1    indifference to constitutional violations." *Baddour v. Hart*, Case No. 14-cv-1355-PJH, 2016 WL

2    344711 at *11 (N.D. Cal. Jan. 28, 2016).  Plaintiffs have not put forward any specific facts

3    showing a supervisor failing to discipline a police officer for a constitutional violation.

4    Accordingly, summary judgment is GRANTED as to Plaintiffs' *Monell* claim premised on failure

5    to discipline.

6          To survive a motion for summary judgment on a failure to train theory, a plaintiff must

7    introduce "evidence of a policy or practice of failure to train." *Baddour*, 2016 WL 344711 at *11.

8    Here, there is substantial evidence that the Department's police officers received yearly training in

9    applying the WRAP device, training and instruction in the appropriate use of force, and training in

10   conducting 5150 interviews and imposing holds on mentally ill persons.  Plaintiffs contend that

11   such training was inadequate, particularly with regard to persons with disabilities and obese

12   persons.  In cases where the adequacy of a training program is at issue, "it may happen that in light

13   of the duties assigned to specific officers or employees the need for more or different training is so

14   obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the

15   policymakers of the city can reasonably be said to have been indifferent to the need." *City of*

16   *Canton, Ohio v. Harris*, 498 U.S. 378, 390 (1989).  The deficiency in training adduced "must be

17   closely related to the ultimate injury." *Id.* at 391.  Here, Plaintiffs contend that the Department's

18   failure to train officers to avoid positional asphyxia, particularly when dealing with mentally ill or

19   obese persons, caused or contributed significantly to Nelson's death.  Based on the evidence

20   adduced, it would be possible for a reasonable jury to conclude that the Department's training was

21   so inadequate regarding how to safely apply the WRAP device, particularly to mentally ill or

22   obese persons and given the number of cases nationwide involving positional asphyxia in police

23   detention, that it amounted to deliberate indifference to the rights of persons with whom the police

24   come into contact.  Defendants' motion for summary judgment is therefore DENIED as to

25   Plaintiff's *Monell* claim premised on failure to train.

26          To survive a motion for summary judgment on a policy or custom theory, a plaintiff must

27   demonstrate "the existence of a policy or custom of the use of excessive force other than the

28   alleged excessive force used during his own arrest." *Alegrett v. City and Cnty. of San Francisco*,

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Case No. 12-cv-05538-MEJ, 2014 WL 1911405 at *6 (N.D. Cal. May 13, 2014) (citing *City of*

2    *Oklahoma v. Tutle*, 471 U.S. 808, 823-24 (1985).  This may take the form of either an express

3    policy or an unwritten custom.  "A 'custom' for purposes of municipal liability is a 'widespread

4    practice that, although not authorized by written law or express municipal policy, is so permanent

5    and well-settled as to constitute a custom or usage with the force of law.'" *Id.* at *5 (quoting *St.*

6    *Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  Here, Plaintiffs have not demonstrated that the

7    excessive force they claim was used on Nelson constituted a part of a larger pattern of conduct by

8    the Department.  There is no evidence in the record of other officers' using excessive force during

9    other incidents, and there is no evidence of an unwritten practice or policy of using excessive

10   force.  Accordingly, summary judgment is GRANTED as to Plaintiffs' *Monell* claim premised on

11   unconstitutional policy or custom.

12         7.  <u>Bane Act Claim</u>

13         To prevail on a claim under California's Bane Act, a plaintiff must show both violation of

14   a constitutional right and the specific intent to violate that right.  *See Cornell v. City and Cnty. Of*

15   *San Francisco*, 17 Cal. App. 5th 766, 803 (2017).  As discussed above, there potentially is

16   evidence of subjective intent in this case.  And whether officers acted with the "particular

17   purpose" of depriving a plaintiff of a right is "a question of fact." *Id.* at 804.  Summary judgment

18   is therefore not warranted as to Plaintiffs' Bane Act Claims.

19         8.  <u>Other State Law Claims</u>

20         Plaintiffs' remaining claims for assault and battery under California law will also require a

21   factual determination centered on the reasonableness of the force used on Mr. Nelson.  *See, e.g.*,

22   *Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. 2010) (holding that "it is clear that an

23   assault and battery claim against a police officer requires that unreasonable force be established"

24   and declining summary adjudication of both state law claims and the Fourth Amendment

25   excessive force claim brought alongside).  For that reason, summary judgment on Plaintiffs' state

26   law assault and battery claims is inappropriate.

27                                  **CONCLUSION**

28         For the foregoing reasons, the Court DENIES Plaintiffs' motion for summary judgment

EXCEPT as to the qualified immunity claim, which the Court GRANTS against the individual officer Defendants.  The Court likewise DENIES Defendants' motion for summary judgment, EXCEPT on Plaintiffs' *Monell* claims premised on ratification, failure to discipline, and unconstitutional custom, as to which the Court GRANTS summary judgment in favor of Defendant City of Hayward.

   **IT IS SO ORDERED**.

Dated: March 1, 2019



_____

SALLIE KIM
United States Magistrate Judge